**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

DAVID A. McDOUGALL, *individually and*
*as Trustee for the next-of-kin of decedent*
*Cynthia A. McDougall*,

                              Plaintiff,

v.

CRC INDUSTRIES, INC., and
JOHN DOE COMPANIES 1–10,

                              Defendants.

No. 20-1499 (JRT/LIB)


**MEMORANDUM OPINION**
**AND ORDER GRANTING IN**
**PART AND DENYING IN PART**
**MOTION TO DISMISS**

---

Tara D. Sutton, Gary L. Wilson, Jason L. DePauw, Philip L. Sieff, and Rashanda C. Bruce, **ROBINS KAPLAN LLP**, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402, for plaintiff.

Robert J. Gilbertson, David J. Wallace-Jackson, and Virginia R. McCalmont, **FORSGREN FISHER MCCALMONT DEMAREA TYSVER LLP**, Capella Tower, 225 South Sixth Street, Suite 1750, Minneapolis, MN 55402, for defendant CRC Industries, Inc.

Plaintiff David McDougall brought an action against CRC Industries, Inc. ("CRC") and John Doe Companies 1–10, related to the death of his wife, Cynthia McDougall, who was killed by a person who inhaled a computer duster product while driving. Defendant CRC is the manufacturer of "CRC Duster," the product that the driver is alleged to have inhaled prior to the automobile crash that took Ms. McDougall's life. The John Doe

Company Defendants are individuals and entities that may have sold, distributed, manufactured, or marketed CRC Duster, but whose identities are unknown at this time.

Plaintiff's Complaint contains eight counts, including strict products liability–defective design, manufacturing defect, and failure to warn; negligence; breach of express warranty and implied warranty; public nuisance; and violations of Minnesota statutes, including the Unlawful Trade Practices Act (UTPA), Deceptive Trade Practices Act (DTPA), False Statement in Advertising Act (FSAA), and Unlawful Practices Act (UPA).  CRC has filed a Motion to Dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).  Because Plaintiff has not met his pleading burden with respect to his public nuisance and Minnesota DTPA claims, the Court will grant CRC's Motion and dismiss these claims.  However, because Plaintiff has alleged facts to support plausible claims for products liability, negligence, breach of express warranty and implied warranty, and violations of the remaining Minnesota statutes (FSAA, UTPA, and UPA), the Court will deny the Motion with respect to these claims.

## BACKGROUND

I.   **FACTUAL BACKGROUND**

### A.  The Parties and the Crash

On July 22, 2019, Cynthia McDougall was driving on State Highway 172 in Baudette, Minnesota when she was struck and killed in a crash with another vehicle.  (Compl. ¶ 7,

July 1, 2020, Docket No. 1.)  The other vehicle was driven by Kyle Neumiller, who crossed over the center line, drove into oncoming traffic, and struck Ms. McDougall's car head on. (*Id.* ¶¶ 7, 177.)  At the time of the collision, Neumiller was allegedly intoxicated due to ingesting gas from a cannister of compressed gas dusting spray manufactured by CRC ("CRC Duster"), and his loss of body functions and inability to maintain control of his vehicle is attributed to his intoxication.  (*Id.* ¶¶ 6, 172–177.)[1]

Plaintiff David McDougall brings this action in his capacity as Ms. McDougall's wrongful death Trustee for her next-of-kin and in his personal capacity as her surviving spouse.  (*Id.* ¶¶ 8–10.)

CRC is a corporation registered, and with a principal place of business, in Pennsylvania, and is a wholly-owned subsidiary of Berwin Industries, LLC.  (*Id.* ¶ 13.)  Plaintiff alleges that CRC is responsible for all aspects of CRC Duster's life cycle in the chain of commerce, from design, research, manufacturing, production, distribution, labeling, and marketing. (*Id.* ¶ 15.)  CRC Duster is marketed, sold, and distributed in Minnesota, and other states. (*Id.* ¶¶ 14–15.) John Doe Company Defendants 1–10 are individuals and entities that may have sold, distributed, manufactured, or marketed CRC Duster whose identities are unknown at this time, but against which Plaintiff wishes to preserve potential claims.  (*Id.* ¶ 14.)

