UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

David A. McDougall, *Individually and as*               Case No. 20-cv-1499 (JRT/LIB)
*Trustee for the Next-of-Kin of Decedent*
*Cynthia A. McDougall*,

                                   Plaintiff,            **ORDER**

v.

CRC Industries Inc., John Doe Company
Defendants #1-10,

                                   Defendants.

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment made in accordance with the provisions of 28 U.S.C. § 636, and upon Plaintiff's Motion to Alter/Amend/Supplement Pleadings to Assert a Claim for Punitive Damages (hereinafter "Motion to Amend the Complaint"), [Docket No. 69], as well as, the parties' Joint Motion to Alter/Amend/Correct Other Orders Amended Scheduling Order (hereinafter "Motion to Amend the Amended Pretrial Scheduling Order"). [Docket No. 78]. On December 12, 2022, the Court took the Motions under advisement on the parties' written submissions. (Order, [Docket No. 85]).

For the reasons discussed herein, Plaintiff's Motion to Amend the Complaint, [Docket No. 69], is **DENIED**, and the parties' Motion to Amend the Amended Pretrial Scheduling Order, [Docket No. 78], is **DENIED as moot**.[1]

---

[1] On November 29, 2022, the parties filed a Joint Motion to Amend the Amended Pretrial Scheduling Order, [Docket No. 78], solely for the purpose of completing expert depositions by mid-January 2023. [Docket No. 80, at p. 2]. On December 12, 2022, as noted above, the undersigned took the Motion under advisement on the parties' written submissions. [Docket No. 85]. On December 14, 2022, the parties filed a letter, [Docket No. 86], requesting the Court's guidance on how to proceed with expert depositions in light of the Court cancelling the Motions hearing. On December 15, 2022, based upon review of the files and proceedings therein, the Court granted, among other things, the parties' request to proceed with completing expert depositions. [Docket No. 87]. Accordingly, the parties' Joint

## I.   Background

This action arises out of the death of Cynthia McDougall ("Mrs. McDougall"), who was killed on July 22, 2019, while driving on State Highway 172 in Baudette, Minnesota (the "July 2019 Accident").  (Complaint, [Docket No. 1], at ¶¶ 7, 171, 177).  According to the Complaint, Kyle Neumiller ("Neumiller") was allegedly inhaling the contents of a cannister of CRC Duster, a compressed gas dusting spray manufactured by Defendant CRC Industries Inc. ("Defendant CRC"), when he lost consciousness and/or all control of his bodily movements, crossed over the center line of State Highway 172, drove into oncoming traffic, and struck Mrs. McDougall's vehicle head on.  (Id. at ¶¶ 177).  The collision resulted in Mrs. McDougall's death.  (Id. at ¶ 178).

Plaintiff David A. McDougall ("Plaintiff"), who is the surviving spouse of Mrs. McDougall, and brings this action in his individual capacity and as trustee on behalf of her next of kin, asserts various claims against Defendant CRC and John Doe Company Defendants #1-10.[2] According to the Complaint, Defendant CRC designs, manufactures, tests, labels, distributes, and sells a product called "Duster" ("CRC Duster").  (Id. at ¶¶ 15, 35, 130).  CRC Duster is a handheld compressed gas dusting spray commonly used to "remove dust and lint."  (Id. at ¶¶ 33, 34, 36, 37). Similar to other dust removers on the market, CRC Duster uses difluoroethane ("DFE") as an "aerosol propellant or foaming agent to propel . . . a pressurized burst of gas from the can at a high velocity to displace dust and other material from the surface of whatever item is being cleaned." (Complaint, [Docket No. 1], at ¶¶ 41-42, 135).

When inhaled, DFE causes "debilitating and impairing effects such as unconsciousness, drowsiness, dizziness, . . . suffocation . . . loss of inhibitions, inabilities to make sound decisions,

Motion to Amend the Amended Pretrial Scheduling Order, [Docket No. 78], is denied as moot in light of the Court's December 15, 2022, Order, which granted the very request the parties sought in their joint motion.
[2] Plaintiff asserts that these pseudonymous designations are being used to preserve claims against these parties who will be named more fully if their identities are discovered.  (Complaint, [Docket No. 1], at ¶ 14).

. . . slurred speech[,] . . . [and] cardiac arrest," as well as, "paralysis, which partially or completely interferes with a person's ability to move normally or control their bodily movements." (Id. at ¶¶ 43-46). Because inhalants containing DFE are "often cheap, easily accessible, and easy to conceal," DFE is a popular substance of abuse and can lead to addiction. (Id. at ¶¶ 24, 52, 54). As a result, inhaling products containing DFE have resulted in, among other things, people killing and injuring others by driving high on dust removers. (Id. at ¶¶ 55-62).

According to the Complaint, Defendant CRC published online a Safety Data Sheet ("SDS") for CRC Duster that acknowledged the severe effects of inhaling DFE. (Id. at ¶ 136). Defendant CRC also supports "the prevention of product misuse and abuse" and supports the Alliance for Consumer Education's "abuse prevention program." (Complaint, [Docket No. 1], at ¶ 141). Plaintiff asserts, however, that Defendant CRC revised CRC Duster's product label and/or its SDS to "remove reference to the product's harmful intoxicating effects" with instead "a general notice to the user of the product that '[d]eliberately inhaling this product can lead to death from asphyxiation depending on concentration and duration of exposure.'" (Id. at ¶ 137). Further, "at one point in time," Defendant CRC indicated in its SDS that a bittering agent was added to CRC Duster to prevent inhalant abuse, but the currently available SDS does not contain this information. (Id. at ¶ 145).

Plaintiff alleges that Defendant CRC "never warned people who are, or who could be, exposed to CRC Duster that they should not operate a motor vehicle," nor did it provide warnings "that inhaling CRC Duster [could] cause harm or death to innocent bystanders, including the foreseeable and predictable risk that a person could lose control of their vehicle and strike and injure or kill another person when high on CRC Duster." (Id. at ¶¶ 143-144). Further, Plaintiff alleges that the bittering agent did not "effectively discourage or prevent people from inhaling

CRC Duster to get high"; "did not work for its intended purpose"; or "worse, reasonable further investigation and discovery may show that CRC Duster did not contain a bittering agent whatsoever." (Id. at ¶¶ 146, 150, 151). Moreover, Plaintiff alleges that Defendant CRC "had no intention of actually discouraging abuse" and "may have only advertised the existence of a bittering agent" because it may have been required by certain retailers.[3] (Complaint, [Docket No. 1], at ¶¶ 147-149).

On the basis of the above allegations in his Complaint, Plaintiff raises eight causes of actions: 1) strict products liability – defective design; 2) strict products liability – manufacturing defect; 3) strict products liability – failure to warn; 4) negligence; 5) breach of express warranty; 6) breach of implied warrant; 7) unlawful trade practices, deceptive trade practices, false statement in advertising, and unlawful practices acts under Minnesota statutes; and 8) public nuisance.[4] (Id. at ¶¶ 179-270).

## II.    Plaintiff's Motion to Amend the Complaint.  [Docket No. 69].

Plaintiff now moves the Court for leave to amend his Complaint to assert a claim for punitive damages against Defendant CRC for all claims. (Plf.'s Mot., [Docket No. 69]; Plf.'s Mem., [Docket No. 71]; Plf.'s Proposed Amended Compl., [Docket No. 73-14], at ¶¶ 271-275). Plaintiff does not present any argument directed at any specific cause of action but argues instead that, based on the actions of Defendant CRC, he should be permitted to amend his Complaint to

---

[3] Additional facts, including a detailed description of the evidence cited in support of Plaintiff's present Motion is addressed below.
[4] On September 2, 2020, in lieu of filing its Answer to the Complaint, Defendant CRC filed a Motion to Dismiss. [Docket No. 17]. On March 3, 2021, the Honorable John R. Tunheim issued an Order granting, in part, and denying, in part, Defendant CRC's Motion to Dismiss, dismissing only Plaintiff's claims of public nuisance and under the Deceptive Trade Practices Act. [Docket No. 43]. Thereafter, on March 17, 2021, Defendant CRC filed its Answer to the Complaint. [Docket No. 45].

assert a ninth cause of action entitled "Punitive Damages."  (See Plf.'s Proposed Amended Compl., [Docket No. 73-14], at ¶¶ 271-275).[5]

### A.  Standard of Review

"As part of the Tort Reform Act of 1986, the Minnesota legislature enacted § 549.191 prohibiting a prayer for punitive damages in the initial complaint and requiring a prima facie showing to the court as a condition of seeking such damages in an amended complaint." Fournier v. Marigold Foods, Inc., 678 F. Supp. 1420, 1422 (D. Minn. 1988).  As this District has previously explained, "the Minnesota Legislature adopted, in 1986, the [evidentiary based] pleading requirements of Section 549.191 in order to deter certain practices in the presentment of punitive damage claims which were thought to be abusive, and in order to address a perceived insurance crisis." Ulrich v. City of Crosby, 848 F. Supp. 861, 866–67 (D. Minn. 1994).  As the Eighth Circuit Court of Appeals has recognized, the Minnesota Legislature enacted the statute "to prevent frivolous punitive damage claims by allowing a court to determine first if punitive damages are appropriate." Gamma–10 Plastics, Inc. v. American President Lines, Ltd., 32 F.3d 1244, 1255 (8th Cir. 1994).

