**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| DAVID A. MCDOUGALL, *individually and as Trustee for the Next-of-Kin of Decedent Cynthia A. McDougall*, | Civil No. 20-1499 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT TESTIMONY** |
| CRC INDUSTRIES, INC., and JOHN DOE COMPANY DEFENDANTS #1–10, | |
| Defendants. | |

---

David E. Bland, Michael D. Reif, Ryan W. Marth, Tara D. Sutton, Philip L. Sieff, and Rashanda C. Bruce, **ROBINS KAPLAN LLP**, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402, for plaintiff.

Robert J. Gilbertson, David J. Wallace-Jackson, and Virginia R. McCalmont, **FORSGREN FISHER MCCALMONT DEMAREA TYSVER LLP**, 225 South Sixth Street, Suite 1750, Minneapolis, MN 55402, for defendant CRC Industries, Inc.

This case arises from the death of Cynthia McDougall, who was killed in Baudette, Minnesota in a vehicle crash caused by Kyle Neumiller. At the time of the accident, Neumiller was allegedly driving his motor vehicle while using Defendant CRC Industries, Inc.'s ("CRC") computer dust remover (the "CRC Duster") to get high. Mrs. McDougall's surviving spouse and next-of-kin David McDougall brings this action—in his individual capacity and as court-appointed wrongful death Trustee—against CRC and John Doe

Companies 1–10, alleging various products liability claims, negligence, breach of warranty, deceptive and unlawful trade practices, and public nuisance.  The John Doe Company Defendants are individuals and entities that may have sold, distributed, manufactured, or marketed the CRC Duster, but whose identities are unknown at this time.

Following the Court's dismissal of some counts and McDougall's voluntary withdrawal of others, CRC brings a summary judgment motion for McDougall's remaining claims: strict liability for design defect, strict liability for failure to warn, and negligence. Both parties also bring cross motions to exclude expert testimony.  Because genuine disputes of material fact remain as to the duty CRC owed Mrs. McDougall and CRC's alleged negligent conduct, the Court finds that summary judgment is inappropriate and thus will deny CRC's motion.  The Court will grant in part and deny in part the experts' reports and testimony.

**BACKGROUND**

**I.      FACTUAL BACKGROUND**

**A.  The Parties and the Crash**

On July 22, 2019, Cynthia McDougall was driving a vehicle on State Highway 172 in Baudette, Minnesota when she was struck and killed in a crash with another vehicle.  (2nd. Decl. of Eric C. Ernstene ("Ernstene Decl."), Ex. K ("Neumiller Dep.") at 2–3, Feb. 15, Docket No. 100-11.)  The other vehicle was driven by Kyle Neumiller, who crossed over

the center line, drove into oncoming traffic, and struck Ms. McDougall's car head on. (*Id.* at 2–3; 1st Ernstene Decl., Ex. A, Sept. 2, 2020, Docket No. 20.) At the time of the collision, Neumiller was allegedly intoxicated due to ingesting gas from a cannister of compressed gas dusting spray manufactured by CRC ("CRC Duster"), and his loss of body functions and inability to maintain control of his vehicle is attributed to his intoxication. (Compl. ¶¶ 6, 172–77, July 1, 2020, Docket No. 1.)[1]

CRC is a corporation registered in Pennsylvania and is a wholly owned subsidiary of Berwin Corporation. (2nd Ernstene Decl., Ex. C ("Rudnick Dep.") at 3, 7, Feb. 15, 2023, Docket No. 100-3.) CRC is responsible for all aspects of CRC Duster's life cycle in the chain of commerce, including design, research, manufacturing, production, distribution, labeling, and marketing. (*Id.* at 20.) CRC Duster is marketed, sold, and distributed in Minnesota and other states. (*Id.* at 50; Neumiller Dep. at 12.)

### B.  The Product – CRC Duster

CRC Duster is a branded compressed gas dusting spray that is similar to other compressed gas dusters, also referred to as keyboard cleaners, compressed air, or dust removers. (2nd Ernstene Decl., Ex. D ("Selisker Dep.") at 19, Feb. 15, 2023, Docket No. 100-4; Rudnick Dep. at 31–32.) The spray canister has a trigger that opens a valve to

---

[1]  On April 1, 2020, Neumiller was convicted in Minnesota State Court of Criminal Vehicular Homicide and is currently serving a 72-month sentence at a Minnesota state correctional facility. (1st Ernstene Decl., Ex. A.)

release a stream of pressurized gas from the spray nozzle, which can remove dust and debris without damaging surface finishes or sensitive components. (Rudnick Dep. at 19–20.) Dust removers typically contain a pressurized volatile, fluorinated hydrocarbon gas called 1,1-difluoroethane ("DFE"), which is used in many consumer products, including deodorants, hairspray, and cleaning products. (2nd Ernstene Decl., Ex. A ("CRC Dep.") at 9, Feb. 15, 2023, Docket No. 100-1; Rudnick Dep. at 20.)

DFE is a central nervous system depressant, which, when inhaled, can cause psychoactive intoxicating side effects like euphoria, hallucinations, and delusions. (CRC Dep. at 8; Rudnick Dep. at 20–21; 3rd Ernstene Decl., Ex. 1 ("Reznikoff Report") at 6, Feb. 15, 2023, Docket No. 106-1.) Ingestion of DFE can also cause drowsiness, dizziness, suffocation, loss of consciousness, paralysis, and in some cases, cardiac arrest. (3rd Ernstene Decl., Ex. 3 ("Marose Report") at 6, Feb. 15, 2023, Docket No. 106-3; Decl. of Rashanda C. Bruce ("Bruce Decl."), Ex. 48 ("CRC Material Safety Data Sheet") at 2, Mar. 8, 2023, Docket No. 124-14.)

DFE has long been associated with substance abuse, in part because products containing DFE are inexpensive and widely available at retail locations. (*See* 4th Ernstene Decl., Ex. A ("Perron Dep.") at 10–13, Mar. 8, 2023, Docket No. 119.) Reports of the spontaneous deaths of teenagers who died after inhaling (also known as "huffing") volatile hydrocarbons first appeared in the 1960s. (Bruce Decl., Ex. 32 ("Poznak Study"), Mar. 8, 2023, Docket No. 124-2; Ex. 36 ("Avella Case Report") at 3, Mar. 8, 2023, Docket

No. 124-5.)  Since the 1990s, various governmental agencies, advocacy organizations, and researchers have gathered data and published studies on abuse of inhaled propellants, including dust removers.  (*See* Bruce Decl., Ex. 34 ("Broussard Case Report") at 3, Mar. 8, 2023, Docket No. 124-3; Ex. 35 ("Xiong Study") at 3, Mar. 8, 2023, Docket No. 124-4.)  The Complaint cites multiple incidents from 1997 to the present time of injury and death associated with dust remover inhalation while driving.  (Compl. ¶¶ 65–129.)  A 2010 study found that, while inhalant abuse of substances like gasoline or paint has been in decline since 1993, propellant abuse, including dust removers, began increasing around 1998 and has continued growing since then.  (*Id.* ¶ 63.)

