| | |
|---|---|
| David A. McDougall, *Individually and as Trustee for the Next-of-Kin of Decedent Cynthia A. McDougall*, | Civil No. 20-1499 (JRT/LIB) |
| Plaintiff, | **CRC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW** |
| v. | |
| CRC Industries, Inc., and John Doe Company Defendants #1-10 | |
| Defendants. | |

## <u>INTRODUCTION</u>

After nearly six days of trial testimony, Plaintiff has comprehensively proven that Cynthia McDougall ("Mrs. McDougall") was a beloved member of her community whose death was an unimaginable tragedy. What Plaintiff has not proven, however, is that there is sufficient evidence from which a reasonable jury could find that defendant CRC Industries, Inc. ("CRC") is to blame for Mrs. McDougall's death. Rather, the evidence presented by Plaintiff at trial has established that the fault for Mrs. McDougall's death rests with the only person who could have prevented it: Kyle Neumiller, the man who lost control of his vehicle on Highway 172 and crashed into Mrs. McDougall's car, instantly killing her.

CRC is entitled to judgment as a matter of law ("JMOL") on Plaintiff's claims for five separate reasons.

*First*, all of Plaintiff's claims fail because CRC did not owe a duty to protect Plaintiff or Mrs. McDougall from Kyle Neumiller's actions.

*Second*, all of Plaintiff's claims fail because CRC's actions were not the proximate cause of Plaintiff's damages.

*Third*, Plaintiff's design-defect claim fails because Plaintiff has failed to offer expert testimony (or, for that matter, any evidence at all) of either (1) a feasible alternative design, or (2) that CRC Duster is so unreasonably dangerous that it should be removed from the market entirely.

*Fourth*, Plaintiff's failure-to-warn claim fails because there is no duty to warn of dangers that are obvious, there is no evidence (expert or otherwise) that CRC's warnings were inadequate, and there is no basis for believing that different warnings would have prevented the accident in which Mrs. McDougall died.

*Finally*, judicial estoppel precludes Plaintiff from continuing to assert that Kyle Neumiller is an intentional tortfeasor, and the undisputed evidence mandates the conclusion that Mr. Neumiller is at fault for Mrs. McDougall's death.

Additional detail on each point follows.


**<u>LEGAL STANDARD</u>**

JMOL "is appropriate '[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Est. of Petersen v. Bitters*, 954

F.3d 1164, 1168 (8th Cir. 2020) (quoting Fed. R. Civ. P. 50(a)(1)). In deciding a JMOL motion, the court must "view[] the facts in the light most favorable to the nonmoving party, and grant[] the nonmoving party all reasonable inferences." *Id.* "Reasonable inferences are those that can be drawn from the evidence without resort to speculation." *Mayorga v. Marsden Bldg. Maint. LLC*, 55 F.4th 1155, 1162 (8th Cir. 2022). The court must also "consider uncontradicted and unimpeached evidence in the record favoring the moving party." *See Doe v. Bd. of Trustees of the Nebraska State Colleges*, 78 F.4th 419, 423 (8th Cir. 2023) (describing appellate-review standard).

## **ARGUMENT**

## I. **ALL CLAIMS**: CRC DID NOT OWE A DUTY OF CARE TO PLAINTIFF OR MRS. MCDOUGALL.

CRC is entitled to judgment as a matter of law because the evidence presented at trial is insufficient to establish that CRC owed a duty of care to Plaintiff or Mrs. McDougall. "Minnesota follows 'the general common law rule' that a person does not owe a duty of care for harm caused by the actions of a third party." *Smits as Tr. for Short v. Park Nicollet Health Servs.*, 979 N.W.2d 436, 458 (Minn. 2022) (quoting *Doe 169 v. Brandon*, 845 N.W.2d 174, 177-78 (Minn. 2014)). This rule applies in this case because it is undisputed that Mrs. McDougall died when Kyle Neumiller lost control of his truck, crossed the center line of Highway 172, and caused a fatal collision. Whatever the reason for Mr. Neumiller losing control of his vehicle, it is *his* actions that resulted in Mrs. McDougall's death.

Plaintiff therefore bears the burden of proving one of two limited exceptions to Minnesota's no-liability-for-the-actions-of-third-parties rule: that CRC's *own conduct* created a foreseeable risk of harm to a foreseeable plaintiff. *See id.* "When [the Minnesota Supreme Court] refer[s] to the defendant's 'own conduct,' [it] mean[s] misfeasance . . . ." *Doe 169 v. Brandon*, 845 N.W.2d 174, 178 (Minn. 2014). The evidence presented at trial does not present a sufficient basis from which to conclude (1) that CRC engaged in misfeasance, which (2) created a foreseeable risk to third-party motorists like Mrs. McDougall.[1]

## A. CRC did not engage in misfeasance.

There has been no evidence presented at trial from which a factfinder could conclude that CRC's actions rose to the level of misfeasance. Misfeasance "is 'active misconduct working positive injury to others.'" *Doe 169*, 845 N.W.2d at 178 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 56 (5th ed. 1984)). "Nonfeasance, which is 'passive inaction or a failure to take steps to protect [others]

---

[1] CRC respectfully disputes the Court's determination at summary judgment that misfeasance and foreseeability are fact questions for a jury in this case. *See* Mem. Opinion & Order on Parties' Mots. for Summ. J. & to Exclude Expert Testimony ("SJ/*Daubert* Order") (Doc. 145) at 11-12. CRC maintains and preserves for appeal the arguments contrary to this view that it raised in its motion for summary judgment and related briefing.

from harm,' is not enough." *Doe 169*, 845 N.W.2d at 178 (quoting Keeton, *Prosser and Keeton* § 56).

Plaintiff has failed to present evidence that CRC's actions in manufacturing and selling CRC Duster constituted "active misconduct." *Doe 169*, 845 N.W.2d at 178 (internal quotation marks omitted). CRC Duster "is perfectly safe when you use it as intended." (Vol. I, Tr. 125[2] (Plaintiff's opening statement); Vol. II, Tr. 393 (Plaintiff's expert Dr. Apple agreeing that "CRC Duster is safe when used as it's supposed to be").) And the record is undisputed that CRC Duster has a proven, consumer-appreciated utility. It is "used by many, many people successfully every day" and is "on desks everywhere." (Vol. III, Tr. 734.) CRC is one of many manufacturers that make similar aerosol-duster products, and CRC's share of the market is no more than five percent. (Vol. III, Tr. 578, 710.) Manufacturing and selling a small percentage of a consumer good that is safe and effective when used as intended is not "active misconduct working positive injury to others." *Doe 169*, 845 N.W.2d at 178.