---

[1]  On April 1, 2020, Neumiller was convicted in Minnesota State Court of Criminal Vehicular Homicide and is currently serving a 72-month sentence at a Minnesota correctional facility.  (Decl. of Eric C. Ernstene ¶ 2, Ex. A, Sept. 2, 2020, Docket No. 20-1.)

**B.  The Product – CRC Duster**

CRC Duster is a branded compressed gas dusting spray that is not distinct from other compressed gas dusters, also referred to as "keyboard cleaners," "compressed air," or "dust removers."  (*Id.* ¶¶ 31–32.)  A trigger on the spray canister opens a valve to release a stream of pressurized gas from the spray nozzle, which can remove dust and debris without damaging surface finishes or sensitive components.  (*Id.* ¶¶ 33, 36–40.)  Dust removers typically contain a pressurized volatile, fluorinated hydrocarbon gas called 1,1-difluoroethane ("DFE"), which is used in many consumer products, including deodorants, hairspray, and cleaning products.  (*Id.* ¶¶ 41–42.)

DFE is a central nervous system depressant, which, when inhaled, can cause psychoactive intoxicating side effects, including euphoria, hallucinations, and delusions.  (*Id.* ¶¶ 43, 51.)  Ingestion of DFE can also cause drowsiness, dizziness, suffocation, loss of consciousness, paralysis, and in some cases, cardiac arrest.  (*Id.* ¶¶ 43–46.)

DFE has long been associated with substance abuse, in part because products containing DFE are inexpensive and widely available at retail locations.  (*Id.* ¶¶ 3–4, 30, 52, 63.)  Reports of the spontaneous deaths of teenagers who died after inhaling (also known as "huffing") volatile hydrocarbons first appeared in the 1960s.  (*Id.* ¶ 53.)  Since the 1990s, various governmental agencies, advocacy organizations, and researchers have gathered data and published studies on abuse of inhaled propellants, including dust removers.  (*Id.* ¶¶ 59–64.)  The Complaint cites multiple incidences from 1997 to the

present of injury and death associated with dust remover inhalation and huffing while driving. (*Id.* ¶¶ 65–129.) A 2010 study in the journal Pediatrics found that, while inhalant abuse of substances like gasoline or paint has been in decline since 1993, propellant abuse, including dust removers, began increasing around 1998 and has continued on an upward trajectory since. (*Id.* ¶ 63.)

McDougall alleges that CRC, at all relevant times, has known that people intentionally inhale duster for its intoxicating effects, and do so while driving. (*Id.* ¶ 140.) McDougall states that CRC previously advertised that CRC Duster contained a bittering agent (or "bitterant") to prevent inhalant abuse, although information about the bitterant is no longer included in CRC Duster's current Safety Data sheet. (*Id.* ¶ 145.) McDougall further states that retailers required advertisement of a bittering agent to sell the product, related to concern over inhalant abuse. (*Id.* ¶¶ 148–49.)

However, McDougall contends that CRC knew that the bitterant was ineffective as a deterrent—either because it did not uniformly mix with the DFE and remained in the can when the duster was sprayed or because CRC failed to include it in the product as advertised—despite the existence of design specifications and performance standards mandating inclusion of the bitterant. (*Id.* ¶¶ 146–56, 203–205.) McDougall also asserts that there were multiple safer, feasible, and affordable alternatives available to CRC related to the duster's formula and packaging that would have more effectively prevented duster abuse and the injury to Ms. McDougall. (*Id.* ¶¶ 183–92.)

McDougall alleges that CRC knew or should have known that people continued to abuse CRC Duster to become intoxicated.  (*Id.* ¶¶ 157–160.)  In particular, McDougall asserts that CRC knew that it was selling duster in quantities that far exceeded the number of sales that would be expected if the product were being used for its intended purpose. (*Id.* ¶¶ 157–60.)

McDougall also alleges that CRC revised the product label for CRC duster to remove references to the product's harmful intoxicating effects and replaced them with a warning stating that "[d]eliberately inhaling this product can lead to death from asphyxiation depending on concentration and duration of exposure."  (*Id.*  ¶ 137.)  McDougall claims that CRC thus provided inadequate warnings regarding the potential harms associated with inhalation of CRC Duster, and provided no warnings related to potential harms to innocent bystanders or related to operation of a motor vehicle (*Id.* ¶¶ 142–44.)