Under Minnesota law, a plaintiff may not assert punitive damages in his initial complaint but said plaintiff must instead later move to amend the pleadings to claim punitive damages.  Minn. Stat. § 549.191.  Such a motion must assert "the applicable legal basis under 549.20 or other law for awarding punitive damages" and contain one or more affidavits with facts supporting the motion.  Id.  A court will grant the motion if it finds prima facie evidence of an entitlement to

---

[5] It is evident from Plaintiff's moving papers he seeks to assert a claim for punitive damages at large against Defendant CRC rather than a claim for punitive damages for each of his causes of action.  Because this is the manner in which Plaintiff has presented his request to the Court, it is the manner in which the Court will analyze his request.  However, the Court notes that even if it were to analyze the question of pleading punitive damages respective to each separate cause of action, the Court would still reach the same conclusion; Plaintiff has failed to meet the applicable evidentiary burden.

punitive damages.  Id.  A plaintiff seeking leave to demand punitive damages "is not required to demonstrate an entitlement to punitive damages per se, but only an entitlement to allege such damages."  Ulrich, 848 F. Supp. at 867.

Minnesota Statute § 549.20, provides the applicable standard for entitlement to punitive damages:

> (a) Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.
>
> (b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
>
>> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
>>
>> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Minn. Stat. § 549.20.

To be permitted to allege a claim for punitive damages, the moving party must make a prima facie showing that clear and convincing evidence exists demonstrating that the acts of the defendant show deliberate disregard for the safety of others.  "[P]rima facie evidence is that evidence which, if unrebutted, would support a judgment in the movant's favor."  Swanlund v. Shimano Indus. Corp., Ltd., 459 N.W.2d 151, 154 (Minn. Ct. App. 1990).  Proof is clear and convincing if it is sufficient for a jury to find a high probability of such deliberate disregard.  Olson v. Snap Prods., Inc., 29 F. Supp. 2d 1027, 1036 (D. Minn. 1998).

In addition, under the Section 549.20 standard, the Court "is required to search for evidence which is 'clear and convincing.'"  Id.  "To be 'clear and convincing,' there must be 'more than a preponderance of the evidence but less than proof beyond a reasonable doubt.'"  Ulrich, 848 F.

Supp. at 868 (quoting <u>Weber v. Anderson</u>, 269 N.W.2d 892, 895 (Minn. 1978)).  Ultimately, the

Court's independent search for a <u>prima</u> <u>facie</u> showing that clear and convincing evidence exists

(albeit unrebutted at this motion stage) demonstrating that the defendant acted with a deliberate

disregard for the rights or safety of others requires the Court to do more than "rubber stamp" the

mere allegations in the motion papers.  <u>Ulrich</u>, 848 F. Supp. at 868; <u>Swanlund</u>, 459 N.W.2d at 154.

      Since the enactment of Minnesota Statute § 549.191, Courts in this District—treating §

549.191 and § 549.20 as substantive in nature—have applied § 549.191 and § 549.20 in

determining whether to allow the assertion of claims for punitive damages brought in federal court

when the claims are premised on Minnesota state law causes of action.  <u>See, e.g.</u>, <u>Fournier</u>, 678 F.

Supp. at 1422; <u>Murrin v. Fischer</u>, No. 7-cv-1295 (PJS/RLE), 2008 WL 540857, at *29 (D. Minn.

Feb. 25, 2008); <u>Wehlage v. ING Bank, FSB</u>, No. 7-cv-1852 (PJS/RLE), 2008 WL 4838718, at *6

(D. Minn. Nov. 5, 2008); <u>Cenveo Corp. v. S. Graphic Sys., Inc.</u>, No. 8-cv-5521 (JRT/AJB), 2011

WL 1741910, at *2 (D. Minn. May 4, 2011); <u>Sec. Sav. Bank v. Green Tree Acceptance, Inc.</u>, 739

F. Supp. 1342, 1353 (D. Minn. 1990); <u>Gebremariam v. Mulugeta</u>, No. 6-cv-953 (PAM/JSM), 2008

WL 11464731, at *2 (D. Minn. May 1, 2008); <u>Richardson v. Cardiac Surgical Assocs., P.A.</u>, No.

1-cv-542 (ADM/SRN), 2002 WL 737505, at *1 (D. Minn. Apr. 24, 2002); <u>Best Buy Stores, L.P.

v. Devs. Diversified Realty Corp.</u>, No. 5-cv-2310 (DSD/JJG), 2008 WL 227689, at *2 (D. Minn.

Jan. 25, 2008); <u>Adams v. Stryker Pain Pump Corp.</u>, No. 10-cv-858 (MJD/LIB), 2010 WL 4909564,

at *3 (D. Minn. Dec. 1, 2010); <u>Mertes v. Stuart Mgmt. Corp.</u>, No. 4-cv-4214 (JNE/SRN), 2006

WL 8444818, at *2 (D. Minn. Apr. 24, 2006); <u>Coy v. No Limits Educ.</u>, No. 15-cv-93 (BRT), 2016

WL 7888047 (D. Minn. Apr. 1, 2016); <u>Inline Packaging, LLC v. Graphic Packaging Int'l LLC</u>,

No. 15-cv-3183 (ADM/LIB), 2018 WL 9919941 (D. Minn. Mar. 8, 2018).  More recently,

however, some United States Magistrate Judges in this District have instead applied Federal Rule

of Civil Procedure 15's more liberal pleading standard.  See In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig., MDL No. 15-cv-2666 (JNE/FLN), 2017 WL 5187832 (D. Minn. July 27, 2017).

This Court has previously discussed the disagreement in this District as to whether Minnesota Statutes 549.191 and 549.20 or Federal Rule of Civil Procedure 15 controls a request to amend a complaint to add a claim for punitive damages, and the undersigned has consistently concluded that the substantive law of Minnesota Statutes 549.191 and 549.20 control a request to amend a complaint to add a claim for punitive damages in this Court when the underlying claim is based on Minnesota state law.   See, e.g., Rilley v. MoneyMutual, LLC, No. 16-cv-4001 (DWF/LIB), 2018 WL 6920764, at *2–8 (D. Minn. Dec. 13, 2018).  Plaintiff acknowledges this, but nevertheless requests that the Court apply Rule 15's more liberal standard in considering Plaintiff's present Motion.  (Plf.'s Mem., [Docket No. 71], at pp. 28-29).  Thus, before addressing the merits of the present Motion, the Court discusses the standard which is applicable to the present Motion.

The Courts which have more recently concluded that the Rule 15 standard applies to the question of whether a party may amend its complaint to assert claims for punitive damages premised on Minnesota state law claims brought in federal court have relied heavily on the United States Supreme Court's decision in Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co., 559 U.S. 393 (2010) (hereinafter "Shady Grove").  See In re Bair Hugger Forced Air Warming Devices Products Liability Litigation, 2017 WL 5187832 (hereinafter "In re Bair Hugger"); Dolphin Kickboxing Co. v. Franchoice, Inc., 335 F.R.D. 393, 396-401 (D. Minn. 2020).

Shady Grove was a putative class action suit filed in the United States District Court for the Eastern District of New York on behalf of plaintiffs to whom Allstate Insurance Company

allegedly owed statutory interest on benefits which had been paid after a statutory deadline for payment. 559 U.S. at 397. The Eastern District of New York dismissed the case for lack of jurisdiction reasoning that New York Civil Practice Law § 901(b), "which precludes a suit to recover a 'penalty' from proceeding as a class action," applies in cases brought in federal court under diversity jurisdiction, and the statutory interest sought was a "penalty." Id. The Court of Appeals for the Second Circuit affirmed, holding that Federal Rule of Civil Procedure 23, which states that "'[a] class action may be maintained'" if two specifically enumerated conditions are met (both of which were met in Shady Grove), did not conflict with New York Civil Practice Law § 901(b). Id. at 398. The Second Circuit further held that because there was no federal rule addressing the legitimacy of class action suits seeking to recover a penalty and the New York state law was substantive, the New York state law applied in diversity cases such as Shady Grove and prohibited the class action suit initiated therein. Id.