CRC has known at all relevant times that people intentionally inhale duster for its intoxicating effects.  (CRC Dep. at 12; 2nd Ernstene Decl., Ex. E ("Grey Dep.") at 30–31, Feb. 15, 2023, Docket No. 100-5.)  CRC previously advertised that CRC Duster contained a bittering agent (or "bitterant") to prevent inhalant abuse, although information about the bitterant is no longer included in CRC Duster's current Safety Data sheet.  (CRC Dep. at 9–14; Selisker Dep. at 6, 14.)  CRC discontinued use of the bitterant following its inability to deter product abuse.  (CRC Dep. at 9–14.)  McDougall asserts that CRC knew the bitterant was ineffective as a deterrent and that there were multiple safer, feasible, and affordable alternatives available to CRC related to the duster's formula and packaging that would have more effectively prevented duster abuse and the injury to Ms. McDougall.  (Compl. ¶¶ 146–56, 183–92.)

At some point between 2012 and 2017, CRC revised the Safety Data Sheet product label for CRC duster, removing information about the anesthetic effects of misusing the product and replacing it with a warning that "[d]eliberately inhaling this product can lead to death from asphyxiation depending on concentration and duration of exposure." (Selisker Dep. at 13.) McDougall claims these warnings were inadequate regarding the potential harms associated with inhalation of CRC Duster and provided no warnings related to potential harms to innocent bystanders or related to operation of a motor vehicle. (Compl. ¶¶ 142–44.)

## II.   PROCEDURAL HISTORY

McDougall filed a Complaint against Defendants CRC and John Does #1–10 ("Defendants") on July 1, 2020. (*See generally* Compl.) McDougall alleged eight counts: Strict Products Liability – (1) Defective Design, (2) Manufacturing Defect, and (3) Failure to Warn; (4) Negligence; (5) Breach of Express Warranty and (6) Implied Warranty; and (8) Public Nuisance. (*Id.*) McDougall also brings (7) statutory claims pursuant to Minn. Stat. § 8.31, subd. 3a, alleging violations of the Minnesota Unlawful Trade Practices Act, False Statement in Advertising Act, and Unlawful Practices Act. (*Id.*) McDougall seeks damages and injunctive relief. (Compl. at 63–64.) The requested injunctive relief includes prohibiting the sale of CRC Dusters that include DFE to minors; limiting the sale of CRC Duster with DFE to one can per consumer in a 30-day period; and prohibiting CRC from

designing, manufacturing, distributing, and selling dust removers containing DFE without an effective physical mechanism or chemical composition to deter inhalant abuse.  (*Id.*)

On September 2, 2020, CRC filed a 12(b)(6) Motion to Dismiss.  (Mot. Dismiss, Sept. 2, 2020, Docket No. 17.)   The Court granted in part the motion as to the public nuisance and Minnesota DTPA claims, finding that McDougall failed to meet his pleading burden. (Order on Mot. Dismiss at 2, Mar. 3, 2021, Docket No. 43.)  The Court denied the motion as to the remaining claims.  (*Id.*)  Following the order, CRC filed its Answer and the parties proceeded to discovery.  (Answer, Mar. 17, 2023, Docket No. 42.)   McDougall later voluntarily withdrew his claims for strict liability (manufacturing defect), breach of express and implied warranties, and the remaining Minnesota statutory claims.  (Meet & Confer Statement, Feb. 15, 2023, Docket No. 101.)

CRC brought its current Motion for Summary Judgment on February 15, 2023. (Def.'s Mot. Summ. J., Feb. 15, 2023, Docket No. 98.)  CRC argues that summary judgment is appropriate because McDougall's strict liability design defect and failure to warn claims merge into the negligence claim and fail because there are no triable issues on duty, breach, or proximate causation.  (Def.'s Mem. Supp. Mot. Summ. J. at 6, Feb. 15, 2023, Docket No. 102.).

The parties also bring cross motions to exclude respective expert testimony. (Def.'s Mot. Exclude, Feb. 15, 2023, Docket No. 104; Pl.'s Mot. to Exclude, Feb. 15, 2023, Docket No. 110.)  CRC seeks to exclude the testimony and report of McDougall's experts Charles

Reznikoff, Donald Marose, Richard Stern, Fred Apple, Brian Perron, and Justin King. McDougall, on the other hand, seeks to exclude CRC's experts Richard Kingston, Daniel Lofgren, Delmar Morrison, and Melissa Snelson. (*Id.*)

## DISCUSSION

### III.   SUMMARY JUDGMENT

#### A.  STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

### B.  NEGLIGENCE & PRODUCTS LIABILITY CLAIMS

CRC challenges the remaining negligence and strict liability claims on the same grounds: that there are no triable issues because (1) CRC owed no duty, and thus did not breach a duty owed, to the McDougalls, and (2) CRC's conduct did not proximately cause the injury.   CRC also challenges the strict liability defective design claim because McDougall has not set forth evidence of a feasible alternative design and the strict liability failure to warn claim because Neumiller did not read the label.

As a federal court sitting in diversity, the Court applies the substantive law of the state in which it sits.  *Fogelbach v. Wal–Mart Stores, Inc.,* 270 F.3d 696, 698 (8th Cir. 2001). In Minnesota, "[p]roducts liability is a manufacturer's . . . tort liability for any damages or injuries suffered by a buyer, user, or bystander as a result of a defective product.  Products liability can be based on a theory of negligence, strict liability, or breach of warranty." *Glorvigen v. Cirrus Design Corp.*, 816 N.W.2d 572, 581 (Minn. 2012) (quotation omitted). In cases alleging strict liability pursuant to design-defects, "Minnesota merges negligence and strict liability claims into a single products liability theory, which employs a reasonable-care balancing test to determine whether a product is defective."  *Thompson v. Hirano Tecseed Co.,* 456 F.3d 805, 809 (8th Cir. 2006).

### A.  Negligence

To establish liability based upon negligence, a plaintiff must demonstrate "(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) that the breach

of the duty of care was a proximate cause of the injury." *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011). "A defendant is entitled to summary judgment [on a negligence claim] as a matter of law when the record reflects a complete lack of proof on an essential element of the plaintiff's claim." *Lubbers v. Anderson,* 539 N.W.2d 398, 401 (Minn. 1995). Because neither party disputes that Mrs. McDougall was injured, the Court only addresses duty, breach, and proximate causation. Further, because duty and proximate causation are applicable to the negligence and strict liability claims, the following analysis applies to all three remaining claims.

### 1. Duty

Generally, a defendant's duty to a plaintiff is a threshold question because "[i]n the absence of a legal duty, the negligence claim fails." *Gilbertson v. Leininger,* 599 N.W.2d 127, 130 (Minn. 1999) (citation omitted). In the products liability context, the question of foreseeability is essential to establishing a duty:

> In Minnesota, it is well settled that a manufacturer has a duty to protect users of its products from foreseeable dangers. But if the danger is not foreseeable, there is no duty. In determining whether a danger is foreseeable, courts look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility. That which is not objectively reasonable to expect is too remote to create liability on the part of the manufacturer. . . When the issue of foreseeability is clear, the courts, as a matter of law, should decide it. In close cases, the question of foreseeability is for the jury.

*Whiteford by Whiteford v. Yamaha Motor Corp., U.S.A.*, 582 N.W.2d 916, 918 (Minn. 1998). A manufacturer has a duty to develop its "plan or design so as to avoid any

unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use." *Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 621 (Minn. 1984) (quoting *Holm v. Sponco Mfg., Inc.*, 324 N.W.2d 207, 212 (Minn. 1982)).