Nor does the fact that some consumers may purchase aerosol dusters to deliberately misuse them for purposes of getting high change the analysis. The evidence that has been presented at trial establishes that only a tiny fraction of the U.S. population deliberately misuses inhalants (including, but not limited to, aerosol dusters like CRC Duster) for purposes of getting high. (*See* Vol. IV, Tr. 932 (Plaintiff's

---

[2] Citations to "Vol. __, Tr. __" are to the trial transcript, cited by volume and page number.

expert Dr. Perron agreeing that only 0.7% of the U.S. population over the age of 12 had used inhalants in 2018).)  The only reasonable inference that can be drawn from this data is that the vast majority of the tens of millions of aerosol duster cans that have been sold in the last 25 years have been sold to people who intended to, and did, use the product safely and in the manner for which it is intended.  (*See* Vol. III, Tr. 710 (CRC has sold roughly 10 million cans of CRC Duster over a 20-year period).)

This Court's summary-judgment order is not to the contrary.  In denying summary judgment, the Court concluded that a reasonable factfinder could find that "the reported fatal accidents in the research articles about duster misuse were sufficient to put CRC on notice that death from huffing CRC Duster itself may lead to a misuser, like Neumiller, driving intoxicated and result in injury to a bystander, like Ms. McDougall."  SJ/*Daubert* Order (Doc. 145) at 12.  But that is a *foreseeability* conclusion, not a misfeasance conclusion.  Only "[o]nce we identify the defendant's 'own conduct,' [do] we then determine whether that conduct created a foreseeable risk of injury to a foreseeable plaintiff."  *Doe 169*, 845 N.W.2d at 178.  The *misfeasance* issue is whether CRC's design and sale of the can of CRC Duster that Neumiller bought was active misconduct working positive injury to others.  The evidence that has been presented at trial conclusively establishes that it was not.

Plaintiff has argued previously and at trial that the use of the propellant 1,1 difluoroethane ("DFE") in CRC Duster is enough standing alone to constitute active misconduct.  Under no reasonable view of the facts or law could a jury agree.  The

problem of inhalant abuse has been around for "a long time," as Plaintiff's addiction expert, Dr. Charles Reznikoff, testified.  (*See* Vol. II, Tr. 478.)  Aerosol dusters are not the only products containing DFE:  DFE is a common propellant used in many aerosols.  At the present time, there is no known alternative propellant that could be used in CRC Duster or any other aerosol that lacks the deliberate-misuse potential of DFE.  (Trial Ex. P#0002, at McDougall005192.)  If aerosol dusters did not exist, there are hundreds of other common household products that could be intentionally inhaled by someone for purposes of getting high.  (*See* Trial Ex. P#0431, at McDougall05370.)  These include "paint products, general household cleaning solutions, refrigerants from appliances, air fresheners, and other aerosol can products like spray paint, or whipped cream, for example."  (Trial Ex. P#0431, at McDougall005424.)  Plaintiff offered no contradictory evidence.

Nor is there anything unique about CRC Duster as compared to other aerosol dusters.  When CRC Duster entered the market, aerosol dusters containing DFE were already being manufactured by CRC's competitors and were "a proven product."  (Vol. III, Tr. 708.)  Because aerosol dusters are all comprised of 100% (or close to it) DFE, there is nothing that meaningfully distinguishes CRC Duster from the aerosol dusters manufactured by CRC's dozens of competitors.  (Vol. III, Tr. 560.)  And there is no evidence that Kyle Neumiller was drawn to CRC Duster specifically.

That some people choose to misuse dusters to become intoxicated—whether due to irresponsibility, addiction, or some other reason—does not make designing

and selling an aerosol duster that is safe when used as intended active misconduct. Because CRC's actions were no more than mere nonfeasance, the own-conduct exception does not apply, and CRC did not owe a duty of care to Plaintiff or Mrs. McDougall.

### B. CRC's design, sale, and warnings on CRC Duster did not create a foreseeable risk that a person would decide to drive while intoxicated from huffing.

CRC did not engage in misfeasance by designing and selling the can of CRC Duster that Mr. Neumiller (allegedly) deliberately misused. But even assuming *arguendo* that the mere fact of manufacturing and selling CRC Duster could constitute misfeasance, CRC's conduct did not "create[] a foreseeable risk of injury to a foreseeable plaintiff." *Doe 169*, 845 N.W.2d at 178. A risk of injury is foreseeable only if it is "objectively reasonable to expect" and "not simply . . . within the realm of any conceivable possibility.'" *Doe 169*, 845 N.W.2d at 178 (citing *Whiteford by Whiteford v. Yamaha Motor Corp., U.S.A.*, 582 N.W.2d 916, 918 (Minn. 1998)). "If the connection between the danger and the defendant's own conduct is too remote, there is no duty." *Doe 169*, 845 N.W.2d at 178.

Here, the risk of injury is that a person would deliberately misuse CRC Duster by huffing it; become intoxicated; make the irresponsible choice to drive while intoxicated; and crash into a vehicle occupied by another person, injuring or killing her. That was within the realm of conceivable possibility. But no reasonable juror

could find on the basis of the evidence presented at trial that it was objectively reasonable to expect.

Plaintiff appears to believe that the question of foreseeability has been settled by the fact that CRC corporate representative Adam Selisker testified that "[w]e could foresee that if someone misused the product and got high and drove, that they could crash." (Vol. III, Tr. 604.) Mr. Selisker's testimony is not dispositive on the question of foreseeability. The foreseeability required by law is something that makes the injury that followed "objectively reasonable *to expect.*" *Doe 169*, 845 N.W.2d at 178 (emphasis added). Mr. Selisker did not testify that he *expected* people to get high from CRC Duster, drive high, and crash. Rather, he acknowledged an unremarkable string of inferences: that CRC Duster (like literally any aerosol) can be deliberately misused by someone seeking a high; that deliberate misuse of CRC Duster can result in all manner of ill effects on the misuser, including loss of consciousness and even death; and that if a misuser lost consciousness (or died) while driving, he could hurt or kill someone else. (Vol. III, Tr. 604.) The fact that CRC could follow this string of inferences to its logical conclusion does not mean that the harm that befell Mrs. McDougall was "objectively reasonable to expect." *Whiteford*, 582 N.W.2d at 918. Indeed, it was not.