## II.   PROCEDURAL HISTORY

McDougall filed this action against Defendants CRC and John Does 1–10 alleging eight counts: Strict Products Liability—Defective Design (Count 1), Manufacturing Defect (Count 2), and Failure to Warn (Count 3); Negligence (Count 4); Breach of Express Warranty (Count 5) and Implied Warranty (Count 6); and Public Nuisance (Count 8).  (*Id.* ¶¶ 179–246.)  McDougall also brings statutory claims under Minnesota's Deceptive Trade Practices Act ("DTPA") (Minn. Stat. § 325D.44) and Private Attorney General Act ("Private AG Act"), Minn. Stat. § 8.31, subd. 3a, for violations of various consumer protection and

unlawful trade practices statutes (Count 7).  (*Id.* ¶¶ 247–55.)   McDougall seeks compensatory and punitive damages, (*id.* ¶¶ 271–73), and asks for injunctive relief, (*id.* at 63–64). CRC has now filed a Motion to Dismiss under Rule 12(b)(6).  (Mot. Dismiss, Sept. 2, 2020, Docket No. 17.)

## DISCUSSION

### I.   STANDARD OF REVIEW

In reviewing a motion to dismiss under Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Twombly*, 550 U.S. at 555 (quotation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and therefore must be dismissed.  *Id.* (quotation omitted).  The Court

construes the complaint in the light most favorable to the plaintiff, *Papasan v. Allain*, 478

U.S. 265, 283 (1986), and draws all reasonable inferences in plaintiff's favor, *Park Irmat*

*Drug Corp v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018).

## II.     NEGLIGENCE & STRICT PRODUCTS LIABILITY CLAIMS

CRC challenges the strict liability and negligence claims (Counts 1–4) on the same

grounds: that CRC owed no duty to the McDougalls, and that the Complaint does not

plausibly allege that CRC's conduct was the proximate cause of the injury in this case.

As a federal court sitting in diversity, the Court applies the substantive law of the

state in which it sits. *Fogelbach v. Wal–Mart Stores, Inc.,* 270 F.3d 696, 698 (8th Cir. 2001).

In Minnesota, "[p]roducts liability is a manufacturer's . . . tort liability for any damages or

injuries suffered by a buyer, user, or bystander as a result of a defective product. Products

liability can be based on a theory of negligence, strict liability, or breach of warranty."

*Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 581 (Minn. 2012) (quotation omitted).

In cases alleging strict liability pursuant to design-defects, "Minnesota merges negligence

and strict liability claims into a single products liability theory, which employs a

reasonable-care balancing test to determine whether a product is defective." *Thompson*

*v. Hirano Tecseed Co.,* 456 F.3d 805, 809 (8th Cir. 2006).

### A.  Negligence & Defective Design

To establish liability based upon negligence, a plaintiff must demonstrate "(1) the

existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) that the breach

of the duty of care was a proximate cause of the injury." *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011). Because neither party disputes that Ms. McDougall was injured, the Court only addresses duty and proximate causation.

### 1. Duty

Duty is a threshold question, because "in the absence of a legal duty, the negligence claim fails." *Id.* (quotation omitted). In the products liability context, the question of foreseeability is essential to establishing a duty:

> In Minnesota, it is well settled that a manufacturer has a duty to protect users of its products from foreseeable dangers. But if the danger is not foreseeable, there is no duty. In determining whether a danger is foreseeable, courts look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility. That which is not objectively reasonable to expect is too remote to create liability on the part of the manufacturer. . . When the issue of foreseeability is clear, the courts, as a matter of law, should decide it. In close cases, the question of foreseeability is for the jury.

*Whiteford ex rel. Whiteford v. Yamaha Motor Corp., U.S.A.*, 582 N.W.2d 916, 918 (Minn. 1998). A manufacturer has a duty to develop its "plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use." *Bilotta*, 346 N.W.2d at 621 (quoting *Holm v. Sponco Mfg., Inc.*, 324 N.W.2d 207, 212 (Minn. 1982)).