On review, the United States Supreme Court reversed the Second Circuit. A plurality of the Court in Shady Grove concluded that Federal Rule 23 was procedural in nature, and further concluded that Rule 23 did not violate the Rules Enabling Act; therefore, Federal Rule 23 operated in Shady Grove to allow the class action to proceed in federal court despite the New York state law. Id. at 406-16.[6]

The undersigned finds that the holding of Shady Grove, and the analysis discussed therein, are inapposite to the determination of whether Federal Rule 15 or Minnesota Statute § 549.191

---

[6] The Court held that Rule 23 directly conflicts with N.Y. Civ. Prac. Law § 901(b) because Rule 23 "empowers a federal court 'to certify a class in each and every case where the Rule's criteria are met'" and, in fact, Federal Courts must do so; Federal Courts do not have the discretion to decline to certify a class if Rule 23's requirements are satisfied. Shady Grove, 559 U.S. at 399-400. Therefore, the New York state law, which would prohibit a class action seeking a penalty even if Rule 23's requirements are met, directly conflicted with Rule 23. Id. Justice Stevens, however, departed from the plurality's rationale, in part, and would have held that "there are some state procedural rules that federal courts must apply in diversity cases because they function as a part of the State's definition of substantive rights and remedies," but Justice Stevens nonetheless joined in the ultimate holding reversing the Second Circuit and remanding the case for further proceedings. Id. at 416-17.

controls the question of whether or not to allow the assertion of a claim for punitive damages brought in federal court when the claims are premised on Minnesota state law causes of action.

Shady Grove involved a conflict between Federal Rule of Civil Procedure 23 and New York Civil Practice Law § 901(b), which the Shady Grove plurality highlighted was "to be found in New York's procedural code[.]" Shady Grove, 559 U.S. at 409.[7]  It is the view of the undersigned that, unlike the procedural law of New York Civil Practice Law § 901(b), Minnesota Statute § 549.191 is a substantive law defining a substantive right under Minnesota law.

The Erie Doctrine prohibits Congress from "declar[ing] substantive rules of common law applicable in a state." See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  "Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any [diversity jurisdiction] case is the law of the State." Id. at 78.  Congress has enacted the Rules Enabling Act, which gives the United States Supreme Court "the power to prescribe, by general rules, . . . the practice and procedure in civil actions at law" as long as such rules "'neither abridge, enlarge, nor modify the substantive rights of any litigant.'"  See Sibbach v. Wilson & Co., 312 U.S. 1, 7-8 (1941) (citation omitted).

The reasoning in the portions of Shady Grove which gained the approval of a plurality of the United States Supreme Court does not indicate that Erie concerns mandate anything other than the application of Minnesota Statute § 549.191 in the present case. Thus, Minnesota Statute § 549.191 controls Plaintiff's present Motion.

---

[7] Notably, the plurality in Shade Grove acknowledged that New York Civil Practice Law § 901(b) was "[u]nlike a law that sets a ceiling on damages (or puts other remedies out of reach)."  Shady Grove, 559 U.S. at 401.  Minnesota Statute § 549.191 is a statute that can put the recovery of punitive damages "out of reach" of a plaintiff because if a plaintiff is unable to satisfy the evidentiary requirement, as opposed to mere allegation pleading thresholds, of Minnesota Statute § 549.191, then that plaintiff will not be permitted to pursue a claim for punitive damages.

For the purposes of an Erie doctrine determination, the undersigned finds that Minnesota Statute § 549.191 is a substantive law defining a substantive right under Minnesota law.  The Courts in the District of Minnesota—taking guidance from Minnesota state courts and the Minnesota Legislature—have always on Minnesota state law claims historically applied Erie doctrine substantive law deference to Minnesota Statute § 549.191 and § 549.20, and therefore, have given the Minnesota statutory scheme substantive law status.  See, e.g., Fournier, 678 F. Supp. at 1422; Kuehn v. Shelcore, Inc., 686 F. Supp. 233, 234–35 (D. Minn. 1988); Sec. Sav. Bank, 1990 WL 36142, at *1-5; Laffey v. Indep. Sch. Dist. No. 625, 806 F. Supp. 1390, 1406 (D. Minn. 1992), aff'd sub nom. Laffey v. St. Paul Tech. Vocational Inst., 994 F.2d 843 (8th Cir. 1993); Hammond v. Northland Counseling Ctr., Inc., No. 5-96-cv-353 (MJD/RLE), 1998 WL 315333, at *6–11 (D. Minn. Feb. 27, 1998); Richardson, 2002 WL 737505, at *1; Berczyk v. Emerson Tool Co., 291 F. Supp. 2d 1004, 1008-18 (D. Minn. 2003); Coy, 2016 WL 7888047; Inline Packaging, LLC, 2018 WL 9919941, at *6-7; Murrin, 2008 WL 540857, at *29; Wehlage, 2008 WL 4838718, at *6; Cenveo Corp., 2011 WL 1741910, at *2; Gebremariam, 2008 WL 11464731, at *2; Best Buy Stores, L.P., 2008 WL 227689, at *2; Adams, 2010 WL 4909564, at *3; Mertes, 2006 WL 8444818, at *2.

The substantive nature of § 549.191 is further demonstrated by the fact that Minnesota has a state civil rule for amending a pleading identical to Federal Rule of Civil Procedure 15.  See Minn. R. Civ. P. 15.01.  Despite this Minnesota rule, however, the Minnesota Legislature chose to treat punitive damages as outside the scope of Minnesota Rule of Civil Procedure 15.01's liberal mere allegations pleading standard, and the legislature erected a clear and convincing evidentiary threshold showing necessary to punitive damages, which if not met, is dispositive of punitive

11

damages claims before trial.   This treatment of § 549.191 by the Minnesota Legislature demonstrates that Minnesota Statute § 549.191 is in effect and by intent substantive in nature.[8]

The substantive nature of Minnesota Statute § 549.191 (as opposed to the procedural nature of Rule 15.01 of the Minnesota Rules of Civil Procedure) is further emphasized by the differing methods in which the two came into effect.   Minnesota Statute § 549.191 is a statutory law of the State of Minnesota.   As such, the Minnesota Statute § 549.191 underwent the full legislative process: it was proposed and authored by elected members of the Minnesota Legislature, presented as a bill to both the Minnesota Senate and the Minnesota House of Representatives, discussed in legislative committees, debated in both legislative houses, voted for by a majority of all members of each house of the legislature; entered into the journal for each house of the legislature; and signed into law by the Governor of Minnesota.   See Minn. Const. art. IV, §§ 1, 19-20, 22-23.

On the other hand, Rule 15.01 of the Minnesota Rules of Civil Procedure is merely a procedural rule promulgated, considered, and put into effect by the Minnesota Supreme Court upon the recommendation of the Minnesota Supreme Court Advisory Committee on the Rules of Civil Procedure.   See Minn. Stat. §§ 480.05, 480.057.   The Minnesota Legislature is not officially involved in this rule making process; instead, the Minnesota Legislature merely retains the right to "modify or repeal any rule" adopted by the Minnesota Supreme Court, as well as, the right "to enact, modify, or repeal any statute" even if said statute affects a rule promulgated by the Minnesota Supreme Court.   See Minn. Stat. §§ 480.058.

---

[8] The undersigned acknowledges that the only Court which can definitively answer the question of whether Minnesota Statute § 549.191 is substantive in nature is the Minnesota Supreme Court; however, the Minnesota Supreme Court has not spoken directly on the issue.   Therefore, an answer to the current question could be achieved through a certified question to the Minnesota Supreme Court.   See Minn. Stat. § 480.065 (providing that the Minnesota Supreme Court "may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statue" and further providing that "[t]he court certifying the question of law to the Supreme Court of [Minnesota] shall issue a certification order and forward it to the Supreme Court of" Minnesota).

Applying the vastly, more liberal, mere allegation pleading standard of Rule 15 of the Federal Rules of Civil Procedure to the decision as to whether or not to allow the assertion of claims for punitive damages brought in federal court when the claims are premised on Minnesota state law causes of action would materially enlarge and modify the substantive rights of litigants attempting to assert claims for punitive damages brought in federal court, as opposed to when the claims premised on Minnesota state law causes of action are brought in state court.  The failure now to apply Minnesota Statute § 549.191 in determining whether or not to allow the assertion of claims for punitive damages brought in federal court when the claims are premised on Minnesota state law causes of action would most certainly invite forum shopping and yield markedly disparate litigation outcomes because it would greatly lower the substantive standard by which a plaintiff must show its entitlement to plead and pursue punitive damages on Minnesota state law claims, despite this Court's long history of applying Minnesota Statute § 549.191 in materially indistinguishable cases.  See, e.g., Sorin Group USA, Inc. v. St. Jude Medical, S.C., Inc., 176 F. Supp. 3d 814, 828 (D. Minn. 2016) ("Because this case is in federal court due to diversity jurisdiction, in order to add punitive damages to its claim, [plaintiff] had to seek leave to amend under Minn. Stat. § 549.191."); Rassier v. Sanner, No. 17-cv-938 (DWF/LIB), 2017 WL 5956909, *7 (D. Minn. Nov. 30, 2017) ("Courts in this district, however, have consistently applied §§ 549.191-.20 to state-law claims."); Streambend Props. III, LLC, v. Sexton Lofts, LLC, 297 F.R.D. 349, 360–61 (D. Minn. 2014) ("Minnesota Statutes sections 549.191 and 549.20 govern the pleading of punitive damages claims based on Minnesota law."); Nat'l Union Fire Ins. Co. of Pittsburgh, PA, v. Donaldson Co., Inc., No. 10-cv-4948 (JRT/TNL), 2016 WL 6902408, *3–7 (D. Minn. June 15, 2016) (applying Minn. Stat. § 549.191 to determine whether punitive damages could be pled); Coy, 2016 WL 7888047, *2-6 (same); Fournier, 678 F. Supp. at 1422.