As a general matter, a person does not owe a duty of care to another if the harm is caused by a third party's conduct. *Doe 169 v. Brandon*, 845 N.W.2d 174, 177–78 (Minn. 2014). However, an exception exists when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff. *Domagala,* 805 N.W.2d at 23. Accordingly, a manufacturer may have a duty to protect the user, as well as those who might be injured by the product's use or misuse, from foreseeable danger. *Whiteford*, 582 N.W.2d at 919. In determining the scope of this duty, Minnesota courts draw a distinction between two types of conduct by the defendant: misfeasance, comprising "active misconduct working positive injury to others," and nonfeasance, which is "passive inaction or a failure to take steps to protect [others] from harm." *Doe 169*, 845 N.W.2d at 178 (quotation omitted). "If a defendant's conduct is mere nonfeasance, that defendant owes no duty of care to the plaintiff for harm caused by a third party." *Fenrich v. The Blake Sch.*, 920 N.W.2d 195, 203 (Minn. 2018).

CRC argues that it owed no duty to the McDougalls. It asserts that discovery has uncovered no evidence that CRC engaged in misfeasance. Further, it argues that its conduct did not create a foreseeable risk of injury to a foreseeable plaintiff because the

act of making and selling the duster was far removed from Ms. McDougall's death, which was caused by the misuse of the duster by a third party.

Factual issues preclude summary judgment on this issue. The law establishes that foreseeability should be decided by a court as part of its "duty" analysis in all but "close cases." *Domagala*, 805 N.W.2d at 27. This is a close case. McDougall advances evidence that could lead a factfinder to conclude that it was objectively reasonable for CRC to anticipate a danger to third party bystanders from individuals who huffed while driving. For example, McDougall provides deposition testimony that demonstrates CRC was aware that its product could cause a variety of ill effects to someone who intentionally misused it to get intoxicated. (CRC Dep. at 12; Grey Dep. at 30–31.) McDougall also presents case reports, news articles, and published articles documenting huffing incidents and injury by drivers who were impaired from huffing. (*See, e.g.*, Broussard Case Report at 2–3; Xiong Study at 2–4; Bruce Decl., Ex. 44, Mar. 8, 2023, Docket No. 124-13.) A reasonable factfinder could find that the reported fatal accidents in the research articles about duster misuse were sufficient to put CRC on notice that death from huffing CRC Duster itself may lead to a misuser, like Neumiller, driving intoxicated and result in injury to a bystander, like Ms. McDougall.

Moreover, McDougall has demonstrated that the reporting was done by the Alliance for Consumer Education (ACE), an industry-funded trade group seeking to teach about the dangers of product or inhalant abuse, of which CRC is a member. (Bruce Decl.,

Ex. 40, Mar. 8, 2023, Docket No. 124-9; Bruce Decl., Ex. 42, Mar. 8, 2023, Docket No. 124-11; Selisker Dep. at 22.)  Because CRC was affiliated with ACE, it is more likely that CRC knew or should have known of the prevalence of huffing while driving.  This suggests that the dangers of huffing while driving, including injuring or killing a bystander, were a foreseeable risk.  Further, CRC engaged in certain steps to warn users about the dangers of inhalant abuse.  (CRC Dep. at 10, 20; Selisker Dep. at 10; Rudnick Dep. at 17; 2nd Ernstene Decl., Ex. B ("Duster Label"), Feb. 15, 2023, Docket No. 100-2.)  This evidence may further support a finding of foreseeability.

McDougall also presents other evidence that, viewed in the light most favorable to him, could ultimately support a finding of foreseeability: the use of the warning label and changes to its language, the bitterant to deter inhalant abuse, and expert testimony suggesting CRC should have been aware of the danger to third party bystanders.  (Duster Label; CRC Dep at 9–14; Selisker Dep. at 13–14; Rudnick Dep. at 42–46; 3rd Ernstene Decl., Ex. 1 ("Reznikoff Report") at 4, Feb. 15, 2023, Docket No. 106-1; Ex. 3 ("Marose Report") at 8, Feb. 15, 2023, Docket No. 106-3; Ex. 5 ("Stern Report") at 17–18, 22, Feb. 15, 2023, Docket No. 106-5; Ex. 8 ("Perron Report") at 22, Feb. 15, 2023, Docket No. 106-8.) , McDougall also sets forth deposition evidence showing CRC's lack of policies or research to test deterrence and prevention of misuse, which could support a finding of liability. (*See, e.g.*, CRC Dep. at 16–17, 24, 29; Rudnick Dep. at 36–37.)

Where the "test is not whether the precise nature and manner of the plaintiff's injury was foreseeable, but whether the possibility of an accident was clear to the person of ordinary prudence," McDougall has presented evidence that could lead a reasonably jury to find the injury was foreseeable. *Domagala*, 805 N.W.2d at 27 (quotation omitted). The material factual disputes regarding the foreseeability of this type of injury preclude the Court from entering summary judgment in favor of CRC on this issue.

In short, the Court finds a reasonable factfinder could find that it was foreseeable that a driver would misuse the product, become intoxicated, and be a danger to bystanders like Ms. McDougall. Thus, a reasonable factfinder could conclude that CRC owed Ms. McDougall a duty. *See Diehl v. 3M Co.*, A19-0354, 2019 WL 4412976, at *4 (Minn. Ct. App. 2019) (finding 3M would have a duty where "it was reasonably foreseeable that [the driver] would misuse the dust remover and become acutely intoxicated" and "[i]f it was also foreseeable that people who [huff and become intoxicated] were a danger to [plaintiff]"). The ultimate question is whether the specific danger—huffing while driving—is objectively reasonable to expect and "clear to the person of ordinary prudence." *Domagala*, 805 N.W.2d at 27. The answer to this question is not entirely clear at this juncture, making this a close case that must be decided by a jury. As such, the Court will deny summary judgment as to whether CRC owed a duty to Mrs. McDougall.

### 2. Proximate Causation

In Minnesota, a party's negligence is the proximate cause of an injury, if "the act [is] one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others" and the defendant's "conduct was a substantial factor in bringing about the injury." *Lubbers*, 539 N.W.2d at 401 (quotations omitted). Only "where reasonable minds can arrive at only one conclusion," is proximate cause a question of law. *Id.*

The Court previously stated that "[w]hether CRC should have anticipated the likely injury of someone using their product to become intoxicated and causing an accident is ultimately a question of foreseeability." *McDougall v. CRC Indus., Inc.*, 523 F. Supp. 3d 1061, 1072 (D. Minn. 2021). CRC seeks to challenge the Court's determination that proximate cause is a question of foreseeability. CRC cites *Dellwo*, where the Minnesota Supreme Court determined that "[a]lthough a rigorous definition of proximate cause continues to elude us, nevertheless it is clear, in this state at least, that it is not a matter of foreseeability." *Dellwo v. Pearson*, 107 N.W.2d 859, 861 (Minn. 1961); *see also DeLuna v. Mower Cnty.*, 936 F.3d 711, 717 (8th Cir. 2019) (relying on *Dellwo*). However, the Minnesota Supreme Court recently clarified that "for a party's negligence to be the proximate cause of an injury, the injury must be a foreseeable result of the negligent act and the act must be a substantial factor in bringing about the injury." *Staub as Tr. of Weeks v. Myrtle Lake Resort, LLC*, 964 N.W.2d 613, 620 (Minn. 2021) (internal quotation

-15-

omitted).  While CRC argues that this language is dicta because *Straub* was not about foreseeability, it is clear that the court was considering whether summary judgment was appropriate based on whether there was a genuine issue of material fact concerning proximate causation, which rested on foreseeability and whether certain actions were a substantial factor in bringing about the injury.  *See Staub*, 964 N.W.2d at 620.  Moreover, the court made clear that the parties "d[id] not dispute on appeal whether a fall and injury are a foreseeable result of [the defendant's actions]."  *Id.* at 620–21, n.6.  Thus, the court focused its analysis on the substantial factor issue, having already assumed that the injury was foreseeable.  The Court is not persuaded that foreseeability is irrelevant to the proximate causation analysis.