As a matter of law, CRC's design and sale of CRC Duster did not create a foreseeable risk of someone huffing, driving, and killing another motorist because the injury is too remote from the act. Two appellate cases—one from the Minnesota

Court of Appeals (*Johnson*), one from the Eighth Circuit (*Ashley*)—control the analysis.[3]

In *Johnson*, a wholesale distributor of malt liquor sold beer to third parties, who in turn sold it at a softball tournament. *Johnson v. Kotval*, 369 N.W.2d 584, 585 (Minn. App. 1985). An attendee drank and became intoxicated from this beer, drove while still intoxicated, and struck a motorcycle being ridden by the plaintiff. *Id.* A jury found the distributor 14% at fault. *Id.* The Minnesota Court Appeals reversed the judgment as to the distributor. *Id.* at 587. It reasoned that "the wholesale sale by [the distributor] is too far removed from the resultant injury to constitute proximate cause." *Id.* at 586. So too here. The sale to distributors of a product safe when used as intended but that some people might choose to deliberately misuse while driving is "too far removed" to be foreseeable. *Id.* Indeed, the distance is even greater here than in *Johnson*. An intended purpose of beer is to make a user intoxicated. No intended purpose of an aerosol duster is to make a user high.

In *Ashley,* various Arkansas counties sued manufacturers of cold medicine that could be deliberately misused to manufacture methamphetamine. *See* 552 F.3d

---

[3] *Johnson* and *Ashley* are cases about proximate causation, but this Court has already determined that foreseeability—the legal requirement being analyzed here—is part of both the duty and the proximate-cause elements of a negligence claim under Minnesota law. *See* SJ/*Daubert* Order (Doc. 145) at 15-16. The Eighth Circuit made a similar determination in *Ashley* (which arose under Arkansas law), noting that "[t]here is a link between the questions of the existence of a duty and the existence of legal cause because both depend on an analysis of foreseeability." *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 670 (8th Cir. 2009) (quotation omitted).

at 662-63.  The *Ashley* plaintiffs' theory of liability was strikingly similar to Plaintiff's theory of liability in this case:

1.  Both Plaintiff and the *Ashley* plaintiffs conceded that the product at issue was safe when used as intended;

2.  Both Plaintiff and the *Ashley* plaintiffs' causes of action were premised on alleged deliberate (and in fact criminal) misuse of the product;

3.  Both Plaintiff and the *Ashley* plaintiffs focused on the social impact of third parties' deliberate misuse:  Plaintiff argues that aerosol duster abuse "is a nationwide problem and unfolding tragedy," (Vol. I, Tr. 127-28), while the *Ashley* plaintiffs sought to hold cold-medicine manufacturers liable for "the societal effects of the methamphetamine epidemic," 552 F.3d at 663;

4.  Both Plaintiff and the *Ashley* plaintiffs alleged that there was more that the product manufacturers could have done to warn about, educate about, or otherwise mitigate the risks of deliberate misuse of the product, *id.* at 664;

5.  Both Plaintiff and the *Ashley* plaintiffs alleged that product manufacturers could have imposed additional restrictions on the sale of their products to the consuming public, including "plac[ing] the products behind the counter of retail stores; requiring the retailers to make retail purchasers sign for products when purchased from the retailer; . . . and requiring the retailers to limit the amount of product that could be purchased at retail by an individual during a specified period of time," *id.*; and

6.  Both Plaintiff and the *Ashley* plaintiffs alleged that the product manufacturers "f[ought] regulatory efforts in order to continue reaping large profits."  *Id.*[4]

In *Ashley*, the Eighth Circuit rejected the plaintiffs' arguments as a matter of law.  The Eighth Circuit concluded that the distance between the manufacturing of cold medicine and the "societal effects of the methamphetamine epidemic" was

---

[4] To be clear, Plaintiff's argument that CRC opposes additional regulation of aerosol dusters is counterfactual.  (*See, e.g.,* Vol. III, Tr. 784-85.)

simply too far to be legally foreseeable. *Ashley,* 552 F.3d at 663, 671-72. The Eighth

Circuit analogized the situation to claims against gun manufacturers. *See id.* And the

Eighth Circuit implied that, if presented with other attempts to make manufacturers

responsible for societal ills caused by third parties who do bad things with their

products, it would similarly reject them as a matter of law:

> And what of the liability of manufacturers in other
> industries that, if stretched far enough, can be linked to
> other societal problems? Proximate cause seems an
> appropriate avenue for limiting liability in this context, as
> in the gun manufacturer context, particularly where an
> effect may be a proliferation of lawsuits not merely against
> these defendants but against other types of commercial
> enterprises—manufacturers, say, of liquor, anti-
> depressants, SUVs, or violent video games—in order to
> address a myriad of societal problems regardless of the
> distance between the "causes" of the "problems" and their
> alleged consequences.

*Id.* (quotation omitted).

The Eighth Circuit's logic in *Ashley* squarely applies in this case. Deliberately

misusing an aerosol duster by inhaling it while driving is too remote from the act of

designing and selling a dust remover that is safe when used as intended to be legally

foreseeable. For this additional reason, under *Johnson* and *Ashley*, CRC did not have a

duty to protect Ms. McDougall, and JMOL on all claims is warranted.

**II.     ALL CLAIMS: CRC'S DESIGN, SALE, AND WARNINGS ON CRC DUSTER DID
         NOT PROXIMATELY CAUSE MS. MCDOUGALL'S DEATH.**

Entirely separately, CRC is entitled to JMOL because there is insufficient

evidence from which the jury could conclude that CRC's actions were the proximate

cause of Plaintiff's damages. Proximate cause is an element of Plaintiff's strict-liability and negligence claims. *Adams v. Toyota Motor Corp.*, 867 F.3d 903, 916–17 (8th Cir. 2017) (citing *Bilotta v. Kelley Co. Inc.*, 346 N.W.2d 616, 623 n.3 (Minn. 1984) (design defect)), *as corrected* (Aug. 14, 2017); *Anderson v. Christopherson*, 816 N.W.2d 626, 631 (Minn. 2012) (strict liability); *see also Abel v. Abbott Nw. Hosp.*, 947 N.W.2d 58, 77 (Minn. 2020) (negligence). Plaintiff's suggestion that CRC was the proximate cause of his damages is foreclosed because (1) CRC's actions were not the legally foreseeable cause of Plaintiff's injuries, and (2) Mr. Neumiller's actions were a superseding cause that breaks the chain of causation as to CRC.