As a general matter, a person does not owe a duty of care to another if the harm is caused by a third party's conduct of a third party. *Fenrich v. The Blake School*, 920

N.W.2d 195, 201 (Minn. 2018).  However, an exception exists when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff.  *Smits as Tr. For Short v. Park Nicollet Health Servs.*, --- N.W.2d at ---, 2021 WL 560728, *8 (Minn. Ct. App. 2021).  Accordingly, a manufacturer may have a duty to protect the user, as well as those who might be injured by the product's use or misuse, from foreseeable danger.  *Whiteford*, 582 N.W.2d at 919.  In determining the scope of this duty, Minnesota courts draw a distinction between two types of conduct by the defendant: "[m]isfeasance is 'active misconduct working positive injury to others' . . . Nonfeasance is 'passive inaction or a failure to take steps to protect [others] from harm.'"  *Fenrich*, 920 N.W. 2d at 203 (quoting *Doe 169*, 845 N.W.2d at 178).  "If a defendant's conduct is mere nonfeasance, that defendant owes no duty of care to the plaintiff for harm caused by a third party."  *Id.*

CRC argues that it owed no duty to the McDougalls, and that its own conduct could be characterized as nonfeasance, at best.  Further, it argues that CRC's own conduct cannot be said to have created a foreseeable risk of injury to a foreseeable plaintiff because CRC's act of making and selling the duster was far removed from Ms. McDougall's death, which was caused by the misuse of the duster by a third party.

CRC asks the Court to declare that a duty does not exist and dismiss the Complaint.[2]  But McDougall does not merely allege that CRC manufactured a product that someone

---

[2]  The Minnesota Court of Appeals recently addressed a set of facts very similar to the instant case—a bystander was hit and grievously injured by someone who was using a 3M Duster as an inhalant while driving.  *Diehl v. 3M Company*, No. A19-0354, 2019 WL 4412976 (Minn. Ct. App. Sept. 16, 2019).  The District Court dismissed the Complaint pursuant to Minnesota Rule of Civil

abused and that the abuse caused an injury.  Rather, McDougall alleges extensive facts to support its claims that CRC was aware of the risk to people who would inhale duster (evidenced by the warning label it included on its product), that it was aware of duster abuse and the prevalence of driving while huffing, that it knew a significant portion of its duster sales were to people who intended to abuse the product, and that CRC responded by including a bittering agent in its product, which CRC knew to be ineffective.  As such, the Court finds that McDougall has plausibly pleaded that CRC owed a duty to Ms. McDougall.

### 2. Proximate Causation

In Minnesota, a party's negligence is the proximate cause of an injury, if "the act [is] one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others" and the defendant's "conduct was a substantial factor in bringing about the injury." *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995) (quotations omitted).  Only "where reasonable minds can arrive at only one conclusion," is proximate cause a question of law.  *Id.*  Whether CRC should have anticipated the likely injury of someone using their product to become intoxicated and causing an accident is ultimately a question of foreseeability.  The Court finds that McDougall has alleged

---

Procedure 12.02(e) (failure to state a claim), on the grounds that 3M owed no duty to the Plaintiff because its manufacture and sale of a product that others might misuse was "nonfeasance" and not active misconduct.  *Id.* at *1.  The Court of Appeals reversed and remanded on the grounds that the District Court had not conducted a complete analysis of whether the foreseeability of duster misuse created a duty.  *Id.* at *4.

sufficient facts to support its claim that this particular injury was foreseeable to CRC and that CRC's actions—particularly related to the ineffective bitterant and product design— were substantial factors in the injury.  Accordingly, the Court finds that McDougall has met his pleading burden as to the negligence and design defect claims.

### B.  Manufacturing Defect

McDougall may pursue his manufacturing defect claims under a theory of negligence, as above, or under a theory of strict liability.  *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 622 (Minn. 1984).  "If a dangerous manufacturing flaw existed and resulted from negligence, a plaintiff could in theory recover in negligence; if a dangerous flaw existed but did *not* result from negligence, a plaintiff could recover in strict liability."  *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1147 (D. Minn. 2011).  Under either negligence or strict liability theories, the "crux of the claim is that the product, as provided to the public, was defective because the manufacturing, assembly, inspection, packaging or testing processes failed to turn out the product intended by the defendant manufacturer."  *Johnson v. Zimmer, Inc.*, No. 02-1328, 2004 WL 742038, at *10 (D. Minn. Mar. 31, 2004).