13

If Federal Rule of Civil Procedure 15 is now applied, because Minn. Stat. § 549.191 and § 549.20 are now to be deemed purely procedural (despite a history of decisions to the contrary), then for Minnesota state law claims or diversity cases arising out of Minnesota, the District of Minnesota need not even require a motion to amend; rather, as a matter of "procedure," punitive damages could be plead in the original complaint to be filed directly in federal court or in the amended complaint as soon as a defendant removes a diversity case from state court to federal court.  Additionally, under Federal Rule 15, plaintiffs are permitted to amend a pleading "once as a matter of course within" twenty-one days of answer or responsive pleadings or within twenty-one days of serving the complaint which could further allow a plaintiff to amend to add a claim for punitive damages on Minnesota state law claims as a matter of right.  See Fed. R. Civ. P. 15. Under the liberal Rule 15 standard, a punitive damage claim need not be supported by any actual admissible evidence, but only by mere factual allegations that would plausibly suggest the putative defendant deliberately disregarded the rights or safety of a putative plaintiff.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556-67 (2007)).

This liberal (and unchecked in the case of a "matter of course" amendment) pleading standard completely undermines the substantive claim-preclusive purpose the Minnesota Legislature intended in enacting Minnesota Statute § 549.191.  As noted above, "the Minnesota Legislature adopted . . . Section 549.191 in order to deter certain practices in the presentment of punitive damage claims which were thought to be abusive, and in order to address a perceived insurance crisis[,]"  Ulrich, 848 F. Supp. at 866–67, and "to prevent frivolous punitive damage claims by allowing a court to determine first if punitive damages are appropriate."  Gamma–10 Plastics, Inc., 32 F.3d at 1255.  Should the federal courts in this District now suddenly shift to take the position that Rule 15 governs the amendment of complaints to add claims for punitive damages

14

based on Minnesota state law without need to comply with the substantive evidentiary standard of Minnesota Statute § 549.191, it could lead to a reinstatement in federal cases involving Minnesota state law claims of the precise "practices in the presentment of punitive damage claims which [the Minnesota Legislature] thought to be abusive" in the litigation settlement process, while the same claim if brought it Minnesota State Court would have a materially different substantive outcome even at the pleading stage.

Accordingly, in the absence of binding Eighth Circuit, United States Supreme Court, or Minnesota Supreme Court precedent to the contrary, the undersigned finds Minnesota Statute § 549.191 to be substantive state law in nature and effect.   Thus, Minnesota Statute § 549.191 provides the relevant applicable standard by which to consider the present Motion.

As observed above, Minnesota Statute § 549.191 provides that a plaintiff seeking to amend a complaint to add a claim for punitive damages does so through the assertion of a motion asserting "the applicable legal basis under section 549.20 or other law for awarding punitive damages" supported by one or more affidavits with facts supporting the motion.  Minnesota Statute § 549.20, Subd. 1(a), allows punitive damages in civil actions "only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." "The clear-and-convincing standard is satisfied when 'the evidence is sufficient to permit the Jury to conclude that it is highly probable that the defendant acted with deliberate disregard to the rights or safety of others.'"  Nat'l Union Fire Ins. Co., 2016 WL 6902408, at *4 (citation omitted); see Olson, 29 F. Supp. 2d at 1036; Morrow v. Air Methods, Inc., 884 F. Supp. 1353, 1358 (D. Minn. 1995).  "To be 'clear and convincing,' there must be 'more than a preponderance of the evidence but less than proof beyond a reasonable doubt.'"  Ulrich, 848 F. Supp. at 868 (quoting Weber, 269 N.W.2d at 895.

Minnesota Statute § 549.20 further explains:

> **[Subd. 1]**(b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

In substance, "[a] defendant operates with 'deliberate disregard' by acting with intent or indifference to threaten the rights or safety of others." Gamma–10 Plastics, Inc, 32 F.3d at 1256; see Hern v. Bankers Life Cas. Co., 133 F. Supp. 2d 1130, 1135 (D. Minn. 2001). As such, "[a] mere showing of negligence is not sufficient" to sustain a claim of punitive damages. Admiral Merchs. Motor Freight, Inc. v. O'Connor & Hannan, 494 N.W.2d 261, 268 (Minn. 1992).[9] "[I]nstead, the conduct must be done with . . . reckless disregard for the rights of others." Nat'l Union Fire Ins. Co., 2016 WL 6902408, at *4 (citation omitted).

The moving party must make a prima facie showing that clear and convincing evidence exists that the acts of the defendant show deliberate disregard for the safety of others. "[P]rima facie evidence is that evidence which, if unrebutted, would support a judgment [on punitive damages] in the movant's favor." Swanlund, 459 N.W.2d at 154 (emphasis added).

Because a prima facie showing is one "that prevails in the absence of evidence invalidating it," Blumberg v. Palm, 238 Minn. 249, 253, 56 N.W.2d 412, 415 (1953), "the Court reviews the evidence in support of a Motion to Amend as the Court would review a . . . Motion for Judgment as a Matter of Law" under the Federal Rules of Civil Procedure. Ulrich, 848 F.Supp. at 867; see also Nw. Airlines, Inc. v. Am. Airlines, Inc., 870 F.Supp. 1499, 1502-03 (D. Minn.1994) (stating that evidence submitted in opposition to the motion is not considered). In other words, in reaching

---

[9] Nor is a showing of even "gross negligence" sufficient to sustain a claim for punitive damages. Ulrich, 848 F. Supp. at 868.

the determination whether the plaintiff has established a <u>prima facie</u> case for punitive damages, the Court makes no credibility rulings and does not consider any challenge, by cross-examination or otherwise, to the plaintiff's proof, but the Court must carefully scrutinize the evidence presented by the moving party to make sure that it amounts to a <u>prima facie</u> showing that the substantive requirements for punitive damages have been met.   <u>Target Corp. v. LCH Pavement Consultants, LLC</u>, 960 F. Supp. 2d 999, 1010 (D. Minn. 2013) (citations omitted); <u>see Berczyk</u>, 291 F. Supp. 2d at 1008 n. 3.

Ultimately, the Court's independent search for a <u>prima facie</u> showing of clear and convincing evidence demonstrating that the defendant acted with a deliberate disregard for the rights or safety of others requires the Court to do more than "rubber stamp" the mere allegations in the motion papers.  <u>Ulrich</u>, 848 F. Supp. at 868; <u>Swanlund</u>, 459 N.W.2d at 154.  While the court may not make credibility determinations, "the court must ascertain whether a jury could reasonably find that plaintiff proved his case by the quantity and quality of evidence required by Minnesota law." <u>Morrow</u>, 884 F. Supp. at 1358.

## B.  Evidence Presented to the Court

Plaintiff relies on the following evidence, as more fully detailed below, to support his proposed punitive damages claim: Defendant CRC's discovery responses to Plaintiff's First Set of Interrogatories, [Docket No. 74]; the deposition testimonies of Michelle Rudnick, Adam Selisker, Scott Grey, and Defendant CRC, [Docket Nos. 73, 73-1, 73-3, 73-6]; a copy of Defendant CRC's "Duster Safety Data Sheet" from June 12, 2012 and August 24, 2017, [Docket Nos. 73-7, 73-8]; email correspondence from CRC employees, [Docket Nos. 74-1, 74-2];  a copy of a scientific case report entitled "Sudden Death Caused by 1,1-Difluoroethane Inhalation," [Docket No. 73-4]; a copy of a scientific case report entitled, "Fatal Cardiac Arrhythmia After Repeated Exposure to

17

1,1-Diifluoroethane (DFE)," [Docket No. 73-5]; a copy of a scientific article entitled, "Fluorine Derivatives of Chloroform," [Docket No. 73-11]; a copy of a scientific article entitled, "Anesthetic Properties of a Series of Fluorinated Compounds," [Docket No. 73-12]; a copy of a correspondence produced by Defendant CRC, [Docket No. 74-3]; a copy of a photograph of a CRC Duster can, [Docket No. 73-9]; a copy of a CRC Duster Label, [Docket No. 74-4]; a copy of a CRC Duster Sales Spreadsheet, [Docket No. 74-5]; a copy of an invoice from the National Aerosol Association to Defendant CRC, [Docket No. 74-6]; a copy of the Minnesota State Patrol Field Report following the July 2019 Accident, [Docket No. 73-10]; a copy of an Order from Diehl v. 3M Company, Court File No. 69DU-CV-18-2662, [Docket No. 73-13]; and the expert report[10] from Plaintiff's expert, Dr. Brian Perron. [Docket No. 73-2].