Moreover, it is clear that proximate cause is satisfied if "the injury was the natural and probable consequence" of the defendant's act, as to be a consequence "which follow[s] in unbroken sequence, without an intervening efficient cause, from the original negligent act."  *Dellwo*, 107 N.W.2d at 861–62.  The defendant's acts must also have been a substantial factor in bringing about the harm.  *Staub*, 964 N.W.2d at 620.  An intervening cause is not **superseding** unless it has satisfied several criteria, including that it "actively worked to bring about a result which would not otherwise have followed from the original negligence" and was not "reasonably **foreseeable** by the original wrongdoer." *Canada ex rel. Landy v. McCarthy*, 567 N.W.2d 496, 507 (Minn. 1997) (emphasis added). Foreseeability certainly factors into the proximate causation analysis.

CRC argues that there is no evidence that CRC's actions in making and selling CRC Duster were a "substantial factor" in bringing about the injury and that Neumiller's actions—allegedly inhaling CRC Duster, driving while under the influence, losing control of his vehicle, crossing into oncoming traffic, and hitting Ms. McDougall's car—were an intervening cause.   Ultimately, the Court finds that genuine issues of material fact preclude summary judgment on proximate causation.   While it is clear that Neumiller's actions "actively worked to bring about a result which would not otherwise have followed from the original negligence," McDougall presents evidence that could lead a factfinder to conclude that the events leading to Ms. McDougall's death were a reasonably foreseeable risk of CRC's manufacture and sale of CRC Duster.   *McCarthy*, 567 N.W.2d at 507.   A jury could plausibly conclude that CRC's actions were also a substantial factor in bringing about the injury.   *See Staub*, 964 N.W.2d at 621 ("There may be more than one substantial factor—in other words, more than one proximate cause—that contributes to an injury.").   This evidence, as with the duty inquiry, includes deposition testimony of CRC officials about CRC's knowledge of huffing misuse, use of the bitterant, evidence that CRC took de minimus steps to deter misuse despite evidence of its ineffectiveness, warning label changes, and expert reports that draw conclusions on foreseeable risk. Consequently, based on the evidence in the record, a jury could reasonably infer that CRC's actions were a substantial factor in causing Ms. McDougall's death.

The Court emphasizes that "[b]ecause negligence cases are fact-intensive, the procedural posture of each case matters a great deal." *Staub*, 964 N.W.2d at 620. On a motion for summary judgment, "the facts **and the reasonable inferences to be drawn from those facts** must be resolved in [McDougall's] favor." *Id.* (emphasis in original). While CRC may ultimately be able to convince a jury that its actions did not proximately cause Mrs. McDougall's death, summary judgment is "blunt instrument" that is not appropriate where, as here, "reasonable persons could draw different conclusions from the evidence presented." *Id.*

### B. Defective Design

To recover on a strict liability claim, "the plaintiff must establish (1) that the defendant's product was in a defective condition unreasonably dangerous for its intended use, (2) that the defect existed when the product left the defendant's control, and (3) that the defect was the proximate cause of the injury sustained." *Bilotta,* 346 N.W.2d at 623 n.3. A manufacturer is obligated to address defects related to unintended, but reasonably foreseeable, uses. *Id.* at 621. A manufacturing defect exists when a product is "physically flawed, damaged, or incorrectly assembled . . . [and] such a defect existed in the product when it left the hands of the manufacturer." *Webb v. Ethicon Endo-Surgery, Inc.*, No. 13-1947, 2014 WL 7213202, at *4 (D. Minn. Dec. 17, 2014) (quoting Restatement (Third) of Torts: Prod. Liab. § 2, cmt. c (1998)); *Harrison ex rel. Harrison v. Harrison*, 733 N.W.2d 451, 454 n.2 (Minn. 2007).

-18-

The test for a defective-design claim is a "reasonable-care balancing test." *Bilotta,* 346 N.W.2d at 621.  Specifically, whether a product's design is defective and unreasonably dangerous must be determined by balancing "the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm."  *Id.* (internal quotations omitted).

In addition to arguing for a lack of duty and proximate causation, CRC argues that McDougall's design defect theory fails because McDougall has not offered evidence that there is no feasible alternative design that would have eliminated the risk of this type of injury, which CRC argues is required under Minnesota law.  CRC cites to *Kallio*, a strict liability products case where the court stated that "[o]bviously, a factor bearing upon the latter requirement [to establish that a product was unreasonably dangerous] will be the existence or nonexistence of a feasible alternative design."  *Kallio v. Ford Motor Co.*, 407 N.W.2d 92, 96 (Minn. 1987) (internal citations omitted).  CRC also points to *Kapps* for the proposition that courts grant summary judgment on design-defect claims when there is no evidence of alternative designs.  *See Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1161 (D. Minn. 2011).

While *Kallio* suggests that the production of evidence showing a feasible, alternative safer design is normally required to establish a prima facie case that a product was unreasonably dangerous, the Court is not persuaded that such evidence must be produced in **all** cases.  The *Kallio* court noted that "[e]xamination of our cases . . .

demonstrates that, **as a practical matter, successful plaintiffs**, almost without fail, introduce evidence of an alternative safer design." *Kallio*, 407 N.W.2d at 96 n.6 (emphasis added). But *Kallio* does not hold such evidence out as an explicit requirement. CRC's reliance on *Kapps* is also misplaced, as the expert there merely speculated as to alternative designs. *Kapps*, 813 F. Supp. 2d at 1160. In that context, the court explained that "[w]ithout evidence of a proposed alternative design, a jury cannot possibly engage in the 'reasonable-care balancing test' called for by Minnesota law." *Id.* at 1161.

The Eighth Circuit's analysis on this point is instructive. The Eighth Circuit in *Wagner* explained that the existence of a safer alternative design is not an essential element in design defect cases. *See Wagner v. Hesston Corp.*, 450 F.3d 756, 759 (8th Cir. 2006). Importantly, the *Wagner* court noted that the Minnesota Supreme Court "**did not go so far as to require proof of an alternative feasible design** in all defective-products cases," and there are some cases where an unreasonably dangerous product should be completely removed from the market—rather than be redesigned. *Id.* at 760 (citing *Kallio*, 407 N.W.2d at 97 n.8).

Thus, the Court finds that proof of an alternative design is not a requirement in this case and summary judgment is not appropriate simply because McDougall failed to offer proof of an alternative design. To the extent that McDougall seeks to introduce evidence or expert testimony of a feasible alternative, the Court will consider whether such evidence satisfies *Daubert*.