### A. CRC's actions were not the legally foreseeable cause of Plaintiff's damages.

CRC's design and sale of CRC Duster is not a proximate cause of Plaintiff's damages because Mrs. McDougall's death was not legally foreseeable to CRC. *See supra* Section I.B (discussing foreseeability in the context of duty). This Court has already determined that the question of foreseeability is relevant to both the duty and proximate-cause elements of Plaintiff's products-liability claims. *See* SJ/*Daubert* Order (Doc. 145) at 15-16. And for the reasons set forth above, *Johnson* and *Ashley* compel the conclusion that foreseeability is lacking as a matter of law in this case.

As the Eighth Circuit explained when affirming a grant of judgment on the pleadings to the cold-medicine manufacturer in *Ashley*, "[p]roximate cause is bottomed on public policy as a limitation on how far society is willing to extend liability for a defendant's actions." *Ashley*, 552 F.3d at 671. "This limitation is

sometimes, but rarely, one of the facts of causation.  More often it is purely one of policy, not connected with questions of causation at all." *Wannebo v. Gates*, 34 N.W.2d 695, 699 (Minn. 1948) (quotation omitted).  The logic of *Ashley* (and analogous Minnesota caselaw) means that imposing liability on CRC for Mrs. McDougall's death is a bridge too far.

Crucially, in *Ashley* the Eighth Circuit concluded that even a product manufacturer's awareness of the downstream impacts of a product's sale were insufficient to establish proximate causation.  The Eighth Circuit noted that even if the manufacturers "knew that cooks purchased their products to use in manufacturing methamphetamine,"

> [t]he criminal actions of the methamphetamine cooks and those further down the illegal line of manufacturing and distributing methamphetamine are sufficient to stand as the cause of the injury to the Counties in the form of increased government services, and they are totally independent of the Defendants' actions of selling cold medicine to retail stores.

552 F.3d at 670 (quotation marks omitted).  So too are the criminal actions of anyone who does something that we all know should not be done:  driving while intoxicated, on *anything*.  Such criminal acts are "totally independent" of CRC's selling CRC Duster to retailers.  *See id.*

It is also important to remember that under longstanding Minnesota law, proximate causation is not the same as but-for causation.  But-for causation "converts events both near and far, which merely set the stage for an accident, into a convoluted

series of causes of the accident." *Lubbers v. Anderson*, 539 N.W.2d 398, 402 (Minn. 1995) (quotation omitted). Proximate causation requires more: the defendant's conduct must be a "*substantial factor* in bringing about the injury." *Id.* at 401 (quotation omitted) (emphasis added).

No reasonable juror could find that CRC's design and sale of CRC Duster was a substantial factor in Mr. Neumiller (allegedly) choosing to do something that everyone knows one should never do: driving while intoxicated. Nor could a reasonable juror find that CRC's design and sale of CRC Duster was "likely" to result in Mr. Neumiller (allegedly) deciding to huff an aerosol duster *and* drive. As a Florida court concluded in *Grieco*, another huffing-while-driving case, "the subject product did not cause this accident; rather, Merrill's impaired faculties resulting from the product's inappropriate use caused the accident." *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 26 (Fla. Dist. Ct. App. 2022); *accord Horstman v. Farris*, 725 N.E.2d 698, 703 (Ohio Ct. App. 1999) (similar). So too here. Because there is insufficient evidence from which a factfinder could conclude that CRC's actions were a substantial factor in bringing about Plaintiff's injuries, Plaintiff has failed to establish that CRC's actions were the proximate cause of his damages.

**B.      Mr. Neumiller's actions were a superseding cause that breaks the chain of causation.**

Even if CRC's actions were a proximate cause of Plaintiff's injuries (and again, they were not), CRC is still entitled to JMOL because Mr. Neumiller's actions were a superseding cause that breaks the chain of causation. A cause is superseding if four

elements are met: "1) its harmful effects must have occurred after the original negligence; 2) it must not have been brought about by the original negligence; 3) it must have actively worked to bring about a result which would not otherwise have followed from the original negligence; and 4) it must not have been reasonably foreseeable by the original wrongdoer." *Canada By & Through Landy v. McCarthy*, 567 N.W.2d 496, 507 (Minn. 1997). All four of these elements are met in this case:

**Element 1:** It is undisputed that Mr. Neumiller's alleged decision to huff and drive occurred (if it did) after CRC designed and sold the CRC Duster can that Mr. Neumiller purchased from a hardware store.

**Element 2:** CRC's design and sale of CRC Duster did not bring about Mr. Neumiller's choice to buy an aerosol duster and deliberately misuse it (again, if he did) for purposes of getting high. Even if CRC's manufacture and sale of an aerosol duster "set the stage," for Mr. Neumiller's choice to (allegedly) engage in what is indisputably an intentional and criminal misuse of the product, CRC's actions are no more than "but-for" causation. *Lubbers*, 539 N.W.2d at 402.

**Element 3:** This Court has already concluded that "it is clear that Neumiller's actions 'actively worked to bring about a result which would not otherwise have followed from the original [alleged] negligence.'" SJ/*Daubert* Order (Doc. 145) at 17. This Court's conclusion is law of the case, and in any event as a matter of both fact and logic this Court's conclusion is correct.

**Element 4:**  For the reasons explained at length above (*see supra* Sections I.B & II.A), Mr. Neumiller's decision to allegedly inhale CRC Duster while driving was not legally foreseeable to CRC.

Because the evidence presented by Plaintiff at trial conclusively establishes that Mr. Neumiller's actions were a superseding cause, Plaintiff's claim that CRC's actions proximately caused his injuries fails as a matter of law.

## III. <u>DESIGN-DEFECT CLAIM</u>: THERE IS NO EVIDENCE FROM WHICH A JURY COULD CONCLUDE THAT CRC DUSTER IS DEFECTIVELY DESIGNED.

In addition to the duty and proximate-cause deficiencies discussed above, Plaintiff's strict liability design-defect claim fails as a matter of law because Plaintiff has failed to introduce evidence from which a jury could reasonably conclude "that the design employed was unreasonably dangerous."  *Kallio v. Ford Motor Co.*, 407 N.W.2d 92, 96 (Minn. 1987).  As a general matter, proof that a design is unreasonably dangerous "normally requires production of evidence of the existence of a feasible, alternative safer design."  *Id.*  Plaintiff has not offered any evidence of such a feasible, alternative safer design in this case.  Instead, Plaintiff has set out to prove that this is one of those "rare cases" in which "the product may be judged unreasonably dangerous because it should be removed from the market rather than be redesigned."  *Id.* at 97 n.8.  But no reasonable jury could agree.  There would be at least three significant problems with allowing Plaintiff to submit the question of whether CRC Duster should be removed from the market to the jury.