To recover on a strict liability claim, "the plaintiff must establish (1) that the defendant's product was in a defective condition unreasonably dangerous for its intended use, (2) that the defect existed when the product left the defendant's control, and (3) that the defect was the proximate cause of the injury sustained."  *Bilotta,* 346 N.W.2d at 623

n.3.  A manufacturer is also obligated to address defects related to unintended, but reasonably foreseeable, uses.  *Id.* at 621.  A manufacturing defect exists when a product is "physically flawed, damaged, or incorrectly assembled . . . [and] such a defect existed in the product when it left the hands of the manufacturer."  *Webb v. Ethicon Endo-Surgery, Inc.*, No. 13-1947, 2014 WL 7213202, at *4 (D. Minn. Dec. 17, 2014), *citing* Restatement (Third) of Torts: Prod. Liab. § 2, cmt. c (1998); *Harrison ex rel. Harrison v. Harrison*, 733 N.W.2d 451, n.2 (Minn. 2007).

McDougall has plausibly alleged that when the duster left CRC's control, it was defective because it either did not contain bitterant, or that the bitterant was included but did not function as intended, rendering the product unreasonably dangerous.  As above, the Court finds that McDougall's pleadings sufficiently support his claim that the duster Neumiller used was defective and that his inhalation of the duster was reasonably foreseeable to CRC.

CRC contends that McDougall's strict liability claims fail because CRC's actions were not the proximate cause of injury.  However, McDougall alleges that the defect enabled CRC duster to be inhaled, and thereby proximately caused the injuries.  The question of whether a product is defective—like the question of proximate cause—is "generally a question of fact; only where reasonable minds cannot differ does the question become one of law."  *Thompson v. Hirano Tecseed Co.,* 456 F.3d 805, 809 (8th Cir.2006).  As with the negligence and defective design claims, the Court finds that

McDougall has alleged sufficient facts to state a claim for strict liability manufacturing defect.

### C. Failure to Warn

Under Minnesota law, suppliers generally have a "duty to warn end users of a dangerous product if it is reasonably foreseeable that an injury could occur in its use." *Gray v. Badger Mining Corp.,* 676 N.W.2d 268, 274 (Minn. 2004).  The duty to warn consists of two duties: "(1) The duty to give adequate instructions for safe use; and (2) the duty to warn of dangers inherent in improper usage." *Glorvigen*, 816 N.W.2d at 582 (quotation omitted).  Where the manufacturer of a product has actual or constructive knowledge of danger to users, the manufacturer has a duty to warn of these dangers. *Frey v. Montgomery Ward & Co.*, 258 N.W.2d 782, 788 (Minn. 1977).  "To be legally adequate, the warning should (1) attract the attention of those that the product could harm; (2) explain the mechanism and mode of injury; and (3) provide instructions on ways to safely use the product to avoid injury." *Gray,* 676 N.W.2d at 274.  The duty to warn regarding a product's misuse is also intertwined with the question of foreseeability. *Germann v. F.L. Smith Mach. Co.*, 395 N.W.2d 922, 925 (Minn. 1986) (finding a legal duty to warn where the "misuse was foreseeable; it was not remote; and the danger of injury to a user because of the misuse was likewise foreseeable.").

Here, neither party disputes that CRC has a duty to warn that the duster is harmful if inhaled.  The dispute is focused on the adequacy of the warning: in particular, whether

-14-

the risk of harm to bystanders or the loss of control of a vehicle as a result of duster inhalation are foreseeable enough that CRC has a duty to warn.  Although a warning label on a can of Duster could not be expected to legally warn innocent bystanders of the danger, McDougall alleges that the warning on CDC Duster does not meet the second or third prongs of legal adequacy either.