---

[10] In support of the present Motion, Plaintiff relies on, among other things, Dr. Perron's expert report. (See Plf.'s Mem., [Docket No. 71], at pp. 8-12, 22-23). Plaintiff relies on this expert report in his attempt to demonstrate clear and convincing evidence that Defendant CRC deliberately disregarded the rights and safety of others. As this Court and other Courts in this District have said, in considering a motion to amend to assert punitive damages, an expert report is "[a]t best . . . an unsworn letter, which carries little evidentiary weight. Even apart from its non-evidentiary status, the [expert] report does not constitute 'clear and convincing' evidence." Inline Packaging, LLC, 2018 WL 9919941, at *9 (quoting Berczyk v. Emerson Tool Co., 291 F. Supp. 2d 1004, 1015 (D. Minn. 2003)). As the Court explained, expert reports which "are merely 'characterizations of evidence'" combined with "conclusory statements" and expert opinions based on said expert's review of the evidence presented in a particular case "do not add to a prima facie showing." Inline Packaging, LLC, 2018 WL 9919941, at *10 (quoting Hoffman v. Enterprise Leasing Co. of Minn., No. 13-cv-255 (JNE/SER), 2014 WL 12601037, at *5 (D. Minn. June 26, 2014)). It is the underlying evidence which a Court must consider—not the expert's characterization of said evidence or the expert's opinion as to whether or not said evidence represented a deliberate disregard. See, e.g., Inline Packaging, LLC, 2018 WL 9919941, at *9-11; Hoffman, 2014 WL 12601037, at *5; Berczyk, 291 F. Supp. 2d at 1004-1015. Here, Plaintiff's citation to Dr. Perron's expert report is merely to support Plaintiff's assertion that, among other things, Defendant CRC's involvement in ACE, and the 2,170 articles that Dr. Perron reviewed from the ACE blog discussing reports of inhalant abuse, should have made Defendant CRC "aware that individuals such as Kyle Neumiller would obtain CRC Duster to get high while driving and then crash into innocent community members such as Cynthia," and that, despite the ACE blog and its involvement in ACE, Defendant "CRC (and other dusting spray manufacturers) have done nothing to effectively deter intentional inhalation of their dusting sprays." (See Plf.'s Mem., [Docket No. 71], at pp. 22-23). However, although these cited pages summarize the evidence as perceived by Dr. Perron, "this sort of summarization is not 'evidence' which the Court ought to consider in support of" Plaintiff's Motion to Amend the Complaint. Therefore, in light of the nature of Dr. Perron's expert report and the specific portions thereof on which Plaintiff relies, the Court declines to consider those portions of Dr. Perron's report which contains no more than mere characterizations of evidence, conclusory statements, or opinions as to the culpability, liability, or intent of Defendant CRC. To the extent Plaintiff cites to Dr. Perron's expert report for a permitted purpose, those portions of his expert report are considered in the Court's analysis.

## C.  Factual Allegations Relevant to Plaintiff's Claim for Punitive Damages[11]

Defendant CRC began manufacturing CRC Duster in the 1990s.  (Def.'s Discovery Responses, Ex. 1 to the Declaration of Rashanda C. Bruce (the "Bruce Decl."), [Docket No. 74], at p. 4).  Defendant CRC also designs, tests, labels, distributes, and sells CRC Duster.  (Transcript from the September 1, 2022, Deposition of Michelle M. Rudnick ("Rudnick Dep."), Ex. 2 to the Bruce Decl., [Docket No. 73], at 73:8-13).   In 2019, Defendant CRC sold over one million cannisters of dusters, resulting in over $4 million in sales.  (CRC Duster Sales Spreadsheet, Ex. 16 to the Bruce Decl., [Docket No. 74-5]).  CRC Duster is a pressurized gas cannister with an actuator that releases an aerosol to remove dust and lint from surfaces.  (Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 74:23-75:3, 121:19-25).   The sole ingredient in CRC Duster is a chemical known as 1,1-Difluoroethane or DFE.  (Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 74:23-75:3; Transcript from the September 15, 2022, Rule 30(b)(6) Deposition of Defendant CRC ("30(b)(6) Dep."), Ex. 6 to the Bruce Decl., [Docket No. 73-3], at 29:20-22).

DFE is a pressurized, volatile fluorinated hydrocarbon, which when inhaled in a concentrated fashion, causes immediate depressive effects on a person's central nervous system. (Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 76:13-77:5, 80:13-19; "Fluorine Derivatives of Chloroform," Ex. 19 to the Bruce Decl., [Docket No. 73-11]; "Anesthetic Properties of a Series of Fluorinated Compounds: I. Fluorinated Hydrocarbons," Ex. 20 to the Bruce Decl., [Docket No. 73-12]).  As acknowledged by Defendant CRC, intentionally inhaling DFE (also known as huffing or dusting) can cause loss of consciousness, drowsiness, and dizziness, as well as, psychoactive intoxicating effects such as euphoria, hallucinations, and delusions.  (Rudnick

---

[11] In discussing these facts and the following analysis, the Court considers only the evidence presented by Plaintiff and views the evidence as unrebutted as it must under Minnesota Statute § 549.20.  Berczyk, 291 F. Supp. 2d at 1008 n.3.  The Court considers the evidence in such a manner solely for the purposes of the present Motion.

Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 78:8-79:22; 30(b)(6) Dep., Ex. 6 to the Bruce Decl., [Docket No. 73-3], at 27:20-29:12).   Consequently, because of its euphoric effect and easy accessibility, individuals may seek out a duster product for the purpose of getting high or for inhalant abuse.   (Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 80:21-81:25; Xiong Case Report, Ex. 7 to the Bruce Decl., [Docket No. 73-4], at p. 1).   Inhalant abuse can also lead to loss of bodily control, impaired judgment, possible sudden cardiac effects and can become potentially fatal to the inhaler.   (Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 80:21-81:25).   For example, two case reports published in two scientific journals in May 2004 and March 2006, respectively, reported the death of two individuals who were each found next to a can of CRC Duster and had died from intentionally misusing dusters.   (Xiong Case Report, Ex. 7 to the Bruce Decl., [Docket No. 73-4]; Avella Case Report, Ex. 8 to the Bruce Decl., [Docket No. 73-5]).

At some point, Defendant CRC became aware of the potential for inhalant abuse of its CRC Duster.   (30(b)(6) Dep., Ex. 6 to the Bruce Decl., [Docket No. 73-3], at 29:15-18, 34:14-24.   As such, in 2007 or 2008, a bitterant known as denatonium benzoate was added to the CRC Duster "to create a foul and deterring taste in the mouth if misused," which would essentially deter huffing.   (Id. at 32:21-25, 33:23-34:3, 35:5-10; Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 82:6-13, 84:8-17; Transcript from the September 14, 2022, Deposition of Adam M. Selisker ("Selisker Dep."), Ex. 3 to the Bruce Decl., at 17:17-23, 139-7-14; CRC Email Correspondence, Ex. 4 to the Bruce Decl., [Docket No. 74-1], at p. 5).   However, the bitterant was removed in 2012 because Defendant CRC did not have evidence that it was effective in deterring huffing.   (30(b)(6) Dep., Ex. 6 to the Bruce Decl., [Docket No. 73-3], at 45:16-47:20; Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 145:5-20; Selisker Dep., Ex. 3 to the Bruce

Decl., [Docket No. 73-1], at 138:6-140:2; CRC Email Correspondence, Ex. 4 to the Bruce Decl., [Docket No. 74-1], at p. 5; CRC Communication, Ex. 11 to the Bruce Decl., [Docket No. 74-3]). The decision to remove the bitterant from CRC Dusters was also due to complaints of the product not working correctly and reports that the taste of the bitterant could easily be overcome by eating chocolate or drinking Gatorade, as well as, cost (although this would have been "little factor in determining whether to continue to using the bitterant").  (30(b)(6) Dep., Ex. 6 to the Bruce Decl., [Docket No. 73-3], at 46:21-51:5, 59:3-10; Selisker Dep., Ex. 3 to the Bruce Decl., [Docket No. 73-1], at 141:18-142:16).

To further prevent inhalant abuse, Defendant CRC also provided warning labels on its CRC Duster cannisters, which included a warning that: "Deliberate misuse by concentrating and inhaling the contents [of CRC Duster] is illegal and can be harmful or fatal.  Inhalation abuse can cause death"; "Overexposure can cause drowsiness, unconsciousness, respiratory depression, and death;" and "Open doors, windows or other fresh air sources during use."   (CRC Duster Label, Ex. 15 to the Bruce Decl., [Docket No. 74-4]; Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 80:21-81:25; 108:8-109:8).  Defendant CRC acknowledged, however, that it did not consult with third parties to determine whether this warning label was effective.  (Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 80:21-81:25, 115:5-7; 30(b)(6) Dep., Ex. 6 to the Bruce Decl., [Docket No. 73-3], at 61:3-63:10).