-20-

### C.  Failure to Warn

"[F]ailure to warn is a cause of action separate from defective design."  *Drager by Gutzman v. Aluminum Indus. Corp.,* 495 N.W.2d 879, 884 (Minn. Ct. App. 1993) (quotation omitted); *see Germann  v.  F.L.  Smithe  Mach.  Co.,* 395  N.W.2d  922,  924–25  (Minn. 1986) (noting that even where a design defect claim fails, a cause of action may still proceed based on the manufacturer's failure to warn).  To establish a claim for the failure to warn, a plaintiff must prove three elements: "(1) the defendant had a duty to warn; (2) the defendant breached that duty by providing an inadequate warning (or no warning at all); and (3) the defendant's inadequate (or nonexistent) warning caused the plaintiff's damages."  *Kapps*, 813 F. Supp. 2d at 1155 (citing *Balder v. Haley,* 399 N.W.2d 77, 81 (Minn.  1987)).    Whether  a  duty  to  warn  exists  is  a  question  of  law  for  the Court.  *Germann,* 395 N.W.2d at 924.  The adequacy of a warning is a question of fact.  *J & W Enters., Inc. v. Economy Sales, Inc.,* 486 N.W.2d 179, 181 (Minn. Ct. App. 1992).

CRC argues that McDougall's failure to warn claim fails because he has not offered any plausible alternative warning or competent evidence that different warnings would have prevented Ms. McDougall's injuries.  CRC contends that this claim requires that the product user actually read the warning, and because Neumiller testified that he did not read the label before using the product on the day in question, the presence of additional or different warnings would not have prevented the accident.

CASE 0:20-cv-01499-JRT-LIB   Doc. 145   Filed 08/25/23   Page 22 of 43

Minnesota courts have consistently held that a plaintiff's failure to read a warning on a product precludes a failure-to-warn claim as a matter of law. *See, e.g., Lammle v. Gappa Oil Co., Inc.,* No. A08–0582, 2009 WL 67438, at *8 (Minn. Ct. App. Jan. 13, 2009) (explaining that absent a reading of the warning, there is no causal link between the alleged inadequate warning and the injury).[2]  However, Neumiller testified that, though he did not read the instructions the day of the accident, he had read them at some point in time. (*See* Neumiller Dep., at 7.)  Thus, the Court finds that a genuine dispute about whether Neumiller read the label precludes summary judgment on the failure to warn claim.

In sum, the Court finds that genuine issues of material fact preclude summary judgment. McDougall presents evidence that could lead a reasonable factfinder to conclude that CRC owed a duty to Mrs. McDougall because the dangers of huffing while driving, including injuring or killing a bystander, were a foreseeable risk.  And while reasonable persons could draw different conclusions from the evidence presented, a jury could plausibly conclude that CRC's actions were also a substantial factor in bringing about the injury.  Lastly, there remains material fact issues regarding the failure to warn and design defect claims.  Thus, the Court will deny CRC's motion for summary judgment.

---

[2] *See also Lindsay v. St. Olaf College,* No. A06–2416, 2008 WL 223661, at *5 (Minn. Ct. App. Jan. 29, 2008); *Tropple v. Black & Decker (U.S.) Inc.*, No. 13-2907, 2015 WL 4992011, at *7 (D. Minn. Aug. 20, 2015) (holding that the plaintiff's failure to read the warning on the product was fatal as a matter of law to his claim that the product lacked an adequate warning).

-22-

IV.     **MOTIONS TO EXCLUDE EXPERT TESTIMONY**

Having concluded that there are genuine disputes of material fact that foreclose

CRC's motion for summary judgment, the Court will now consider the parties' motions to

exclude expert testimony and determine whether the testimony is sufficiently reliable

under *Daubert*.

A.  **Standard of Review**

Federal Rule of Evidence 702 governs the admissibility of expert testimony.

*McMahon v. Robert Bosch Tool Corp.*, 5 F.4th 900, 903 (8th Cir. 2021).  An expert's opinion

testimony is admissible if:

> (a)     the expert's scientific, technical, or other specialized
>          knowledge will help the trier of fact to understand the
>          evidence or to determine a fact in issue;
> (b)     the testimony is based on sufficient facts or data;
> (c)     the testimony is the product of reliable principles and
>          methods; and
> (d)     the expert has reliably applied the principles and
>          methods to the facts of the case.

FexDESd. R. Evid. 702.

The district court has a gate-keeping obligation to ensure that all testimony

admitted under Rule 702 satisfies these prerequisites and that "any and all scientific

testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell*

*Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  The proponent of the expert testimony has

the burden of establishing by a preponderance of the evidence that the expert is qualified,

that the methodology used is scientifically valid, and that "the reasoning or methodology

in question is applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006). "Expert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Id.* at 757.

"Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Id.* at 758. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (quoting *Daubert*, 509 U.S. at 595). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)).

## B. CRC's Motion to Exclude

### 1. Dr. Reznikoff's Testimony

CRC moves to exclude Dr. Charles Reznikoff's testimony because his report includes opinions about matters he is not qualified to present, including the fields of toxicology, product design, warnings, and sales and marketing practices. CRC argues that Dr. Reznikoff has no training or experience in these areas, used no particular methodology in developing his opinions, and that they lack foundational reliability and are not helpful to the jury. Further, CRC asserts that Dr. Reznikoff's expertise in addiction medicine does not qualify him as an expert on warnings for potentially addictive products and his

opinions are not reliable because he has not tested his proffered alternative designs and shown that they would work or that the existing technology could be applied to the product.

Dr. Reznikoff is an experienced internal medicine doctor whose work encompasses addiction. (Reznikoff Report at 4.) Despite CRC's contentions, as an internal medicine doctor who specializes in addiction medicine, the use of potentially addictive products and their elements, such as warnings, is apt for his expertise because these elements likely arise within his practice. For example, treating patients with different addictions requires Reznikoff to study the ways in which addiction forms and how different patients are more or less influenced to abuse substances. (*Id.* at 6, 19.) Thus, Dr. Reznikoff appears well-suited to offer his opinion on the warnings used in this case and the Court will deny CRC's motion to exclude his testimony in this regard.

However, it is also clear that Dr. Reznikoff's opinions about alternative designs are somewhat unreliable because his report does not show how these designs are feasible. Rather, he offers mere ideas. (*Id.* at 31–35) (discusses improving labelling, marketing, branding, and store placement.) While design defect experts are not required to manufacture a new device or prototype, they must demonstrate that the proposed safety designs are feasible and compatible with the machine's proper function. *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1012 (8th Cir. 2005) (explaining that the expert's opinion must be "sufficiently grounded to be helpful to the jury"). Dr. Reznikoff's opinions about

possible alternative designs are not sufficiently grounded, as he himself acknowledges that these alternative possibilities would need to be tested. (*Id.* at 31, 35.) For example, Dr. Reznikoff discusses possible designs that allow parents to disable the can when not in use, limiting the jet of DFE released, limiting the quantity of DFE in each can, and designing cans to have lock out periods, among other suggestions. (*Id.*) However, he notes that these designs are time-consuming, costly, and may pose design challenges. (*Id.* at 31–34.)

Testing is an important factor in analyzing the reliability of alternative design proposals. *Peitzmeier v. Hennessy Indus., Inc.,* 97 F.3d 293, 297–98 (8th Cir. 1996). As such, Eighth Circuit precedent establishes that it is appropriate for district courts to exclude expert testimony involving proposed design changes that have never been developed or tested. *See, e.g., Jaurequi v. Carter Mfg. Co., Inc.,* 173 F.3d 1076, 1084 (8th Cir. 1999) (affirming the exclusion of expert's testimony because expert did not attempt to draw or construct safety device, "much less test its utility as a safety device or its compatibility" with the machine's proper function). Such is the case here, where Dr. Reznikoff's ideas for safer designs seemingly do "nothing more than criticize an existing design and imagine a safer" CRC Duster cannister. *Ehlers v. Siemens Med. Sols., USA, Inc.,* 251 F.R.D. 378, 387–88 (D. Minn. 2008). Thus, the Court will grant CRC's motion only as it relates to Dr. Reznikoff's opinion about proposed alternative designs.