*First,* Plaintiff has conceded that CRC Duster (and the similar products made by two dozen of CRC's competitors) are safe when used as intended. (Vol. I, Tr. 125 (Plaintiff's opening statement); Vol. II, Tr. 393 (Dr. Apple).) Plaintiff has also effectively conceded that there is utility in the use for which CRC Duster was designed and intended. The market agrees: tens of millions of cans of aerosol dusters have been purchased by consumers in the last twenty-five years. (Vol. III, Tr. 710.) Vanishingly few of these cans of aerosol duster (on the order of magnitude of millionths of a percentage point) have been shown to be involved in a deliberate-misuse incident. (*See, e.g.*, Vol. IV, Tr. 908-09 (Dr. Perron testifying about aerosol duster misuse incidents reported on the ACE blog).) The utility of CRC Duster and its undisputed safety when used as intended distinguishes this case from the sorts of "rare cases" that have previously been identified as cases in which a product should be removed from the market, instead of redesigned. *See, e.g.*, Restatement (Third) of Torts: Prod. Liab. § 2, Illustration 5 (1998) (exploding cigar should be removed from the market instead of redesigned).

*Second*, it is undisputed that the Consumer Product Safety Commission, a federal government agency with jurisdiction over consumer products including CRC Duster, has the power to (1) recall, or (2) entirely ban consumer products. (Vol. III, Tr. 752.) In the case of aerosol dusters, CPSC has done neither. (*See id*.) Rather, CPSC has granted a petition for rulemaking filed by a group called Families United Against Inhalant Abuse ("FUAIA") and is looking at whether it is possible to redesign aerosol

dusters to make them less susceptible to deliberate misuse by people looking to become high. (Trial Ex. P#0001.)

*Third*, and most importantly, Plaintiff has failed to introduce any evidence whatsoever that aerosol dusters like CRC Duster are so "unreasonably dangerous" that they should be "removed from the market rather than be redesigned." *Kallio*, 407 N.W.2d at 97 n.8. As noted above, Plaintiff's primary documentary evidence (the CPSC materials) do not support the conclusion that aerosol dusters should be removed from the market, because the CPSC could have ordered their removal and chose not to do so. And none of Plaintiff's experts opined that aerosol dusters are so unreasonably dangerous that they should be removed from the market, because the experts whom Plaintiff chose to call at trial—a toxicologist, an addiction medicine doctor, and an academic who studies the epidemiology of inhalant abuse—are not qualified to offer that opinion. *Cf.* SJ/*Daubert* Order (Doc. 145) at 25-26 (granting CRC's motion to exclude Plaintiff's expert Dr. Reznikoff's alternative-design opinions).

Plaintiff's failure to offer expert testimony to support the assertion that CRC Duster is so unreasonably dangerous that it must be removed from the market is fatal to his design-defect claim. Expert testimony is required any time "the product at issue and any of its relevant inner workings are beyond the ken of a lay jury." *Markel v. Douglas Techs. Grp., Inc.*, 968 F.3d 888, 890 (8th Cir. 2020). This includes "[w]hen the standard of care that a manufacturer must exercise in weighing the costs and benefits of an alleged design defect is not within the general knowledge and experience of lay

people." *Markel v. Douglas Techs. Grp., Inc.*, No. 17-CV-1790 (SRN/LIB), 2019 WL 1440423, at *3 (D. Minn. Apr. 1, 2019) (internal quotation marks omitted), *aff'd,* 968 F.3d 888 (8th Cir. 2020). Moreover, mere expert commentary on a purported defect is not sufficient: the expert must also "explain[] *why* the 'defects' constituted an 'unreasonably dangerous condition' under Minnesota's reasonable-care balancing test." *Id.* (citations omitted).

Plaintiff has offered no expert testimony to show what standard of care CRC was required to satisfy in weighing the costs and benefits of deciding to manufacture and sell CRC Duster. Nor has Plaintiff offered expert testimony to show how CRC's choices breached that standard—let alone in a way that makes CRC Duster so dangerous that it should be off the market entirely. As Judge Nelson explained in *Markel*, the "'expert witness rule'" exists for a reason, namely "to prevent a jury from being 'forced to speculate in determining whether an injured plaintiff has proven the requisite elements on their defect claims.'" *Id.* (quoting *Mozes v. Medtronic, Inc.*, 14 F. Supp. 2d 1124, 1128 (D. Minn. 1998)) (internal alterations omitted). Without expert testimony to support his design-defect claim, Plaintiff seeks to invite the jury to speculate on whether aerosol dusters in general and CRC Duster in particular are so unreasonably dangerous that they should not exist. Such speculation is unnecessary and improper. CRC is entitled to judgment as a matter of law on Plaintiff's design-defect claim.

## IV.   __FAILURE-TO-WARN CLAIM__: ALTERNATIVE GROUNDS WARRANT JMOL.

### A.  There is no evidence that CRC's warnings were inadequate.

CRC is also entitled to judgment as a matter of law on Plaintiff's failure-to-warn claim.  Although Plaintiff's case-in-chief included much speculation about different warning language that could have been included on the CRC Duster can, Plaintiff presented zero evidence from which the jury could conclude that CRC's existing warnings were inadequate.  The inadequacy of a provided warning is an essential element of a failure-to-warn claim.  *See Balder v. Haley*, 399 N.W.2d 77, 81-82 (Minn. 1987); *see also Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1155 (D. Minn. 2011) (stating the elements of a failure-to-warn claim under Minnesota law). Without such evidence, Plaintiff's failure-to-warn claim fails.

As a preliminary matter, it is undisputed that the can of CRC Duster purchased by Kyle Neumiller explicitly warned against deliberate misuse of the product.  A stand-alone box on CRC Duster's back label contains the following warning:

> Deliberate misuse by concentrating and inhaling the contents is illegal and can be harmful or fatal. Inhalation abuse can cause death.

(Trial Ex. D#2.)  At trial, Plaintiff suggested that there is different warning language that could have been included on the CRC Duster label, such as the language proposed in legislation currently pending in Minnesota.  (*See* Trial Ex. P#1220.)  But the fact that there is different warning language that *could* have been used on CRC Duster does

not establish the inadequacy of the warning language that *was* used on the can of CRC Duster.  It is the lack of evidence on this latter point that dooms Plaintiff's failure-to-warn claim.