CRC argues that it has no duty to warn about the potential hazards of driving after inhaling duster because its existing warning—that inhalation could lead to death by asphyxiation—renders an additional warning about driving too obvious to require inclusion.  *Citing Mix v. MTD Prods., Inc.*, 393 N.W.2d 18, 19 (Minn. Ct. App. 1986) ("[A] manufacturer of a product has no duty to warn of dangers that are obvious to anyone using the product").  However, CRC puts itself in a bind when it argues that the potential injuries associated with operating a vehicle after inhaling duster are at once not foreseeable **and** too obvious to require a warning.

McDougall has adequately pleaded that CRC knew, or should have known, that its product was being misused in a way that made the risk of injury to a bystander and the risk of operating a vehicle foreseeable.

## III.    WARRANTY CLAIMS

### A.  Breach of Express Warranty

An express warranty is created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the

bargain" or "[a]ny description of the goods which is made part of the basis of the bargain." Minn. Stat. § 336.2–313(1)(a), (b).   "To establish a warranty claim the plaintiff must basically prove: the existence of a warranty, a breach, and a causal link between the breach and the alleged harm."  *Peterson v. Bendix Home Sys., Inc.,* 318 N.W.2d 50, 52–53 (Minn. 1982).   Further, with regard to the sale of goods, a seller's warranty under Minnesota law, "extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by the breach of the warranty."  Minn. Stat. § 336.2-318.

McDougall alleges that CRC made express warranties that CRC was committed to preventing inhalant abuse and that its duster contained a bittering agent to prevent inhalant abuse.  McDougall contends that these warranties were made because certain retailers would not sell the product without such an advertisement and that CRC breached this warranty by failing to include effective inhalation deterrents.  To the extent that these warranties induced retailers to sell the product, McDougall alleges that the breach made the product easily available and ultimately caused the injury.

Whether CRC's warranties were part of the basis of the bargain that Kyle Neumiller made in purchasing the CRC Duster or the basis of the bargain the retailers made in agreeing to buy and sell CRC's product, if Ms. McDougall was reasonably expected to be affected by the warranties, then the warranty extends to Ms. McDougall as well.  As above, the question comes down to whether it was reasonable to expect (in other words,

foreseeable) that the duster would be (mis)used and result in injury to third parties like Ms. McDougall.  And, as above, the Court finds that McDougall has plausibly alleged that inhalation abuse was a reasonable expectation such that CRC's warranty regarding the bitterant would extend to "any person . . . affected by the goods and who is injured by the breach of the warranty."  Minn. Stat. § 336.2-318.

### B.  Breach of Implied Warranty

The standard for prevailing on an implied warranty claim is the same as for an express warranty: a plaintiff must prove (1) the existence of a warranty, (2) a breach, and (3) a causal link between the breach and harm.  *Masepohl v. Am. Tobacco Co.*, 974 F. Supp. 1245, 1253 (D. Minn. 1997).  Under Minnesota law, "strict products liability has effectively preempted implied warranty claims where personal injury is involved."  *In re Levaquin Prods. Liab. Litig.,* 752 F. Supp. 2d 1071, 1079 (D. Minn. 2010) (quotation omitted). However, at the pleadings stage, a plaintiff may be entitled to develop breach of implied warranty claims in the alternative to strict liability claims.  Fed. R. Civ. P. 8; *see also Lloyd F. Smith Co. v. Den-Tal-Ex*, 491 N.W.2d 11, 17 (Minn. 1992).  Because McDougall has pleaded facts to support his warranty claims, the Court will allow McDougall to develop his implied warranty claims as an alternative to his products liability claims.

### IV.   STATUORY CLAIMS

### A.  Minnesota's Private Attorney General Act and Consumer Protection Claims

McDougall also brings statutory claims arising under the UTPA (Minn. Stat. § 325D.13), FSAA (Minn. Stat. § 325F.67), UPA (Minn. Stat. § 325F.69), and DTPA (Minn. Stat. § 325D.44).   McDougall brings the UTPA, FSAA, and UPA claims pursuant to Minnesota's Private Attorney General Act (Minn. Stat. § 8.31, subd. 3a).   The DTPA includes a private right of action and does not require plaintiffs to bring claims under the Private Attorney General Act.   The DTPA claims are addressed separately below.