As a general policy, Defendant CRC also provided to its consumers a Safety Data Sheet ("SDS")[12] for CRC Dusters (as well as, for all its products), which warned users of the risks

---

[12] Also referred to as a Material Safety Data Sheet or MSDS, an SDS is a document required under OSHA regulations for workplace products.  Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 64:15-21.  Adam Selisker testified that SDSs are "a way to communicate the physical properties of a chemical or chemical blend or product, . . . [whether there are] certain hazards that may be associated with [the product,] . . . communicates the proper way to store the product and can also have some other regulatory information on it that may be useful to the user."  (Selisker Dep., Ex. 3 to the Bruce Decl., [Docket No. 73-1], at 16:1-8).

associated with using CRC Duster.  (Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 80:21-81:25; 63:22-34:21).  A copy of the SDS was not provided with the CRC Duster but was available online.  (Id. at 63:22-64:6, 109:12-20).  The format and the way in which an SDS was created and prepared changed between June 2012 and August 2017.  Specifically, the June 2012 SDS was prepared by Defendant CRC employees, while the August 2017 SDS was computer generated utilizing a software program.  (Id. at 172:2-185:8).  The warnings provided between the June 2012 SDS and the August 2017 SDS also changed.  (Id.).  Specifically, in the June 2012 SDS, Defendant CRC warned about the following inhalation effects:

> Inhalation of dispersed gas is not expected to cause negative effects. Inhalation of concentrated vapor may produce anesthetic effects and feeling of euphoria. Prolonged exposure can cause rapid breathing, headache, dizziness, narcosis, and unconsciousness. Deliberately inhaling this product can lead to death from asphyxiation depending on concentration and duration of exposure.

(June 2012 CRC Duster SDS, Ex. 12 to the Bruce Decl., [Docket No. 73-7]).  Whereas, in the August 2017 SDS, CRC Duster warned about the following inhalation effects: "Deliberately inhaling this product can lead to death from asphyxiation depending on concentration and duration of exposure"; and "Inhalation: Prolonged inhalation may be harmful."  (August 2017 CRC Duster SDS, Ex. 13 to the Bruce Decl., [Docket No. 73-8]).[13]  Defendant CRC acknowledged that the statements and representations made in the August 2017 SDS were not independently verified, however, it maintained that the software program utilized "credible sources and databases" to create and to provide relevant substantive information.  (Selisker Dep., Ex. 3 to the Bruce Decl., [Docket No. 73-1], at 27:25-30:7).

To support the prevention of product misuse and abuse, Defendant CRC was a financially supporting member of the Alliance for Consumer Education ("ACE") through the Household &

---

[13] Ms. Rudnick testified that any warnings omitted in the August 2017 CRC Duster could have been manually entered by Defendant CRC employees.  Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 183:15-184:11.

Commercial Products Association ("HCPA").   Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 90:14-17).   As a member, Defendant CRC contributed $1000 annually to ACE for educational purposes and participated in meetings that discussed ways to help minimize or deter inhalant abuse.  (30(b)(6) Dep., Ex. 6 to the Bruce Decl., [Docket No. 73-3], at 64:9-69:3).   ACE also maintained an online blog, which Mr. Selisker acknowledged hearing of, wherein incidents involving "huffing and driving," among other things, were reported.  (Selisker Dep., Ex. 3 to the Bruce Decl., [Docket No. 73-1], at 85:4-13; see ACE's Inhalant Abuse Report Blog, available at http://inhalant-info.blogspot.com/).   Defendant CRC also contributed $5,000 annually to the National Aerosol Association ("NAA"), which is "an independent association of aerosol fillers and those that serve aerosol fillers."  (Selisker Dep., Ex. 3 to the Bruce Decl., [Docket No. 73-1], at 143:25-144:5; Rudnick Dep., Ex. 2 to the Bruce Decl., [Docket No. 73], at 144:3-16; NAA Invoice, Ex. 17 to the Bruce Decl., [Docket No. 74-6]).

In February 2013, Defendant CRC was notified that an individual had died from inhaling CRC Duster.  (CRC Email Correspondence, Ex. 9 to the Bruce Decl., [Docket No. 74-2], at p. 4; 30(b)(6) Dep., Ex. 6 to the Bruce Decl., [Docket No. 73-3], at 77:7-78:16).   Defendant CRC "followed up but did not receive any further information about [the] incident and was not able to verify it."  (Def.'s Discovery Responses, Ex. 1 to the Bruce Decl., [Docket No. 74], at p. 15). Beyond this fatality, Defendant CRC was not aware of any other deaths involving CRC Duster, although Defendant CRC did not have any policies and procedures to proactively determine injuries or deaths pertaining to its products.  (30(b)(6) Dep., Ex. 6 to the Bruce Decl., [Docket No. 73-3], at 86:17-23).   Nor did Defendant CRC have specific policies or procedures in place for monitoring and tracking inhalation abuse of CRC Duster, beyond receiving information from

direct phone calls, CHEMTREC, and the CPSC.[14]   (30(b)(6) Dep., Ex. 6 to the Bruce Decl.,

[Docket No. 73-3], at 83:4-13, 84:11-14, 85:10-19).

On July 22, 2019, at approximately 5:22 p.m., Neumiller purchased a cannister of CRC

Duster from a hardware store in Baudette, Minneosta.  (Minnesota State Patrol Field Report, Ex.

18 to the Bruce Decl., [Docket No. 73-10], at p. 5).  About forty minutes later, Neumiller was

driving his Chevy Silverado northbound on State Highway 172 when he lost control of his vehicle,

crossed over the center line, continued through the southbound lane, and collided with a Toyota

Highlander, which was being driven by Mrs. McDougall.  (Id. at p. 6).  After being extricated from

the vehicle, Mrs. McDougall was transported to the hospital where she died from her injuries.  (Id.

at p. 2).  Based on interviews, evidence, analysis, and experience, law enforcement believed that

Neumiller was impaired at the time of the accident from huffing CRC Duster.  (Id. at p. 6).

Following the collision, Neumiller was arrested and charged with Criminal Vehicular Homicide.

(Id. at p. 4).

### D.  Discussion

As already set forth above, in order to be entitled to plead a claim seeking punitive damages

against Defendant CRC, Plaintiff must provide evidence which, if unrebutted, clearly and

convincingly allows a conclusion that Defendant CRC (1) was aware of or intentionally

disregarded facts that created a high probability of injury to Plaintiff, and (2) deliberately

proceeded to act in conscious disregard, intentional disregard, or with indifference to that high

probability of injury to Plaintiff.  See Minn. Stat. §§ 549.191, 549.20(1).

---

[14] CHEMTREC is an 800 number a user of CRC Duster may call if they have issues with the products and need to
know the chemical composition. (30(b)(6) Dep., Ex. 6 to the Bruce Decl., [Docket No. 73-3], at 86:3-6).  The CPSC
is an outside agency known as the Consumer Product Safety Commission.  (Id. at 22:25-24:19).

Plaintiff essentially argues that he should be permitted to plead a claim for punitive damages against Defendant CRC because, despite being aware that people intentionally misuse CRC Duster to get high; and being aware of the possibility that people huffing CRC Duster could drive a vehicle impaired, lose control of that vehicle, and injure or kill themselves or bystanders, Defendant CRC's warnings and participation in ACE failed to adequately address or educate the public about this known motor vehicle danger, such that Defendant CRC was aware of or intentionally disregarded facts that created a high probability of injury to innocent bystanders, such as Mrs. McDougall, and thus acted with deliberate disregard for their safety.   (Plf.'s Mem., [Docket No. 71], at pp. 32-42).

Although the Court is sympathetic to the circumstances of the present case, having carefully reviewed the voluminous record of exhibits, both individually and as a whole, the Court finds that Plaintiff has failed to demonstrate by clear and convincing evidence the necessary prima facie showing to support amending his Complaint to assert a claim for punitive damages against Defendant CRC.  In fact, the Court finds that Plaintiff's evidence falls far short of the requisite standard.[15]

First, there are several factual assertions underlying Plaintiff's argument here that are either unsupported by the record, based solely on his subjective characterization of the record, or some combination thereof.  For example, the factual record now before the Court does not support Plaintiff's assertion that "[Defendant] CRC acknowledge[d] that consumers do not use an SDS." (Plf.'s Mem., [Docket No. 71], at p. 34).  Rather, Ms. Rudnick testified that the SDS "is not typically used by a consumer on how to use the product." (Rudnick Dep., Ex. 2 to the Bruce Decl.,

---

[15] Although the Court here applies the substantive, evidentiary law as found in Minnesota Statute §§ 549.191 and 549.20, the Court notes that even if it were to review Plaintiff's Motion under Rule 15's more liberal standard, the Court would reach the same conclusion: Plaintiff has failed to make the requisite showing of plausibility specifically necessary to be permitted to amend his Complaint to allege a claim for punitive damages against Defendant CRC.