### 2.  Marose Testimony

CRC also argues that the Court should exclude in part the testimony of Lieutenant Donald Marose, a former Minnesota State Patrol and Metro Transit Police officer specializing in drug-impairment recognition, as areas outside of his expertise.  Marose offers five opinions, and CRC contends that four should be excluded: the first three, which concern the prevalence and law enforcement knowledge of inhalant abuse, and the fourth concerning CRC's knowledge about misuse.  (Marose Report at 1.)  CRC argues that Marose's testimony should be excluded because Marose lacks adequate expertise on corporate conduct, processes, or business administration, that his testimony would be unduly prejudicial, and that it risks misleading the jury.

The Court is not persuaded that Marose lacks adequate qualifications to offer opinions on the prevalence of inhalant abuse because they relate to his expertise in the areas of drug recognition and impairment evaluation.  Certainly, Marose's decades of experience in detecting drivers' drug abuse and its effects is relevant to a case about that very same issue.  While Marose's opinion regarding the prevalence of inhalant abuse does not tend to prove Neumiller engaged in inhalant abuse, it is nevertheless relevant because it could support reasonable inferences about CRC's knowledge as to the foreseeability analysis.  Thus, Marose's opinions go to issues of fundamental importance to the case and their probative value outweigh the risk of prejudice.  His opinions, of course, may be challenged on cross-examination.

That being said, the Court agrees that Marose may not offer testimony specifically about CRC's corporate knowledge.  Though Marose's opinion about what CRC should have known stems from his extensive law enforcement experience and the relationship between inhalants and road travel, such an opinion results from an unsupported inferential leap, requiring assumptions about CRC's informational processes, reporting structures, and state of mind.  *In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1056 (D. Minn. 2007) ("An expert may rely on inferences, analogies and extrapolation as long as the gaps between steps is not too great.").  Such an opinion, even from an experienced lieutenant such as Marose, ultimately amounts to pure conjecture based on Marose's impressions of the evidence of inhalant abuse prevalence.  *Id.* at 1053 ("[E]xpert testimony that is merely speculation or pure conjecture based on the expert's impressions of the physical evidence must be excluded as not based on any reliable methodology or scientific principle.").

A jury, armed with all the facts and Marose's other opinions regarding the prevalence of inhalant abuse, can rightly infer what CRC should or should not have known as it relates to foreseeability.  Therefore, the Court will grant CRC's motion as to Marose's fourth opinion regarding the state of CRC's corporate knowledge, but otherwise will deny CRC's motion to exclude Marose's testimony.

### 3.  Stern's Testimony

CRC next contends that Richard Stern's deposition testimony should be excluded in full because his recommended measures, even if implemented, do not reveal whether they would have changed the outcome of the collision and his opinions are either no longer relevant to the issue of the case or will not be helpful to the jury.

Stern is an expert on the development of various products and their safety.  (Stern Report at 5–6.)   It is clear that Stern possesses an expertise in product safety management, risk assessment, and hazard analysis that will be helpful to the jury in determining whether CRC engaged in negligent conduct.  Stern has also been directly involved in all aspects of product and process safety management.  (*Id.* at 6.)  He is therefore qualified to opine on product safety design and regulatory compliance, and the extent to which CRC followed industry standards.

To the extent CRC argues that Stern's opinions go to issues no longer part of the case, those issues can be addressed during trial.  Other deficiencies in Stern's testimony, such as whether certain opinions reach outside the bounds of Stern's expertise, may similarly be dealt with on cross-examination.  The Court will thus deny CRC's motion to exclude Stern's testimony.

### 4.  Dr. Apple's Testimony

CRC next argues that Dr. Fred Apple, a Ph.D. toxicologist with 40 years of experience in forensic and clinical toxicology, mostly repeats the findings of law

enforcement and consequently parrot the same points offered by McDougall's other expert, Donald Marose. (3rd Ernstene Decl., Ex. 7 ("Apple Report"), at 3–4, Feb. 15, 2023, Docket No. 106-7.) CRC asserts that Dr. Apple's opinions are either conclusory or mere recitations of fact that would be unhelpful to a jury. Particularly, CRC takes issue with Dr. Apple's causation opinion, where he opines that Neumiller's huffing was a substantial causal factor in the crash. (Apple Report at 8.) CRC states that this is a blanket statement because Dr. Apple does not provide any explanation, scientific support, or factual citation to support this conclusion.

If Dr. Apple's causation opinion was not supported by any methodology or other process, this evidence would only be connected by "the *ipse dixit* of the expert" and CRC would thus be correct that such unsupported statement may stain the jury's minds. *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1000 (8th Cir. 2019) ("A court should not admit opinion evidence that 'is connected to existing data only by the *ipse dixit* of the expert.'") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). However, Dr. Apple's testimony walks through his report and the underlying facts and data on which he relies. (Bruce Decl., Ex. 25 at 25–27, Mar. 8, 2023, Docket No. 122-1.) Dr. Apple thus provided the methodology and factual evidence that support his causation analysis, such as the toxicology readings he performed.

The Eighth Circuit has previously held that a toxicologist may testify that exposure to a chemical caused a person's symptoms and resulting injuries. *See Bonner*, 259 F.3d at

928–31; *Loudermill v. Dow Chem. Co.,* 863 F.2d 566, 569–70 (8th Cir. 1988). However, neither *Bonner* nor *Loudermill* provides a blanket rule that toxicologists are qualified to render an opinion on causation. The Court must still consider toxicologists' reliability given the facts of each case. *See Bonner*, 259 F.3d at 930–31 (finding toxicology testimony regarding the causation of plaintiff's symptoms reliable because of the temporal connection between the exposure and the symptoms). The Court may also consider the toxicologist's academic and practical knowledge. *See Loudermill*, 863 F.2d at 568–70. Here, Dr. Apple has experience studying, investigating, and teaching inhalant chemicals. (Apple Report at 4, 23–25, 30–58.) His professional experience makes his causation opinion reliable.

Ultimately, the inquiry as to the reliability and relevance of the testimony is a flexible one designed to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Wholesale Grocery Prods.*, 946 F.3d at 1000 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Dr. Apple, using his professional studies as a chemist and toxicologist and personal experience in analyzing inhalant toxicology, opines on his fields of study and provides an elevated level of rigor that demonstrates he is an expert in the relevant field. He possesses the specialized knowledge that would assist the jury in making its factual determinations. Thus, the Court finds that his testimony is relevant.

The Court will therefore deny CRC's motion to exclude Dr. Apple's expert report and testimony.

### 5.  Dr. Perron's Testimony

CRC next takes issue with the expert testimony of Dr. Brian Perron, a professor of social work with expertise in scientific measurement related to empirical research, validity theory, and large complex data sets.  (Perron Report at 5–10.)  CRC argues that Dr. Perron's report is based on a fundamentally flawed methodology and suffers from serious analytical missteps exposed by CRC's own expert—including definitional, computational, and statistical errors and inaccuracies.  Moreover, CRC contends that Dr. Perron's untimely supplemental report makes major report analysis changes that further evidence its unreliability.  Lastly, CRC argues that each of Dr. Perron's individual opinions are not relevant or helpful to a jury, and that he is not qualified to offer many of them.