Perhaps most tellingly, Plaintiff has failed to present opinions from any of its experts that (1) the warning language that CRC used on CRC Duster was inadequate, or (2) different warning language would have made a difference in this case.  The only one of Plaintiff's experts who came close to offering a warnings-related opinion was Dr. Reznikoff, and even he testified that his opinion was simply that the warnings on aerosol dusters should be the subject of further study:

> Q.  What I'm not seeing is a proposal by you, here's the warning label that CRC should have used.  You didn't do that, did you?
>
> A.  No. My proposal is to study it.

(Vol. III, Tr. 532-33.)  Dr. Reznikoff's concession is dispositive.  Expert testimony may be required in failure-to-warn cases when the subject matter is complex.  *Cf. Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1111-12 (8th Cir. 2007) (applying Missouri law); *Markel*, 2019 WL 1440423, at *3 (noting that the "expert witness rule exists to prevent a jury from being forced to speculate" (internal quotation marks omitted)).  Expert testimony is certainly required in this case, where Plaintiff's failure-to-warn theory hinges on a constellation of complex substance abuse and human factors

issues.[5]  The lack of any such expert testimony means that Plaintiff's failure-to-warn

claim is legally insufficient.

---

[5] Plaintiff will surely agree that expert testimony is required for his failure-to-warn claim, given that a central part of his failure-to-warn argument has long been the assertion that CRC should have consulted a variety of different experts about the adequacy of its warnings.  To illustrate the point, consider the following testimony elicited by Plaintiff's counsel from former CRC executive Adam Selisker at trial:

> Q.  Now, in adopting this language and deciding to put it on the can, I want to make sure we understand something. CRC did not consult with anyone claiming to have expertise in addiction medicine, correct?
>
> A.  We did not.
>
> Q.  CRC did not consult anyone claiming to have expertise or be an expert in epidemiology, correct?
>
> A.  That's correct.
>
> Q.  CRC did not consult anyone claiming to have expertise or be an expert in law enforcement, correct?
>
> A.  That's correct.
>
> Q.  CRC did not consult with anyone claiming expertise in toxicology, correct?
>
> A.  Correct.
>
> Q.  CRC did not consult anyone claiming expertise in human factors, correct?
>
> A.  Correct.

(Vol. III, Tr. 624.)

Even if expert testimony was not required for Plaintiff's failure-to-warn claim, however, Plaintiff's failure-to-warn claim would still founder on the shoals of a lack of evidence.  Plaintiff has simply failed to meet his burden of proving the inadequacy of the warnings that CRC provided on the CRC Duster product.

**B.  CRC had no duty to warn Mr. Neumiller of dangers that were obvious and of which he was already aware.**

Plaintiff's failure-to-warn claim also fails because CRC did not have a duty to warn Mr. Neumiller of dangers that were (1) obvious, and (2) of which he was already aware.  A manufacturer has no "duty to warn of . . . dangers that are obvious to anyone." *Huber v. Niagara Mach. & Tool Works*, 430 N.W.2d 465, 467 (Minn. 1988) (quotation omitted).  Instructively, the danger of drinking alcohol is an example of a subject matter as to which a seller has no duty to warn, as this danger "is generally known and recognized."  Restatement (Second) of Torts § 402A, cmt. j (1965).  But the danger of driving while intoxicated from *any* substance is equally obvious.  CRC accordingly had no duty to warn Kyle Neumiller (or anyone else) to refrain from driving after deliberately misusing CRC Duster for the purpose of becoming high.

Entirely separately, CRC had no duty to provide a different warning to Mr. Neumiller because he already knew the dangers of operating a vehicle after deliberately misusing CRC Duster for purposes of becoming high.  "Generally, there is no duty to warn if the user knows or should know of potential danger." *Minneapolis Soc. of Fine Arts v. Parker-Klein Assocs. Architects, Inc.*, 354 N.W.2d 816, 821 (Minn. 1984), *overruled on other grounds by Hapka v. Paquin Farms*, 458 N.W.2d 683, 687

(Minn. 1990).  In deposition testimony that was relied on and discussed by Plaintiff's expert Dr. Reznikoff at trial, Mr. Neumiller testified that he knew that potentially killing himself or someone else was a risk of driving while high on the DFE in CRC Duster.  (Vol. III, Tr. 562.)  In fact, based on the record that he had reviewed for purposes of preparing his expert analysis, Dr. Reznikoff agreed that if the can of CRC Duster purchased by Mr. Neumiller on July 22, 2019 had said "Hey, Kyle Neumiller, if you huff this and drive, you could possibly kill someone," even *that* warning "would be telling him something that he already knew."  (Vol. III, Tr. 563.)

Plaintiff—in a strategic (though mistaken) effort to make CRC shoulder Mr. Neumiller's fault for Mrs. McDougall's death—drove home this very point.   In Plaintiff's briefing in support of his requested special-verdict form, he argued that Mr. Neumiller "knew the effects of huffing" and that "he blacked out from huffing while driving just months before the crash that killed Cynthia."  Pl. David A. McDougall's Mem. of Law in Support of his Special Verdict Form ("Pl.'s SVF Br.") (Doc. 155) at 4. That does not make Mr. Neumiller an intentional tortfeasor.  *See infra* Section V.  But it does mean that Mr. Neumiller knew the dangers of driving after deliberate misuse of an aerosol duster, which precludes any duty to warn him of those dangers.

In the Court's order denying CRC's motion to dismiss the duty-to-warn claim, it reasoned that "CRC puts itself in a bind when it argues that potential injuries associated with operating a vehicle after inhaling duster are at once not foreseeable and too obvious to require a warning."  Mem. Opinion & Order Granting in Part &

Denying in Part Mot. to Dismiss (Doc. 43) at 15. CRC respectfully disagrees with that rationale and suggests that it conflates two analytically separate issues. It was not reasonably foreseeable under Minnesota law that someone like Mr. Neumiller would get high from CRC Duster (if he did), *and* choose to drive, *and* cause an accident with another vehicle. But it *is obvious* to anyone that if you choose to get high and drive high, you risk hitting and killing someone.