To avail themself of the Private Attorney General Act, a claimant must demonstrate that his "cause of action benefits the public," *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000), and that there is a "causal nexus between the conduct alleged to violate [the statutes] and the damages claimed." *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 4 (Minn. 2001).

### 1.  Public Benefit

"To determine whether a lawsuit is brought for the public benefit the Court must examine not only the form of the alleged misrepresentation, but also the relief sought by the plaintiff." *Zutz v. Case Corp.*, No. 02-1776, 2003 WL 22848943, at *4 (D. Minn. Nov. 21, 2003).   "Where recovery is sought for the exclusive benefit of the plaintiff there is no public benefit." *Id.* at *4.   A plaintiff's request for equitable relief, rather than solely monetary damages may be a factor in the Court's public benefit analysis, though the type

of relief sought is not dispositive.  *In re Levaquin*, 752 F. Supp. 2d at 1077.[3]  The Court also

considers the degree to which defendants' alleged misrepresentations affect the public

at large.  *Id.* (citing *Collins v. Minn. Sch. of Bus., Inc.*, 655 N.W.2d 320, 330 (Minn. 2003)).

"Misleading advertising to the general public supports a finding that a claim benefits the

public . . .  [while] a one-on-one misrepresentation is purely private and is not a ground

for relief."  *Summit Recovery, LLC v. Credit Card Reseller, LLC*, No. 08-5273, 2010 WL

1427322, at *5 (D. Minn. Apr. 9, 2010) (citations omitted).

CRC contends that this action is a products liability case focused on recovering

damages for personal injuries, and therefore does not establish a public benefit.[4]

However, McDougall requests both equitable and monetary relief, and should McDougall

ultimately prevail on his claims, it is possible that this lawsuit may lead to changes that

have a distinct public benefit by deterring duster abuse.  *See, e.g.*, *In re Levaquin*, 752 F.

Supp. 2d at 1078.  The Court accordingly finds that the pleadings and form of relief

McDougall seeks are consistent with a public benefit.

---

[3] *See also ADT Sec. Servs., Inc. v. Swenson, ex rel. Estate of Lee*, 687 F. Supp. 2d 884, 892 (D. Minn. 2009) (no injunctive relief request "does not preclude either party from satisfying the public benefit requirement."); *Jensen v. Duluth Area YMCA*, 688 N.W.2d 574, 578 (Minn. Ct. App. 2004) (equitable relief does not necessarily establish public benefit if relief sought affects only plaintiff).

[4]  CRC cites four cases in support of its position: *Pecarina v. Tokai Corp.*, No. 01-1655, 2002 WL 1023153, at *5 (D. Minn. May 20, 2002), *Wehner v. Linvatech Corp.*, No. 06-1709, 2008 WL 495525, at *3–4 (D. Minn. Feb. 20, 2008), *Zutz*, 2003 WL 22848943, at *3–4, and *Tuttle v. Lorillard Tobacco Co.*, No. 99-1550, 2003 WL 1571584, at * 5–7 (D. Minn. Mar. 3, 2003).  In each of those cases, the plaintiffs sought only compensatory damages that solely benefited the individual plaintiff, and in *Tuttle*, where the plaintiff alleged a public benefit related to a smokeless tobacco company's misrepresentations to the public at large, the Court found that the problem had already been redressed by FDA labeling requirements.  *Tuttle*, 2003 WL 1571584, at *6.

### 2.  Causal Nexus

At the motion to dismiss stage, "it is not necessary to plead individual consumer reliance on the defendant's wrongful conduct to state a claim for damages under [the Private Attorney General Act] and the substantive misrepresentation in sales statutes." *Grp. Health Plan*, 621 N.W. 2d at 13.  However, there must be some "causal nexus" between the alleged damages and the defendant's wrongful conduct. *Id.* at 14–15.  Proof of individual consumers' reliance is not required to demonstrate a causal nexus, "where the plaintiffs' damages are alleged to be caused by a lengthy course of prohibited conduct that affected a large number of consumers," but "may be established by other direct or circumstantial evidence." *Id.* at 14.