[Docket No. 73], at 40:15-20 (emphasis added)).  Acknowledging that consumers do not typically use an SDS is not the same as acknowledging the frequency of its use (however minimal), and it is certainly not clear and convincing evidence that CRC Duster's SDS was not available to consumers at all or that the SDS failed to provide any warnings related to intentional inhalation. To that end, Plaintiff also asserts that "[t]he [August 2017] SDS in effect at the time of the crash did not warn about all the dangerous effects of inhaling CRC Duster." (Plf.'s Mem., [Docket No. 71], at p. 34).  However, Plaintiff fails to acknowledge or mention that, according to Defendant CRC, while the computer-generated August 2017 SDS omitted certain warnings, those warnings that were provided to deter inhalation abuse were generated by a software program utilizing "credible sources and databases" and "in conformance with the Globally Harmonized standards for Safety Data Sheet." (Selisker Dep., Ex. 3 to the Bruce Decl., [Docket No. 73-1], at 27:25-30:7).

Plaintiff also conclusorily asserts that Defendant CRC "did nothing to understand the nature of substance abuse and how to warn against it"; "ignored the numerous articles curated by the industry trade group (ACE) it funded," and "ignored the existence of numerous well-established, publicly available, and nationally representative data sets." (Plf.'s Mem., [Docket No. 71], at p. 34).  However, these assertions are not supported by the factual record which Plaintiff presented to this Court.  First, as to understanding how to warn against substance abuse, Defendant CRC testified that it consulted with Dupont, the patent holder of the bitterant added to its CRC Duster, to help deter inhalation abuse, and engaged in discussions with ACE regarding the efficacy of the bitterant. (30(b)(6) Dep., Ex. 6 to the Bruce Decl., [Docket No. 73-3], at 50:20-25, 54:11-19; 63:4-9).  Although the bitterant was later removed due to, among other things, lack of evidence that it actually helped to deter huffing, the record does not demonstrate that Defendant CRC did

26

nothing; quite the contrary.  Second, as to the assertion that Defendant CRC ignored articles and publicly available data sets, Plaintiff has proffered no evidence that Defendant CRC was aware of these resources, but intentionally ignored information showing a high probability of serious injury or death to bystanders involved in a motor vehicle accident like the type at issue here.  Similarly, although Plaintiff presented in the factual record a sales spreadsheet providing the amount in sales Defendant CRC made annually in dusters, including that it made $4 million in sales in 2019, this is no way supports Plaintiff's assertion that Defendant CRC "deliberately chose to elevate revenues and profits over safety."  (Plf.'s Mem., [Docket No. 71], at p. 34).

Turning to the mix of historical evidence offered by Plaintiff, including the two journal case reports published in May 2004 and March 2006, which reported on the death of two individuals who had reportedly died from huffing CRC Dusters, the Court has carefully reviewed this and finds that the majority of this information has no bearing on the high probability of injury or death to bystanders from users losing control of their vehicle, and striking and killing bystanders while high on CRC Duster.  (Xiong Case Report, Ex. 7 to the Bruce Decl., [Docket No. 73-4]; Avella Case Report, Ex. 8 to the Bruce Decl., [Docket No. 73-5]; Plaintiff's Expert Report of Dr. Brian Perron, Ex. 5 to the Bruce Decl., [Docket No. 73-2]).  Specifically, the May 2004 case report referenced a 20-year-old man who was found on the floor of his computer next to "a nearly full can of 'CRC Duster,'" while the March 2006 case report referenced a 42-year-old man found lying in the seat of his parked car along with 40 cannisters of duster spray, only one of which was a CRC Duster.  (Id.).  These articles are apparently meant by Plaintiff to suggest that, given that there were at least two prior case reports of death resulting from intentional inhalation of CRC Duster, Defendant CRC should have been aware of the high probability that individuals could drive while high on CRC Duster and crash their vehicles, thereby causing injury or death to themselves and/or

any bystanders.  However, the 2004 and 2006 reported fatal incidents are not substantially similar to the July 2019 Accident at issue here, nor has Plaintiff proffered any evidence that so much as suggests that these reported incidents were sufficient to put Defendant CRC on notice that death from huffing CRC Duster itself would lead to a high probability of Neumiller driving high on CRC Duster, resulting in injury or death to Mrs. McDougall.

On this point, the Court finds the analysis in Berczyk, 291 F. Supp.2d at 1014-1015, to be persuasive.  In Berczyk, the plaintiff brought a products liability action alleging design defects after he sustained a multiple finger amputation due to an accident involving a radial arm saw manufactured by the defendants.  In his motion to amend to assert a claim for punitive damages, plaintiff argued that defendants deliberately disregarded his safety by failing to equip the saw with a lower blade guard.  As evidence, he had submitted a listing of approximately 300 claims involving injuries on the defendants' radial arm saws.  The listing, however, was vague, and apparently did not explain precisely how the other injuries were sustained.  Given the information contained in the listing, the court was unable to determine which accidents in the listing were substantially similar to the one involved in the litigation, and as a consequence, it could not determine the degree of probability of injuries similar to the plaintiff's injury based solely on that listing.  Similarly, in this case, Plaintiff has failed to establish a clear record existed of numerous prior motor vehicle accidents resulting in bystander fatalities that had any substantial similarity to the July 2019 Accident.  Consequently, the Court finds that it is unable to conclude that there was a high probability of injury or death to bystanders from users who lose control of their vehicle high on CRC Duster, based on the information Plaintiff introduced into the record.

The Court is similarly unpersuaded by Plaintiff's contention that Defendant CRC demonstrated deliberate disregard and indifference for the safety of consumers when, knowing

that its CRC Duster could be misused, it nevertheless chose to place CRC Duster in the market without specifically warning users not to operate a motor vehicle while high on CRC Duster or without warning that bystanders could be struck by a motor vehicle driven by a user high on CRC Duster, resulting in injury or death.  Plaintiff has proffered evidence of Defendant CRC being aware of one fatal incident involving CRC Duster, prior to the July 2019 accident.  However, other than the individual reportedly dying from inhaling CRC Duster, the details of this incident were largely unknown to Defendant CRC.  Further, all of Plaintiff's arguments raise only routine generalized risks associated with the intentional inhalation of CRC Duster.  Indeed, Plaintiff dedicates a considerable portion of his memorandum to discussing and outlining the intentional misuse of DFE, including how dusting sprays, including CRC Duster, are sought out to get high. (Plf.'s Mem., [Docket No. 71], at pp. 7-14).  However, there is no plausible way to conclude from the present record that Defendant CRC was aware of and deliberately disregarded a high probability that on July 22, 2019, Neumiller was in fact highly likely to or was going to become impaired from huffing CRC Duster and operate his vehicle in such a manner as to result in Mrs. McDougall's death.  Instead, Plaintiff only generally argues that Defendant CRC was aware that CRC Duster contained only DFE and that its decision to place CRC Duster in the market knowing that it could be misused, with warnings and labels that were not independently assessed for efficacy, demonstrated deliberate disregard and indifference for the safety of consumers or the general public.  "This is insufficient.  Plaintiff must demonstrate by clear and convincing evidence that" Defendant CRC was "aware of a 'specific danger' to Plaintiff."  Morton v. Park Christian Sch., No. 19-cv-3134 (ECT/LIB), 2021 WL 7082938, at *8 (D. Minn. Dec. 15, 2021) (citing McKenzie v. Northern States Power Co., 440 N.W.2d 183 (Minn. Ct. App. 1983); Spidell v.

Anderson's Shelter Cove, Inc., No. 15-cv-2529 (WMW/LIB), Order [Docket No. 59] at 12 (D. Minn. June 8, 2016)).

Not to be deterred, Plaintiff also argues that Defendant CRC's "cosmetic 'steps'" and education efforts through its financial contribution to ACE were never independently tested for efficacy in deterring or preventing the misuse of CRC Duster, such as consulting with a substance abuse and misuse expert, thus demonstrating deliberate disregard and indifference for the safety of consumers. (Plf.'s Mem., [Docket No. 71], at p. 34). However, Plaintiff fails to provide any evidence as to how consulting with said expert would have changed the way in which Defendant CRC would have educated about its product or changed the content of the warning label, such as where the warnings should have been located, what information should have been included in the cannister's warning label, and what sort of education efforts Defendant CRC should have engaged in. Nor does Plaintiff offer any evidence that a different warning label would have alerted or deterred Neumiller, or alerted Mrs. McDougall as a bystander, to the dangers of huffing CRC Duster while driving. See Johnson v. Mead Johnson & Co., LLC, No. CV 11-225 (JNE/LIB), 2012 WL 12894473, at *2 (D. Minn. May 21, 2012) ("[A] plaintiff must establish the following elements to succeed on a failure to warn claim: "(1) the defendants had reason to know of the dangers of using the product ; (2) the warnings fell short of those reasonably required, breaching the duty of care; and (3) the lack of an adequate warning caused the plaintiff's injuries."). According to Plaintiff's logic, all manufacturers of dusting sprays containing DFE are aware that individuals may seek out their product for huffing, and therefore, by this fact alone would be aware of facts that create a high probability of injury or death to every bystander on the road from individuals driving high on their dusting spray. This lacks in sound reasoning and ostensibly would make manufacturers of dusting sprays virtually absolutely liable for any injuries resulting

from any misuse of their product.  As such, Plaintiff still fails to demonstrate by clear and convincing evidence that Defendant CRC either (1) was aware of or intentionally disregarded information creating a high probability of injury to Mrs. McDougall's safety or (2) deliberately disregarded a high probability that Neumiller would in July 2019, misuse its product and lose control of his vehicle causing the death of Mrs. McDougall.