 CRC's arguments for the exclusion of Dr. Perron's opinions largely result from the difference of opinion from different experts.  These criticisms hinge more on credibility and weight the factfinder should give them, rather than admissibility.  *See Shoaf v. Am. Way Transps., Inc.,* 47 Fed. Appx. 780, 782 (8th Cir. 2002) (per curiam) ("Disagreements about methodology and technique go to the weight the jury should give the evidence rather than its admissibility.").  While CRC takes issue with Dr. Perron's report by arguing that his methodology was unreliable, his methodology is within reliable bounds.  Dr. Perron uses the same methodology in his professional practice and in routinely analyzes

collections of unstructured text documents, drawing inferences and analyses. (*Id.* at 5, 10.)  Moreover, CRC's expert's attempt to point out defects in Dr. Perron's methodology does not automatically elevate that expert's opinion as superior; it is reasonably possible that the right answer lies somewhere between the two experts' opinions. (*See Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 633 (8th Cir. 2012) (stating that "it is not the province of the court to choose between the competing theories [of the experts] when both are supported by reliable scientific evidence.").  Given that questions of reliability should be resolved in favor of admission, these alleged defects could be explored during cross examination. *Fed. Energy Regul. Comm'n v. Silkman*, No. 16-0205, 2019 WL 6467811, at *5 (D. Me. Dec. 2, 2019) ("[T]he law favors vigorous cross-examination over exclusion.").

Dr. Perron's supplemental report appears timely.  It was submitted on December 15, 2022, the date that all discovery terminated. (*See* 3rd Ernstene Decl., Ex. 10 ("Perron Supp. Report") at 22, Feb. 15, 2023, Docket No. 106-10; Am. Pretrial Scheduling Order at 2, May 11, 2022, Docket No. 59.)  However, none of Dr. Perron's analysis or conclusions change from his original report, thus the Court is unsure what added value the supplemental report would have.  Thus, the Court need not consider the supplemental report.  Regardless, the Court will deny CRC's motion to exclude Dr. Perron's testimony.

### 6.  Dr. King's Testimony

Lastly, CRC argues that the opinions of Dr. Justin King, McDougall's vocational expert, should be excluded.  McDougall offers Dr. King's testimony on the McDougalls'

earning capacities.  (3rd Ernstene Decl., Ex. 12 ("King Report") at 2, Feb. 15, 2023, Docket No. 106-12.)  CRC asserts that Dr. King's testimony requires no specialized knowledge and simply reiterates the facts, rubber stamps Mr. McDougall's own opinions about his own earning capacity, uses simple math, and are devoid of discernible methodology or principles, rending them unreliable and unhelpful to a jury.

The Court finds that Dr. King may opine on the effect of Ms. McDougall's death on Mr. McDougall's vocational outlook.  He competently relies on financial documents and Mr. McDougall's testimony about the circumstances created by the death of Ms. McDougall, combined with other materials and Dr. King's knowledge and experience about the labor market. (King Report at 2, 6; 3rd Ernstene Decl., Ex. 13 ("King Dep.") at 3–4, Feb. 15, 2023, Docket No. 106-13.)     In reaching his expert opinion about the McDougalls' earning capacities, Dr. King reviewed the McDougalls' financial documents, educational and employment history, conducted two client interviews of Mr. McDougall to better understand these documents and get his perspective about the impact of Ms. McDougall's death, and relied in part on his own education, training, and experience as a vocation expert.  *See Masters v. City of Independence*, 998 F.3d 827, 839 (8th Cir. 2021) (outlining various types of evidence that may be useful for a vocational rehabilitation consultant).  Dr. King uses appropriate methodology in a reliable fashion.

Additionally, Dr. King assessed financial documents and other information to present straightforward calculations on the McDougalls' earning capacities "in an

understandable format [that] will assist the jury." *Total Control, Inc. v. Danaher Corp.*, 338 F. Supp. 2d 566, 569 (E.D. Pa. 2004).  The use of simple math may be available to jurors, but that alone does not justify excluding Dr. King's opinions, which flow from his specialized knowledge about vocational abilities and deficits and relation to the labor-market.  Again, "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo*, 457 F.3d at 757–58.  The Court finds CRC's arguments for exclusion unpersuasive and will deny the motion as to Dr. King's testimony.

### C.  McDougall's Daubert Motion

#### 1.  Dr. Kingston's Testimony

For his part, McDougall argues that the opinions of Richard Kingston, a pharmacist with expertise in toxicology and pharmacokinetics, should be excluded because he demonstrates no specialized knowledge, skill, experience, training, or education sufficient to render him an expert and possesses limited knowledge regarding inhalants or the chemicals they contain.  Ryan W. Marth ("Marth Decl"), Ex. 2 ("Kingston Report") at 2–3, Feb. 15, 2023, Docket No. 113-2.)  McDougall takes issue with each of Dr. Kingston's four opinions, arguing that they are unreliable, irrelevant, and/or unhelpful to a jury.

The Court finds that McDougall has not presented a sufficient basis to exclude Dr. Kingston's anticipated testimony.  Dr. Kingston is credentialed and experienced, bringing more than 46 years of experience in poison control and clinical toxicology, and such experience is relevant to the issues of this case.  (Kingston Report at 2.)  That Dr. Kingston

may lack expertise in the slew of fields McDougall names in its brief does not establish

that exclusion is warranted, as "[g]aps in an expert witness's qualifications or knowledge

generally go to the weight of the witness's testimony, not its admissibility." *Robinson v.*

*GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100–01 (8ᵗʰ Cir. 2006) (citation omitted). Such gaps

or deficiencies may be addressed on cross examination. His opinions are within the range

where experts may reasonably differ. If Dr. King's testimony strays too far from his areas

of expertise, McDougall may object during trial.

However, the Court will limit Dr. Kingston's opinion and exclude his testimony that

CRC Duster is not inherently dangerous when used as directed. (Kingston Report at 13–

16, 25. Such testimony is irrelevant and unhelpful for the purposes of this case.

McDougall's action is not premised on a claim that Duster is inherently dangerous when

properly used, thus such opining would confuse the jury. The Court therefore grants

McDougall's motion as to limiting part of opinion two, but otherwise denies the motion

as to Dr. Kingston's testimony.

### 2.  Lofgren's Testimony

McDougall next argues that the opinions of Daniel Lofgren, CRC's accident

reconstructionist, should be excluded because he is unqualified to render them and bases

them on unsupported assumptions and untested methodologies. In particular,

McDougall takes issue with Lofgren's two counterfactuals about the crash scene.

McDougall argues that Lofgren's accounts are unreliable and lack foundation because

Lofgren was unable to opine whether Ms. McDougall's injuries would have been catastrophic or fatal. McDougall asserts that Lofgren does not expose his methodology, fails to account for material facts, and omits his assumption regarding the angle at which Neumiller's truck traveled.