## C. CRC Duster's warning label was not the proximate cause of the accident.

Plaintiff's failure to warn claim also fails because there is not evidence from which a jury could conclude that the warnings provided with CRC Duster were the proximate cause of Plaintiff's damages. This is true for three separate reasons: (1) because there is no evidence that different warnings language would have made a difference; (2) because Mr. Neumiller already knew the information that Plaintiff now suggests should have been on CRC Duster's label; and (3) because Mr. Neumiller did not read the label on the day of the accident.

First—and as noted above, *see* Section IV.A—there is no evidence in the record from which a reasonable jury could conclude that different warning language would have made a whit of difference in this case. Dr. Reznikoff testified that CRC could have warned about the risk of addiction to inhalants and provided resources for someone struggling with inhalant abuse or addiction to get help. (Vol. II, Tr. 463, 565.) But there is no expert opinion in this record that Mr. Neumiller was addicted to huffing. Plaintiff's counsel asked Dr. Reznikoff whether he had such an opinion. (Vol. II, Tr.

442.) Dr. Reznikoff candidly acknowledge that he could not conclusively form such an opinion, presumably because he has never met with or spoken to Kyle Neumiller. (Vol. II, Tr. 443.) Thus, even if the absence of addiction-related information from the label breached a duty to warn (and it did not), that breach is not a proximate cause of Mr. Neumiller deliberately misusing CRC Duster on the day of the accident (if he did so) and driving in that state.

Second—and also as noted above—the evidence presented at trial during Plaintiff's case-in-chief conclusively and unequivocally established that on July 22, 2019, Kyle Neumiller knew that if he deliberately inhaled CRC Duster for the purposes of becoming high and then drove his truck, he could lose consciousness and injure or kill himself or someone else. (Vol. III, Tr. 562.) This fact is fatal to Plaintiff's failure-to-warn claim. It is hornbook law that "there should be no liability for failing to warn someone of a risk or hazard which he appreciated to the same extent as a warning would have provided." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 96, p. 686 (5th ed. 1984) (collecting cases). "Under Minnesota law, a manufacturer's failure to warn is not the cause of an accident or an injury when the user was actually aware of the danger." *Ramstad v. Lear Siegler Diversified Holdings Corp.*, 836 F. Supp. 1511, 1516 (D. Minn. 1993).

For example, in *McCormick v. Custom Pools, Inc.* a plaintiff was injured when he dove into a shallow portion of a pool and struck his head at the bottom. 376 N.W.2d 471, 472 (Minn. App. 1985). He sued the pool's designer and manufacturer, claiming

failure to warn.  *Id.* at 472, 474.  In affirming summary judgment, the Minnesota Court of Appeals reasoned that no genuine issue of material fact existed "as to the proximate cause of" plaintiff's injuries because of undisputed evidence that he "knew the dangers involved in shallow diving."  *Id.* at 477.  Because Kyle Neumiller was indisputably aware of the dangers of huffing while driving on July 22, 2019, the same logic applies in this case and compels the same result.

Third, the evidence presented at trial conclusively establishes that Mr. Neumiller did not read the label of CRC Duster on the day of his fatal collision with Cynthia McDougall.  (Vol. III, Tr. 558.)  The fact that Mr. Neumiller did not read the label on the day of the accident is yet another reason that CRC is entitled to JMOL on Plaintiff's failure to warn claim.  "Minnesota courts have consistently held that a plaintiff's failure to read a warning on a product precludes a failure-to-warn claim as a matter of law." *Tropple v. Black & Decker (U.S.) Inc.,* 2015 WL 4992011, at *7 (D. Minn. Aug. 20, 2015) (collecting cases).  CRC recognizes that this Court rejected this argument at summary judgment.  *See* SJ/*Daubert* Order (Doc. 145) at 22.  But CRC respectfully disagrees with this Court's reasoning.  Mr. Neumiller clearly and unequivocally stated that he did not read the CRC Duster label on the day of the accident.  (Vol. III, Tr. 558.)  Since Mr. Neumiller did not read the label on the day of the accident, no warning language on the label would have made a difference to what unfolded.  JMOL on Plaintiff's failure-to-warn claim is accordingly warranted.

## V. <u>FAULT</u>: NEUMILLER ENGAGED IN NEGLIGENCE OR RECKLESSNESS, AND PRODUCT MISUSE—WHICH ARE FAULT FOR WHICH CRC IS NOT LIABLE.

On April 17, 2024, this Court entered an Order holding that (1) the jury will be asked to decide whether Kyle Neumiller is an intentional tortfeasor, and (2) if the jury decides that Mr. Neumiller is an intentional tortfeasor, "the Court will not permit CRC to limit its exposure to the extent of its fault." Mem. Opinion & Order on Special Verdict Form and Post-Incident Evidence ("SVF Order") (Doc. 229) at 3-4. CRC respectfully maintains that both parts of this conclusion are erroneous under Minnesota law.[6] By requiring CRC to shoulder Mr. Neumiller's fault, the Court "would effectively create a fifth exception to the several liability rule," in violation of Minnesota law. *Staab [II] v. Diocese of St. Cloud*, 853 N.W.2d 713, 719 (Minn. 2014).

But even accepting this Court's ruling (as CRC must and does for the sake of argument only), CRC is still entitled to judgment as a matter of law on the intent and fault questions contained in Court's current draft special verdict form.

### A. CRC is entitled to JMOL on Question 3B.

First, CRC is entitled to JMOL on the question of Kyle Neumiller's intent, which is currently Question 3B: "Did Kyle Neumiller know that huffing CRC Duster while driving on July 22, 2019, was substantially certain to result in harm?"[7] There is no

___

[6] CRC maintains and preserves for appeal the arguments contrary to this Court's holding that it submitted in written pretrial briefing and in oral arguments before the Court. *See generally* CRC's Br. Opposing Pl.'s Br. Re: Special-Verdict Form (Doc. 200).

[7] CRC continues to object to this question in its entirety. Without waiving that objection, CRC also observes that, if the question is to be used (which would be error),

evidence from which a reasonable jury could find that the answer is "Yes." Instructively, under Minnesota law, "[m]erely driving an automobile while under the influence of intoxicating liquor, with nothing more, is not the type of intentional act that will bar contributory negligence as a defense." *Farmers Ins. Exch. v. Vill. of Hewitt*, 143 N.W.2d 230, 238 (Minn. 1966). There is no reason to predict that the Minnesota Supreme Court would deem driving while impaired from huffing an intentional tort while driving while impaired is not in matters of comparative fault.[8]

But even setting Mr. Neumiller's actions aside, CRC is still entitled to JMOL on the question of Mr. Neumiller's intent because of Plaintiff's own testimony. Plaintiff acknowledged that he sued Mr. Neumiller in Minnesota state court and, as part of those proceedings, "alleged the death of [Mrs. McDougall] was caused by the negligent act or omission of Kyle Neumiller in the operation of his motor vehicle." (Vol. VI, Tr.

---

"harm" should be replaced with "death of a motorist." *See Victor v. Sell*, 222 N.W.2d 337, 339 (Minn. 1974) ("Intent or intentionally means that the actor desires to cause consequences of his act or that he believes that *the consequences* are substantially certain to result from it." (emphasis added) (internal quotation marks omitted)); *see also* CIVJIG 60.10 ("'Intent' or 'intentionally means that a person: 1. Wants to cause the consequences of his or her acts, or 2. Knows that his or her acts are substantially certain to cause *those consequences*." (emphasis added)). "[T]he consequence[]" at issue in this case is the death of a motorist.

[8] CRC acknowledges that this Court has already concluded that the fact that Mr. Neumiller has consistently and repeatedly disclaimed intent to harm himself or anyone else is not enough for judgment as a matter of law on the intent question. *See* SVF Order (Doc. 229) at 4 ("Here, the Court finds that a jury may reasonably infer from McDougall's proposed evidence that Neumiller acted with the requisite intent to meet the intentional tortfeasor threshold under Minnesota law.").

1303-04.)  Plaintiff should accordingly be judicially estopped from arguing in this case that Mr. Neumiller behaved intentionally.

"Judicial estoppel is an equitable doctrine 'that is intended to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories.'"  *N. Central Co. v. Minerva Dairy, Inc.*, Case No. 16-cv-3816, 2018 WL 4181605, at *5 (D. Minn. Aug. 31, 2018) (quoting *State v. Pendleton*, 706 N.W.2d 500, 507 (Minn. 2005)).  The Minnesota Supreme Court has identified "three conditions that must be met before judicial estoppel can be applied:  'First, the party presenting the allegedly inconsistent theories must have prevailed in its original position . . . . Second, there must be a clear inconsistency between the original and subsequent position of the party.  Finally, there must not be any distinct or different issues of fact in the proceedings.'"  *Id.* (quoting *Pendleton*, 706 N.W.2d at 507).  All three conditions are met in this case.

First, Plaintiff was successful in his lawsuit against Mr. Neumiller:  the litigation resulted in a settlement, which was the impetus for Plaintiff submitting the petition that he was asked about on cross-examination earlier today.  *See* Second Pet. for Order Approving Settlement & Distribution of Proceeds, *McDougall v. Neumiller*, Court File No. 39-CV-21-117, Index #30, at 2.

Second, there is a clear inconsistency between Plaintiff's allegations in the state-court case against Mr. Neumiller (that Mr. Neumiller was negligent) and

Plaintiff's late-breaking assertion in this case that Mr. Neumiller was an intentional tortfeasor.[9]

Finally, both lawsuits are premised on the same event, which means there are no distinct issues of fact between the proceedings. In fact, Plaintiff's settlement petition in the state-court case explicitly references the existence and ongoing nature of this lawsuit. *See id.* at 3.

Judicial estoppel accordingly applies and should preclude Plaintiff from arguing to the jury that Mr. Neumiller was an intentional tortfeasor. *See N. Central Co.*, 2018 WL 4181605, at *6 (applying the doctrine of judicial estoppel and noting that the doctrine "applies not just to the formal claims and defenses made by a party in its pleadings, but to the arguments that the party made before a court").

## B. CRC is entitled to JMOL on Question 3C.

CRC is also entitled to JMOL on the question of Mr. Neumiller's fault, which is currently Question 3C: "Was Kyle Neumiller at fault for Cynthia McDougall's death?" Mr. Neumiller pled guilty to criminal vehicular homicide, which involves operating a vehicle in a grossly negligent manner. (Vol. VI, Tr. 1233 & Trial Ex. P#0168.) Mr. Neumiller's plea is dispositive, because under black-letter Minnesota law, "[f]ault," includes negligence and recklessness. Minn. Stat. § 604.01, subd. 1a. Mr. Neumiller's

---

[9] The concept that Mr. Neumiller is an intentional tortfeasor appeared for the first time in Plaintiff's brief supporting his proposed form of special-verdict form, which was filed in December 2023—long after the close of discovery and the filing and adjudication of CRC's motion for summary judgment.

plea is also consistent with Eighth Circuit and Minnesota law, which holds that driving while impaired (if Mr. Neumiller did so) is no more than reckless. *See Cassidy v. Minihan*, 794 F.2d 340, 344 (8th Cir. 1986) (concluding that drunk driving "reflect[ed], at most, reckless disregard for the risks involved"); *State v. Brady*, 70 N.W.2d 449, 453 (Minn. 1955) ("[F]or an intoxicated person to undertake to drive an automobile on a much-traveled highway is gross or culpable negligence.").[10]

Moreover, it is undisputed that if Mr. Neumiller intentionally inhaled CRC Duster for purposes of getting high, that was a misuse of the product. "[M]isuse of a product" is "fault" under Minn. Stat. § 604.01, subd. 1a. This is an entirely separate reason that CRC is entitled to JMOL on the question of Mr. Neumiller's fault.

## CONCLUSION

For the reasons set forth above, CRC respectfully asks that the Court grant its motion for judgment as a matter of law.

---

[10] Because Neumiller was, as a matter of law, no more than reckless or negligent, he could not be an intentional tortfeasor. *See Smith v. Johnson*, 779 F.3d 867, 871 (8th Cir. 2015) ("[N]egligence is mutually exclusive of deliberate indifference and intent."); Restatement (Second) of Torts § 8A (1965), cmt. b ("All three have their important place in the law of torts, but the liability attached to them will differ.").

Dated: April 22, 2024

*s/ Virginia R. McCalmont*

Robert J. Gilbertson (# 22361X)
David J. Wallace-Jackson (# 288767)
Virginia R. McCalmont (# 399496)
FORSGREN FISHER MCCALMONT
DEMAREA TYSVER LLP
Capella Tower
225 South 6th Street, Suite 1500
Minneapolis, MN 55402
(612) 474-3300
bgilbertson@forsgrenfisher.com
dwallace-jackson@forsgrenfisher.com
vmccalmont@forsgrenfisher.com

*Attorneys for CRC Industries, Inc.*