McDougall alleges that CRC misrepresented the inhalation deterrent measures in its duster product to appeal widely to retailers and consumers, that the wide availability of the product in retail outlets as a result of the misrepresentations facilitated abuse, and that the abuse caused the injury.  The Court finds that this is a plausible nexus and that McDougall has met his burden as to the claims brought under the Minnesota AG Act.

### B.  Minnesota Deceptive Trade Practices Act

Minnesota's DTPA includes a private cause of action for injunctive relief for "[a] person likely to be damaged by a deceptive trade practice of another[.]"  Minn. Stat. § 325D.45, subd. 1.  To claim injunctive relief under the DTPA, a plaintiff must demonstrate

that he himself faces risk of future harm.  *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1071

(D. Minn. 2013).

McDougall contends that he and Ms. McDougall's other decedents "will likely

continue suffering mental and emotional anguish well into the future knowing that CRC's

conduct and concealment will result in more deaths and injuries as a result of people

abusing CRC Duster until it is abated with the injunctive relief that Mr. McDougall seeks."

(Mem. Opp. at 52, Sept. 23, 2020, Docket No. 24.)  However, the purpose of injunctive

relief under the MDTPA is to prevent future misconduct by a defendant to the plaintiff,

and not to remedy lingering effects of a past harm.  Accordingly, the Court will grant CRC's

Motion as to the MDTPA claim in Count 7.

## V.    PUBLIC NUISANCE

Public nuisance claims have traditionally been the purview of the state; private

parties may initiate a public nuisance suit only "where the plaintiff has suffered some

special or peculiar damage not common to the general public."  *Viebahn v. Bd. Of Comm'rs*

*of Crow Wing Cty.*, 104 N.W. 1089, 1091 (Minn. 1905)).  McDougall relies on *Doe 1 v.*

*Archdiocese of St. Paul*, in which the state trial court allowed plaintiff's public nuisance

claims related to clergy sexual abuse to survive a motion to dismiss.  No. 62-cv-13-4075,

2013 WL 7218911, at *4 (Minn. Dec. 10, 2013).  McDougall argues that, like the plaintiff

in *Doe 1*, he suffered from a harm that the defendant created for the general public, based

on the defendant's failure to disclose a particular danger.  However, the standard laid out

in *Viebahn* is that the plaintiff has suffered a special or peculiar and uncommon damage. McDougall's damage—losing a loved one to an intoxicated driver—while tragic, does not create the kind of peculiar harm that would give rise to a public nuisance claim by a private party, as such sufferings are unfortunately common among the public.  The Court will therefore grant CRC's Motion as to McDougall's public nuisance claim.

## CONCLUSION

In sum, the Court finds that McDougall has met his pleading burden to survive CRC's Motion to Dismiss on all claims except those deriving from the Minnesota Deceptive Trade Practices Act and the public nuisance doctrine.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant CRC Industries, Inc.'s Motion to Dismiss [Docket No. 17] is **GRANTED** in part and **DENIED** in part, as follows:

1. Counts 1–3: Strict Products Liability (Defective Design, Manufacturing Defect, and Failure to Warn) — the Motion to Dismiss is **DENIED**;

2. Count 4: Negligence — the Motion to Dismiss is **DENIED**;

3. Counts 5 & 6: Breach of Express and Implied Warranty — the Motion to Dismiss is **DENIED**;

4. Count 7:

    a. The Motion to Dismiss is **GRANTED** as to the Minnesota Deceptive Trade Practices Act (Minn. Stat. § 325D.44) and claims arising under the Minnesota Deceptive Trade Practices Act are **DISMISSED with prejudice;**

    b. The Motion to Dismiss is **DENIED** as to the claims arising under the Minnesota AG Act (Minn. Stat. § 8.31, subd. 3a). Unfair Trade Practices

Act (Minn. Stat. § 325D.13), False Statement in Advertising Act (Minn. Stat. § 325F.67), and Unlawful Practices Act (Minn. Stat. § 325F.69);

5. Count 8: Public Nuisance — The Motion to Dismiss is **GRANTED**, and Count 8 is **DISMISSED with prejudice**.


DATED:  March 3, 2021
at Minneapolis, Minnesota.

                          JOHN R. TUNHEIM
                              Chief Judge
          United States District Court