In support of his request to amend his Complaint to allege a claim for punitive damages against Defendant CRC, Plaintiff cites to several cases.  (See Plf.'s Mem., [Docket No. 71], at pp. 32-42).  The Court finds these cases to all be inapposite—each of the cases upon which Plaintiff relies either declined to permit the plaintiff to amend the complaint to allege a claim for punitive damages or involved factual circumstances differing materially from the factual circumstances of the present case.  For example, Plaintiff relies heavily on the Minnesota Supreme Court's decision Montemayor v. Sebright Prod., Inc., 898 N.W.2d 623 (Minn. 2017), in which the Court reversed a district court's grant of summary judgment for the defendant manufacturer on the question of whether the employer's negligent failure to use appropriate lockout/tagout procedures for an extruder was a superseding cause of the plaintiff's injury.  898 N.W.2d at 631-33.  However, the issue presented before Montemayor was related to the foreseeability of the plaintiff's injury in the summary judgment context, whereas here, the Court is applying an entirely different standard under different facts.

Plaintiff further cites to Gryc v. Dayton-Hudson Corp., 297 N.W.2d 727 (Minn. 1980), in support of his assertion that Defendant CRC's knowledge of the potential for, or actual, misuse of CRC Duster, alone triggers a duty to protect against misuse, regardless of the number of incidents involved.  (Plf.'s Mem., [Docket No. 71], at pp. 36-37).  However, the Court notes that this case actually detracts from Plaintiff's position.  In Gryc, a child suffered severe burns after her cotton

flannelette pajamas caught on fire.  The evidence demonstrated that the pajamas, which were not treated with a flame retardant, ignited almost instantaneously when exposed to an ignition source, and that consumers, retailers, and wholesalers were <u>not aware</u> of the highly flammable characteristics of the fabric, while the manufacturer of the product was "<u>uniquely aware</u> of these characteristics."  <u>Id.</u> at 731 (emphasis added).  The manufacturer had argued that its compliance with a federal law precluded a finding that it had acted with the requisite state of mind required for an award of punitive damages.  In rejecting this argument, the Minnesota Supreme Court emphasized that the evidence revealed that the manufacturer knew that the test was invalid, and in fact, that the test was ineffective at detecting the flammability of the manufacturer's products.  <u>Id.</u> at 733.  The court found the manufacturer's reliance on the defective test was not undertaken in good faith, particularly in light of its knowledge that the pajamas were "extremely dangerous to the public because of its racing flammability," which was evidenced by the fact that one of its top officials had stated in an internal memo that the manufacturer was sitting on a "powder keg" with respect to liability in connection with its highly flammable clothing products.  Notably, in <u>Gryc</u>, evidence established that the manufacturer was aware of a number of prior injuries resulting specifically from the flannelette garments at issue, including six lawsuits, and that it failed to warn consumers because a warning would "stigmatize" the product, presumably due to the serious risk posed by the extreme flammability of the product.  <u>Id.</u> at 739-740.  However, the facts of this present case are clearly distinguishable from <u>Gryc</u>.

Here, Plaintiff has shown nothing more than a generic possibility for an individual to crash their vehicle and strike a bystander while high on CRC Duster.  However, mere knowledge of a risk alone, without more, is insufficient to establish a claim for punitive damages, nor is mere negligence (nor even gross negligence) a satisfactory basis for imposing punitive damages.  Simply

put, the facts in the record do not come close to establishing clear and convincing evidence that Defendant CRC intentionally disregarded information showing a high probability of serious injury or death to Mrs. McDougall in July 2019.  Here, Defendant CRC knew only that it was generally possible that individuals high on CRC Duster could operate a motor vehicle, lose control, and cause injury or death to a bystander, but the record does not establish that Defendant knew or should have known that Neumiller was highly probable to misuse CRC Duster, lose control of his vehicle, and strike and kill Mrs. McDougall in July 2019.

Further detracting from Plaintiff's position is Olson v. Snap Prods., Inc., 29 F. Supp. 2d 1027 (D. Minn. 1998), which Plaintiff relies on for the proposition that Defendant CRC was required to do more, including "taking adequate measures to minimize the hazards associated with foreseeable misuse" of CRC Duster.  (Plf.'s Mem., [Docket No. 71], at pp. 40-41).  In Olson, the plaintiff sued the manufacturer of a tire inflation product that was used for repairing flat tires. After using the product on a tire, an explosion occurred when plaintiff attempted to conduct welding near the tire.  The product was specifically marketed as a non-explosive product.  The Court found that the plaintiff was entitled to assert a claim for punitive damages, stating:

> The Record, which constitute the Plaintiff's prima facie case, would amply support a reasonable Jury's conclusion that the Defendants deceptively labeled the third generation fix a flat tire inflator as the "NON-EXPLOSIVE FORMULA," in order to preserve their market advantage–even though they knew of the high probability of tire welding explosions–in deliberate disregard of the safety of consumers, and of tire repair professionals. [citation omitted]. Equally supportable, based upon the Plaintiff's showings, is a finding that the Defendants' conscious failure to change the deceptive label design, in the face of mounting evidence that the existing product labels had not adequately protected the public, was at least knowingly indifferent to the consuming public's safety.

Id. at 1036 (emphasis added).  Critical to the Court's decision in Olson that punitive damages were justified was the fact that the manufacturer deliberately chose to label its product as non-explosive even though it was "acutely aware of the significant risk that the product would explode during

33

tire repair." <u>Id.</u> at 1037.  The Court concluded that this evinced "an indifference to the high probability of injury to others."  <u>Id.</u>; <u>see also</u> <u>Hodder v. Goodyear Tire & Rubber Co.</u>, 426 N.W.2d 826, 836 (Minn. 1988) (holding that a tire manufacturer's decision to make minimal efforts to distribute adequate safety information regarding the product's explosiveness was sufficient to show that it "<u>deliberately downplayed and obscured the dangers</u> of the K-rim to protect its tube and tire sales and thereby exhibited willful indifference to the safety of others") (emphasis added).

In contrast, prior to Mrs. McDougall's death, Defendant CRC was actually aware of only one incident involving a fatality from inhaling CRC Duster and was aware of no motor vehicle accidents resulting in injury or death to bystanders due to inhaling CRC Duster.  Nor was there "mounting evidence" that individuals high from inhaling CRC Duster were prone to driving and crashing their motor vehicle into bystanders.  The Court is unable to conclude that a reasonable jury could infer that Defendant CRC was aware of a highly probable motor vehicle hazard, which it then ignored, deliberately obscured, or intentionally failed to protect against.

The Court does not mean to minimize the result of the accident here, which was certainly tragic.  However, the facts as adduced in connection with this motion are not of the kind for which the extreme measure of punitive damages are reserved.  <u>See</u> <u>Molenaar v. United Cattle Co.</u>, 553 N.W.2d 424, 429 (Minn. App. 1996) ("Punitive damages are imposed to punish the defendant and to deter him, and others like him, from intentional wrongs and deliberate disregard of the safety or rights of others," and accordingly, "[t]he focus lies on the defendant's wrongful conduct that must be deterred, not the specific outcome of the conduct.") (quotation and citations omitted]), rev. denied (Oct. 15, 1996)).

In summary, Plaintiff has failed to demonstrate by clear and convincing evidence that Defendant CRC was either (1) aware of or intentionally disregarded information creating a high

34

probability of injury to Mrs. McDougall's safety or (2) deliberately disregarded a high probability that Neumiller would lose control of his vehicle while high on CRC Duster, and strike and kill Mrs. McDougall's death.

Therefore, to the extent Plaintiff's Motion seeks an Order of this Court permitting him to amend his Complaint to assert a claim for punitive damages against Defendant CRC, Plaintiff's Motion to Amend the Complaint to Assert a Claim for Punitive Damages, [Docket No. 69], is **DENIED**.

### III.    Conclusion

For the foregoing reasons, and based on all of the files, records, and proceedings herein,

**IT IS HEREBY ORDERED THAT**:

1.  Plaintiff's Motion to Amend the Complaint, [Docket No. 69], is **DENIED**, as set forth above; and

2.  The parties' Motion to Amend the Amended Pretrial Scheduling Order, [Docket No. 78], is **DENIED as moot**, as set forth above.

Dated: January 4, 2023                                        s/Leo I. Brisbois
                                                              Hon. Leo I. Brisbois
                                                              U.S. MAGISTRATE JUDGE