First, the Court is unconvinced that Lofgren is not qualified to opine about accident reconstruction and the injuries sustained in his hypothetical collisions. Lofgren is an expert in accident reconstruction, with over a decade of experience in law enforcement, and he has had extensive accident reconstruction training. (Marth Decl. Ex. 5 ("Lofgren Report") at 2, Feb. 15, 2023, Docket No. 113-5.) He has reconstructed over 3700 accidents since 1986. (*Id.*) He is also a certified Crash Data Retrieval technician and has training in it as evidenced by his resume and practical experience. (*Id.* at 2, 9–14.) From these qualifications and his practical experience, it is clear that Lofgren qualifies as an expert here. *See Fox v. Dannenberg,* 906 F.2d 1253, 1256 (8th Cir. 1990) ("[A]n individual can qualify as an expert where he possesses sufficient knowledge gained from practical experience, even though he may lack academic qualifications in the particular field of expertise."). Therefore, the Court finds that Lofgren may opine about topics such as whether the speed of Ms. McDougall's vehicle contributed to the collision.

Second, neither Lofgren's failure to account for a margin of error nor his "failure to account for the admittedly possible lower speed" that Ms. McDougall may have been traveling is a sufficient basis to exclude his testimony. These challenges amount to

disagreements between experts about methodology and techniques, which speak to weight—not admissibility. *See Shoaf*, 47 Fed. Appx. at 782. These challenges are the proper basis for cross-examination.

However, the Court agrees that Lofgren fails to account for a primary assumption in his report: his assumption as to the trajectory of Neumiller's vehicle. (*See* Marth Decl., Ex. 6 ("Lofgren Dep.") at 12–13, Feb. 15, 2023, Docket No. 113-6) (stating that he omitted the assumption as to a 30-degree trajectory of Neumiller's vehicle from his report). Still, Lofgren has since explained that his hypotheticals are based on the Event Data Recorder's data, law enforcement's investigation flowing from that data, the scrub and pavement marks, and crush damage, which he then used to conclude that different speeds could have made a material difference in the outcome of the accident. (*Id.* at 13, 37–39, 46–48.) He also explained that he assumed the trajectory angle to continue at the angle of impact relative to Ms. McDougall's vehicle, thus revealing that his assumption is based on the time of impact. (*Id.* at 48.)

An expert's opinion should be excluded only if that "opinion is so fundamentally unsupported that it can offer no assistance to the jury." *Bonner,* 259 F.3d at 929–30 (citation omitted). The Court cannot say that Lofgren's testimony is so fundamentally unsupported that it could offer no assistance to the jury. As noted above, Lofgren has explained his methodology. McDougall will have the opportunity to challenge Lofgren's assumptions and methodology, both through cross-examination and by presenting his

own expert witness, Gregory Gravesen.  Ultimately, it is the jury who makes the decision about whose theory is more sound and properly based in the facts of the case.  *EFCO Corp. v. Symons Corp.,* 219 F.3d 734, 739 (8th Cir. 2000).

However, because Lofgren did not expressly disclose the assumption regarding the angle and trajectory of Neumiller's truck, the Court will require CRC to lay proper foundation as to this opinion at trial.  If CRC fails to lay such foundation, Lofgren's opinions, including his hypotheticals, will be limited at that time. The Court will therefore deny McDougall's motion as to Lofgren's testimony at this time and the Court can deal with the issue of Lofgren's omitted assumption at trial if necessary.

### 3.  Morrison's Testimony

McDougall next seeks to exclude testimony from Delmar Morrison suggesting that CRC conducted a risk assessment concerning intentional inhalation of CRC Duster. McDougall argues that Morrison's testimony plainly contradicts testimony of various CRC officials that CRC did not conduct a risk assessment.

The Court finds this issue constitutes a genuine dispute of fact.  Indeed, record evidence may support a finding that Morrison's testimony contradicts the CRC officials' testimony that CRC did not perform a risk assessment for the CRC Duster. (*See, e.g.*, Marth Decl., Ex. 14 ("Rudnick Dep.") at 12, Feb. 15, 2023, Docket No. 113-14 (stating that no risk assessment was undertaken as to CRC Duster).)  However, there is also record evidence that suggests CRC likely conducted a risk assessment of the CRC Duster as part of its

product safety practices.  (*See, e.g.*, *id.* at 12 (stating that a process was utilized by CRC for assessing product safety); 16, 18 (stating that CRC employs a product safety process for determining intended uses and protecting from unreasonable risk of harm for intended and unintended uses).)

Given these factual disputes, Morrison's opinions on this issue will be helpful to the jury.  Moreover, McDougall offers the testimony of Richard Stern, who will opine that CRC did not conduct a risk assessment.  Because the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and both experts have drawn different conclusions from the factual record, the Court will allow both experts to explain their analysis and basis for their opinions.  It is up to each "opposing party to examine the factual basis for the opinion in cross-examination." *Bonner*, 259 F.3d at 929–30 (*quoting Hose*, 70 F.3d at 974).  The Court will therefore deny McDougall's motion as to Morrison's testimony.

### 4.  Snelson's Testimony

Lastly, McDougall challenges the opinions and testimony of CRC's damages expert, Melissa Snelson, as based on mischaracterizations and misstatements of law.  Specifically, McDougall argues that Snelson's damages calculations improperly reduces estimates based on net income, substitute health insurance, Mr. McDougall's replacement of household services through his own efforts, and his unemployment compensation.

There is no evidence in the record that casts doubt on Snelson's damages calculations. McDougall simply says they are flawed and misapplied. CRC says they are not. Criticisms of Snelson's calculations may be adequately addressed through cross-examination and the presentation of contrary evidence. *See Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1345 (11th Cir. 2003) ("The identification of . . . flaws in generally reliable . . . evidence is precisely the role of cross-examination."). Given that McDougall presents his own damages expert, providing the jury with another perspective is likely to assist in making these difficult calculations. The Court will therefore deny McDougall's motion to exclude Snelson's testimony.

## CONCLUSION

In sum, the Court finds that genuine disputes of material fact exist on the duty and proximate causation elements of McDougall's remaining claims that preclude summary judgment. Further, the Court finds that total exclusion of the experts' testimony and reports for all ten Daubert motions is unwarranted. Some limitations are necessary, as outlined above, and further limiting may be provided at trial. The Court will therefore deny CRC's motion for summary judgment and grant in part and deny in part the parties' motions to exclude expert testimony.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant CRC Industries, Inc.'s Motion for Summary Judgment

-41-

[Docket No. 98] is **DENIED**; that Defendant CRC Industries, Inc.'s and Plaintiff David A. McDougall's Motions to Exclude Expert Testimony [Docket Nos. 104 and 110] are **DENIED** in part and **GRANTED** in part, as follows:

1. CRC's Motion as to Dr. Reznikoff's Testimony is **GRANTED** as to the opinion on alternative designs, but is otherwise **DENIED;**

2. CRC's Motion as to Marose's Testimony is **GRANTED** as to the opinion on the state of CRC's knowledge, but is otherwise **DENIED;**

3. CRC's Motion as to Stern's Testimony is **DENIED;**

4. CRC's Motion as to Dr. Apple's Testimony is **DENIED;**

5. CRC's Motion as to Dr. Perron's Testimony is **GRANTED** as to the supplemental report, but is otherwise **DENIED;**

6. CRC's Motion as to Dr. King's Testimony is **DENIED;**

7. McDougall's Motion as to Dr. Kingston's Testimony is **GRANTED** as to the opinion on whether CRC is inherently dangerous when used as directed, but is otherwise **DENIED;**

8. McDougall's Motion as to Lofgren's Testimony is **DENIED** insofar as it is deferred to a ruling at trial;

9. McDougall's Motion as to Morrison's is **DENIED;** and

10. McDougall's Motion as to Snelson's Testimony is **DENIED.**

DATED:  August 25, 2023
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge