**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

DAVID A. MCDOUGALL, *individually and*
*as Trustee for the Next-of-Kin of Decedent*
*Cynthia A. McDougall*,

                         Plaintiff,

v.

CRC INDUSTRIES, INC., and John Doe
Company Defendants #1–10,

                         Defendants.

Civil No. 20-1499 (JRT/LIB)

**MEMORANDUM OPINION AND ORDER**
**ON POST-TRIAL MOTIONS**

---

Michael D. Reif, Ryan W. Marth, Tara D. Sutton, Philip L. Sieff, Rashanda C. Bruce, and Julie Reynolds, **ROBINS KAPLAN LLP**, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402, for Plaintiff.

Beth A. Jenson Prouty and Jeffrey M. Markowitz, **ARTHUR, CHAPMAN, KETTERING, SMETAK & PIKALA, P.A.**, 81 South Ninth Street, Suite 500, Minneapolis, MN 55402; David J. Wallace-Jackson, Robert J. Gilbertson, and Virginia R. McCalmont, **FORSGREN FISHER MCCALMONT DEMAREA TYSVER LLP**, 225 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for Defendant CRC Industries, Inc.

This case arose from the death of Cynthia McDougall, who was killed in Baudette, Minnesota in a motor vehicle accident with Kyle Neumiller.  Ms. McDougall's surviving spouse and next-of-kin, David McDougall, brought this action against Defendant CRC Industries, Inc. ("CRC"), alleging that Neumiller lost control of his vehicle because he was intoxicated from huffing CRC's computer dust remover (the "CRC Duster").  Among other things, McDougall claimed CRC was liable for Ms. McDougall's death under negligence,

strict liability for design defect, and strict liability for failure to warn theories. These claims proceeded to a jury trial, after which a jury awarded $7.75 million in damages to McDougall after finding that CRC was liable for a design defect with CRC Duster and that CRC Duster's design was a direct cause of McDougall's damages.

CRC now moves for judgment as a matter of law or, in the alternative, for a new trial. Even if the liability judgment stands, CRC requests that the judgment be amended to be proportionate to the percentage of fault that the jury apportioned to CRC. In addition, McDougall moves to amend the judgment to add prejudgment and post-judgment interest. Because the Court finds that sufficient evidence supports the jury's verdict and that a new trial is not warranted, the Court will deny CRC's motions for judgment as a matter of law and for a new trial. Because the Court finds no manifest errors of law, the Court will deny CRC's request to amend the judgment. Finally, the Court will grant McDougall's motion to amend the judgment to include prejudgment and post-judgment interest in part as follows: the Court will order CRC to pay $2,525,523.29 in pre-verdict prejudgment interest and $135,130.169 in post-verdict prejudgment interest and to pay post-judgment interest at a rate of 5.12% starting from the date of the June 11, 2024, judgment for the jury award and from the date of this Order for the jury award plus the prejudgment interest and any costs, until the judgment is satisfied.

## BACKGROUND

The Court has thoroughly addressed the facts and procedural history of this litigation in prior rulings, which are incorporated by reference and summarized below.

*See McDougall v. CRC Indus., Inc.*, No. 20-1499, 2023 WL 5515827, at *1–3 (D. Minn. Aug. 25, 2023).  On July 22, 2019, Cynthia McDougall was killed in a car accident with another vehicle in Baudette, Minnesota.  *Id.* at *1.  The driver of the other car, Kyle Neumiller, was allegedly driving while intoxicated due to ingesting gas from a cannister of aerosol dusting spray manufactured by CRC, called CRC Duster.  *Id.*  Neumiller had allegedly lost control of his bodily functions and vehicle because of intoxication from CRC Duster.  *Id.*

CRC Duster is a compressed gas dusting spray used to remove dust and debris from other products without damaging surface finishes or sensitive components.  *Id.* at *2.  CRC Duster contains a pressurized volatile, fluorinated hydrocarbon gas called 1,1-difluoroethane ("DFE"), which is a central nervous system depressant that, when inhaled, can cause psychoactive intoxicating side effects like euphoria, hallucinations, and delusions.  *Id.*

After Ms. McDougall's death, her husband, David McDougall, brought this action in his individual capacity and as court-appointed wrongful death Trustee against CRC and John Doe Companies 1–10, alleging claims for products liability, negligence, breach of warranty, deceptive and unlawful trade practices, and public nuisance.  *Id.* at *3.  The claims for negligence, strict liability for design defect, and strict liability for failure to warn proceeded to a seven-day jury trial in April 2024.  *Id.* at *4–9.

At trial, McDougall presented evidence that CRC knew well before Ms. McDougall's death that DFE was known to cause immediate and severe impairment upon inhalation,

that DFE's drug-like effects are rapid and intense, and that DFE's drug-like effects could cause automobile accidents. (*See, e.g.*, Trial Tr. 202:1–17, 265:9–266:7, 279:1–7, 283:10–24, 602:11–603:5.) McDougall also presented evidence—including expert testimony and datasets from the U.S. Consumer Product Safety Commission ("CPSC"), the Alliance for Consumer Education ("ACE"), and the National Survey of Drug Use and Health—that people were intentionally inhaling CRC Duster and similar aerosol duster products to get high, and that CRC knew this. (Trial Tr. 289:4–18, 290:3–17, 606:6–14, 617:6–21, 889:13–890:16, 891:19–893:3.) In fact, McDougall elicited testimony that CRC contributed to ACE, whose purpose is to raise awareness and education about the problems of inhalant abuse and which maintained a blog that collected reports of inhalant abuse that made the news, including dust removers. (Trial Tr. 900:23–901:16, 903:11–904:9.) In addition, McDougall presented evidence that CRC had temporarily added a bitterant agent to CRC Duster in 2008 to deter people from misusing the product to get high, though CRC eventually removed the bitterant after finding no evidence that it worked. (Trial Tr. 612:8–614:6, 712:8–18.) McDougall also provided evidence that CRC did not take certain steps to address CRC Duster's potential dangers, like engaging in risk assessment when developing CRC Duster or reporting cases of duster abuse or death to the CPSC. (Trial Tr. 663:4–12, 816:21–820:6, 1035:24–1036:3.)

Further, McDougall presented evidence that, after the crash on July 22, 2019, a can of CRC Duster was found in Neumiller's car and Neumiller had DFE in his blood. (Trial

Tr. 319:20–321:2, 325:1–15, 325:23–328:13, 329:21–332:7, 1219:6–12.) Neumiller testified that he had used aerosol duster to get high before July 22, 2019, and that he knew inhaling aerosol duster could cause loss of consciousness. (Trial Tr. 1325:4–15, 1337:5–24.) In addition, Neumiller testified that, on July 22, 2019, he knew that he if he inhaled duster and drove and lost consciousness, that there was a chance that he could kill someone else. (Trial Tr. 1325:19–1326:4.)

McDougall's damages expert, Dr. Felix Friedt, testified that the present value of McDougall's future losses was $1,142,000 and that McDougall's past economic losses were $391,000. (Trial Tr. 853:17–20, 872:9–13.)

During the trial, CRC moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) based on insufficiency of the evidence. (Def.'s Mem. Supp. JMOL at 3–28, Apr. 22, 2024, Docket No. 242.) Further, CRC argued it should not be required to cover Neumiller's fault for Ms. McDougall's death. (*Id.* at 29–33.) The Court denied CRC's motion from the bench. (Trial Tr. 1622:8–17.)

On April 25, 2024, the jury returned a verdict finding that CRC was liable for a design defect with CRC Duster and that the design was a direct cause of Cynthia McDougall's death, though the jury found no failure to warn. (1st Jury Verdict at 1–2, Apr. 30, 2024, Docket No. 272.) The jury also determined that Kyle Neumiller misused CRC Duster; that he "kn[ew] that huffing CRC Duster while driving on July 22, 2019, was substantially certain to result in the consequences/the death of another person;" that he

was at fault for Ms. McDougall's death; and that Neumiller's fault was a direct cause of Ms. McDougall's death.  (*Id.* at 2–3.)  The jury apportioned 22.5% of fault for Ms. McDougall's death to CRC and 77.5% of fault to Neumiller and awarded McDougall $7,750,000 for his losses.  (*Id.* at 3–4.)

Because the jury found CRC liable for a design defect, they were asked to determine whether to award punitive damages.  (Trial Tr. 1622:22–1623:7; 1838:20–25.) After hours of deliberation, the jury chose not to award punitive damages, but they did request that the Court read a note from the jury in court before adjourning:

As indicated by our verdict yesterday, we believe that CRC Industries is partially at fault for the crash that killed Cindi McDougall. However, we do not believe they acted with deliberate disregard.

After much deliberation we, as a jury, have agreed that we expect CRC to use this as an opportunity to be a leader in their industry, and spearhead an effort to address inhalent abuse. Testimony and evidence shows that there is much more that could be done to combat the misuse of aerosol products, ESPECIALLY Duster.

Please do not confuse our decision not to award punitive damages with a lack of regard for the loss of Cindi McDougall. Our hearts go out to her husband, son, family, and community.

(2nd Jury Verdict Ex. 1, Apr. 30, 2024, Docket No. 273.)

Because the jury found that Neumiller was an intentional tortfeasor, the Court entered judgment in favor of McDougall against CRC for the full judgment amount. (J. at 1, June 11, 2024, Docket No. 309.) Three days later, the Court amended the judgment to include the specific monetary amount ($7,750,000) entered against CRC to McDougall. (Am. J. at 1, June 14, 2024, Docket No. 310.)

CRC thereafter filed the present post-trial motions for judgment as a matter of law

("JMOL") and for a new trial.  (Mot. for JMOL, Mot. New Trial, July 8, 2024, Docket No.

312.)  In general, CRC argues that the jury's verdict was against the weight of the evidence

and that the Court made legal errors that substantially influenced the trial.  (Def.'s Mem.,

Aug. 2, 2024, Docket No. 333.)  McDougall also filed a motion to amend the judgment to

add prejudgment and post-judgment interest.  (Mot. Alter/Amend/Correct J., July 9, 2024,

Docket No. 313.)

**DISCUSSION**

## I.   DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.   Standard of Review

Under Federal Rule of Civil Procedure 50, the Court may resolve an issue as a

matter of law if "a party has been fully heard on an issue during a jury trial" and "a

reasonable jury would not have a legally sufficient evidentiary basis to find for the party

on that issue." Fed. R. Civ. P. 50(a)(1).  "A motion for judgment as a matter of law should

be granted when all the evidence points one way and is susceptible of no reasonable

inferences sustaining the position of the nonmoving party." *Hunt ex rel. Hunt v. Lincoln

Cnty. Mem'l Hosp.*, 317 F.3d 891, 893 (8th Cir. 2003) (quotation omitted).

If the Court denies a motion for judgment as a matter of law made during trial

pursuant to Rule 50(a), the moving party may file a renewed motion regarding legal

questions following the verdict and entry of judgment pursuant to Rule 50(b).  Fed. R. Civ.

P. 50(b).  In deciding a renewed motion, the Court shall

> (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*Stults v. Am. Pop Corn Co.*, 815 F.3d 409, 418 (8th Cir. 2016) (quoting *Jones v. Edwards*, 770 F.2d 739, 740 (8th Cir. 1985)).  Because a Rule 50(b) motion constitutes a renewal of a Rule 50(a) motion made at the close of the evidence, a Rule 50(b) motion is limited to the issues raised in the Rule 50(a) motion.  *Hinz v. Neuroscience, Inc.*, 538 F.3d 979, 983–84 (8th Cir. 2008).

### B.    Analysis

CRC argues that no reasonable juror would have a legally sufficient basis to find for McDougall on the design defect claim.[1]  Specifically, CRC claims there was insufficient evidence to support a reasonable jury's finding (1) that CRC owed Ms. McDougall a duty of care and (2) that CRC Duster's design was both defective and the proximate cause of Ms. McDougall's death.  The Court will analyze each argument in turn.

### 1.    Duty of Care

CRC argues that no reasonable jury could find that CRC had a duty to protect Ms. McDougall from the harm that Neumiller caused.

---

[1] "Out of an abundance of caution," CRC also maintains its challenge to the Court's ruling during trial that permitted McDougall to add a punitive-damages claim.  (Def.'s Mem. at 47.)  However, the jury verdict ultimately did not include any punitive damages, and that verdict is now final.  Therefore, that challenge is now moot.

Under Minnesota law, a person generally does not owe a duty of care to another if the harm is caused by a third party's conduct. *Doe 169 v. Brandon*, 845 N.W.2d 174, 177–78 (Minn. 2014). However, an exception exists when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff. *Domagala v. Rolland*, 805 N.W.2d 14, 23 (Minn. 2011). This exception only applies if the defendant's conduct was misfeasance, which is "active misconduct working positive injury to others," not nonfeasance, which is "passive inaction or a failure to take steps to protect [others] from harm." *Doe 169*, 845 N.W.2d at 178 (quotation omitted); *Fenrich v. The Blake Sch.*, 920 N.W. 2d 195, 203 (Minn. 2018).

In its renewed motion for JMOL, CRC challenges misfeasance and foreseeability.

### a.    Misfeasance

First, CRC argues that McDougall provided insufficient evidence to support a finding of misfeasance. Specifically, CRC claims that McDougall was required to submit misfeasance to the jury and that in any event he failed to prove misfeasance at trial. In CRC's view, McDougall's theory of liability is through nonfeasance, which is insufficient to establish that CRC owed Ms. McDougall a duty of care.

However, McDougall need not have submitted misfeasance as a specific element to the jury. "Whether an alleged tortfeasor's own conduct is misfeasance or nonfeasance is a question of law." *Fenrich*, 920 N.W.2d at 204 n.4 (citation and internal quotations omitted). The Court determined that genuine factual issues precluded summary judgment regarding CRC's own conduct. *McDougall v. CRC Indus., Inc.*, 2023 WL 5515827,

at *8.  And at trial, the Court rejected CRC's proposal to instruct the jury on misfeasance

because the Court was concerned about confusing the jury.  (Trial Tr. 1681:5–9.)  Rather

than confuse the jury with instructions on misfeasance versus nonfeasance, the relevant

question for the jury was whether CRC's manufacturing and selling of CRC Duster created

a foreseeable risk of injury to a foreseeable plaintiff.  In a factually similar case involving

a car accident brought about by a third-party who inhaled aerosol duster, the Court of

Appeals found that the district court erred by only considering whether the manufacturer

of the duster engaged in misfeasance by taking an active role in the third-party's conduct

on the day of the accident.  *Diehl v. 3M Co.*, No. A19-0354, 2019 WL 4412976, at *3 (Minn.

Ct. App. Sept. 16, 2019).[2]  Rather, the inquiry should have been whether the defendant's

"own conduct of manufacturing and selling the product created a foreseeable risk of

injury to [the plaintiff]."  *Id.*  In other words, a defendant's act of manufacturing and selling

a product that created a foreseeable risk of injury to a foreseeable plaintiff may constitute

misfeasance.  Indeed,

> [c]oncluding that a manufacturer does not have a duty
> because the manufacturer was not involved with the product
> user's misuse of the product fails to recognize that a
> manufacturer has a duty to avoid any unreasonable risk of
> harm to anyone who is likely to be exposed to danger when

---

[2] "As an unpublished opinion of the Minnesota Court of Appeals, [*Diehl*] lacks precedential value, but its reasoning is helpful."  *Pitman Farms v. Kuehl Poultry, LLC*, 48 F.4th 866, 881 (8th Cir. 2022).  Indeed, the Court may rely on *Diehl* "as persuasive authority as to how the Minnesota Supreme Court would address" the misfeasance issue, especially because of the similar circumstances under which *Diehl* arose.  *Cent. Specialties, Inc. v. Large*, 18 F.4th 989, 999 n.2 (8th Cir. 2021).

> the product is used in an unintended yet reasonably foreseeable use.

*Id.* Without clearer instruction from the Minnesota Supreme Court, the Court finds that the appropriate inquiry for the jury—as the Court instructed at trial—was whether CRC's own conduct of manufacturing and selling CRC Duster created a foreseeable risk of injury to Ms. McDougall. (*See* Jury Verdict at 1; Final Jury Instr. at 18–20, Apr. 30, 2024, Docket No. 274.) This conclusion is supported by bedrock principles of Minnesota products liability law, which hold that a manufacturer may have a duty to protect the user of a product, as well as those who might be injured by the product's use or misuse, from foreseeable danger. *Whiteford by Whiteford v. Yamaha Motor Corp., U.S.A.*, 582 N.W.2d 916, 919 (Minn. 1998).

Having submitted appropriate instructions regarding misfeasance to the jury, the Court finds that McDougall presented sufficient evidence to support a reasonable jury's finding that CRC owed a duty to Ms. McDougall because its own conduct of manufacturing and selling CRC Duster created a foreseeable risk of injury to Ms. McDougall. At trial, McDougall presented evidence that CRC knew people were using CRC Duster and other aerosol duster products to get high while driving and yet failed to engage in risk assessment for CRC Duster. Further, McDougall presented evidence that CRC was aware of ACE's blog with a collection of reports of inhalant abuse, including driving-while-huffing dust remover cases. The evidence that was presented supports a reasonable conclusion that CRC's manufacturing and selling of CRC Duster—despite the known risks and abuse—

constituted misfeasance.  Thus, the jury's verdict is not so unsupported by evidence as to justify JMOL on this ground.

**b.    Foreseeability**

Second, CRC challenges foreseeability, arguing that Neumiller's actions were too remote to be a reasonably foreseeable result.  Specifically, CRC claims that McDougall did not prove that CRC's conduct created a foreseeable risk of injury to a foreseeable plaintiff because Neumiller's grossly negligent misuse of CRC Duster was too remote from CRC's design, manufacturing, and sale of the product to make Neumiller's conduct a reasonably foreseeable result.  CRC analogizes this case to the wholesale sale of alcohol to an intermediary or the manufacturing of cold medicine that was made into methamphetamine by criminal intermediary "cooks."  *See Johnson v. Kotval*, 369 N.W.2d 584, 585–86 (Minn. Ct. App. 1985); *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 670 (8th Cir. 2009).

It is well settled that a manufacturer has a duty to develop its "plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use."  *Bilotta v. Kelley Co., Inc.*, 346 N.W.2d 616, 621 (Minn. 1984) (quoting *Holm v. Sponco Mfg., Inc.*, 324 N.W.2d 207, 212 (Minn. 1982)).  "In determining whether a danger is foreseeable, courts look at whether the specific danger was objectively reasonable to expect, not simply whether it was within the realm of any conceivable possibility."  *Whiteford*, 582 N.W.2d at 918.

At summary judgment, the Court concluded that, based on the evidence, a factfinder could find that it was objectively reasonable for CRC to anticipate a danger to third-party bystanders from individuals who huffed while driving. *McDougall*, 2023 WL 5515827, at *5. At trial, McDougall presented significant evidence to support his argument that Ms. McDougall's death was a reasonably foreseeable result. For example, McDougall presented evidence that CRC knew about the epidemic of DFE abuse and that people were misusing CRC Duster to get high, including while driving. The jury was asked to weigh this evidence—including both CRC's answer to an interrogatory that a person's misuse of CRC Duster to get high creates risks and testimony from CRC's witnesses regarding CRC's knowledge of the huffing epidemic—to determine whether Ms. McDougall's death was a reasonably foreseeable result of CRC Duster's design. Whether or not CRC knew who Neumiller was before this lawsuit, as CRC argues, is of no matter with respect to foreseeability because the appropriate inquiry is whether it was objectively reasonable for CRC to expect the specific danger that caused Ms. McDougall's death. *Domagala*, 805 N.W.2d at 27. The jury ultimately answered that question in the affirmative. Sufficient evidence supports the jury's conclusion, and the Court will not grant JMOL on this ground.

### 2.    Design Defect

CRC next argues that JMOL is warranted because no reasonable jury could have found a design defect in CRC Duster. To prevail on his design defect claim, McDougall needed to establish that CRC owed a duty to Ms. McDougall, that CRC Duster was in a

defective condition unreasonably dangerous to users of or those exposed to the product because of its design, and that the design was a direct cause of McDougall's damages. *Bilotta*, 346 N.W.2d at 622–23 & n.3; *Domagala*, 805 N.W.2d at 22.[3]  In CRC's view, McDougall (1) did not prove that Neumiller's decision to huff CRC Duster while driving was a foreseeable misuse, (2) did not offer the required standard-of-care balancing-test expert testimony, (3) did not present alternative-design evidence, and (4) did not prove proximate causation.  The Court will analyze each argument in turn.

### a.   Foreseeable Misuse

First, CRC argues that McDougall did not prove that huffing while driving is a foreseeable misuse, such that CRC would owe Ms. McDougall a duty of care.  However, the Court finds that McDougall presented sufficient evidence for a reasonable jury to conclude that Neumiller's decision to huff CRC Duster while driving was a foreseeable misuse.  A manufacturer is obligated to address defects related to unintended, but reasonably foreseeable, uses.  *Bilotta*, 346 N.W.2d at 621.  At trial, McDougall presented evidence that CRC was aware that people were misusing CRC Duster and other aerosol duster products to get high, including while driving.  This was sufficient to support the jury's verdict.

---

[3] In cases with overlapping negligence and strict liability theories, the Minnesota Supreme Court has acknowledged that a trial court could merge them into a single theory in design defect cases to "avoid the confusion and inconsistent verdicts spawned by submission of multiple overlapping theories."  *Bilotta*, 346 N.W.2d at 623.  Thus, the Court's jury instructions merged the elements for negligence and strict liability for design defect.  (*See* Jury Instr. at 18–20.)

b.    **Expert Testimony**

CRC next argues that McDougall did not offer required standard-of-care balancing-test expert testimony to evaluate whether CRC Duster's design was defective.

The test for a defective-design claim is a "reasonable-care balancing test," which involves balancing "the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm." *Id.* (internal quotations omitted).  "When the standard of care that a manufacturer must exercise in weighing the costs and benefits of an alleged design defect is not within the general knowledge and experience of lay people, expert testimony is necessary." *Markel v. Douglas Techs. Grp., Inc.*, No. 17-1790, 2019 WL 1440423, at *3 (D. Minn. Apr. 1, 2019) (citation and internal quotations omitted).  However, "expert testimony is not required in every product liability case involving a complex product." *Holverson v. ThyssenKrupp Elevator Corp.*, No. 12-2765, 2014 WL 3573630, at *4 (D. Minn. July 18, 2014).

In this case, weighing the costs and benefits of CRC Duster's design is not so outside the general knowledge and experience of lay people as to require expert testimony. McDougall presented evidence that CRC knew about the DFE-abuse epidemic and presented expert testimony on the danger of DFE-based aerosol dusters, and the jury was asked to weigh the dangers of misusing DFE with its utility in a product to remove dust from electronics.  (*See* Jury Instr. at 19–20.)  Lay people are suited to weigh such simple costs and benefits, as these circumstances are unlike those where the costs and benefits of an alleged design defect were more technical and thus required expert testimony.  *See,*

-16-

*e.g.*, *Mozes v. Medtronic, Inc.*, 14 F. Supp. 2d 1124, 1128 (D. Minn. 1998) (pacemakers); *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1159–61 (D. Minn. 2011) (catheters); *Holverson*, 2014 WL 3573630, at *4 (electric and mechanical systems that allow elevators to function).

Furthermore, though CRC rightly notes that McDougall ultimately decided not to call one particular expert witness in this case, the jury was no stranger to helpful expert witnesses over the course of this seven-day trial. To the extent the jury needed technical expert testimony to understand the toxic effects of CRC Duster, McDougall provided testimony from multiple experts, including a toxicologist, an addiction-medicine doctor, and an academic who studies the epidemiology of inhalant abuse. McDougall also presented expert testimony that CRC chose to design CRC Duster with 100% DFE even when other products that could be used as inhalants were designed in a way that made inhalant abuse more difficult. (Trial Tr. 269:18–271:11.) McDougall need not have supplemented that already lengthy expert testimony with yet another witness to walk through the standard-of-care balancing test the jury was already well-equipped to conduct on its own.

### c.   Alternative-Design Evidence

Next, CRC argues that McDougall did not present alternative-design evidence or establish that CRC Duster is so unreasonably dangerous that it should be taken off the market, as CRC claims McDougall must have done at trial.

However, at summary judgment, the Court previously rejected CRC's assertion that McDougall must present alternative-design evidence. *See McDougall*, 2023 WL 5515827, at *8. As before, the Court is not persuaded that alternative-design evidence must be produced in all cases. The Minnesota Supreme Court has held that "[a]lthough normally evidence of a safer alternative design will be presented initially by the plaintiff, it is not necessarily required in all cases." *Kallio v. Ford Motor Co.*, 407 N.W.2d 92, 96–97 (Minn. 1987). Further, the Eighth Circuit has noted that the Minnesota Supreme Court "did not go so far as to require proof of an alternative feasible design in all defective-products cases." *Wagner v. Hesston Corp.*, 450 F.3d 756, 760 (8th Cir. 2006). The Court sees no reason to depart from its earlier conclusion that proof of an alternative design is not required in all defective products cases; therefore, JMOL is not warranted on this ground.

Moreover, *Kallio* did not explicitly separate defective design cases into the categories argued by CRC—those that provide proof of an alternative design and those that show the product is so unreasonably dangerous that it should be taken off the market. Only in a footnote did the *Kallio* court explain that "[c]onceivably, rare cases may exist where the product may be judged unreasonably dangerous because it should be removed from the market rather than be redesigned." 407 N.W.2d at 97 n.8. The court in *Kapps* interpreted the footnote in *Kallio* as establishing a bicategorical approach to defective design cases. 813 F. Supp. 2d at 1161. This Court, however, understands the footnote to merely represent an example of cases where no alternative design evidence

is required. If the Minnesota Supreme Court had intended to require plaintiffs to present alternative design evidence or else prove that the product is so unreasonably dangerous that it should be taken off the market, it could have said so in its opinion. But it did not. Thus, not only was McDougall not required to present alternative-design evidence, but he also was not required to prove that CRC Duster is so unreasonably dangerous that it should be taken off the market. The Court therefore sees no reason to grant JMOL on this ground.

### d.  Proximate Causation

Finally, CRC argues that McDougall did not prove proximate causation.

In Minnesota, proximate cause exists if "the act [is] one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others" and the defendant's "conduct was a substantial factor in bringing about the injury." *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995).

The Court previously determined that proximate causation turned on foreseeability. *McDougall*, 2023 WL 5515827, at *6–7. CRC claims that McDougall did not satisfy the foreseeability or substantial-fact elements for proximate causation. Namely, CRC argues that no reasonable jury could have found that Neumiller was not a superseding cause that broke any causal chain. However, there was sufficient evidence to support a reasonable jury's finding that the events leading up to Ms. McDougall's death were a reasonably foreseeable risk of CRC's manufacture and sale of CRC Duster, and that CRC's actions were a substantial factor in causing Ms. McDougall's death. Specifically, at

trial McDougall presented evidence of CRC's knowledge of the huffing misuse, CRC's use and subsequent removal of the bitterant, CRC's de minimis steps to deter misuse, warning label changes on CRC Duster, and expert reports. It was for the jury to determine foreseeability, and despite CRC's well-taken arguments, the evidence presented at trial "would allow reasonable jurors to differ as to the conclusions that could be drawn." *Stults*, 815 F.3d at 418. Sufficient evidence thus supported the jury's conclusion that CRC Duster's design proximately caused Ms. McDougall's death.

*        *        *

In sum, the Court finds no ground warranting JMOL, as sufficient evidence supports the jury's verdict in favor of McDougall on the design defect claim. CRC has therefore failed to show that it is entitled to judgment as a matter of law, and the Court will deny CRC's Rule 50(b) motion.

## II.    DEFENDANT'S MOTION FOR A NEW TRIAL

### A.    Standard of Review

Under Rule 59(a) of the Federal Rules of Civil Procedure, the Court may grant a motion for a new trial "on all or some of the issues." Fed. R. Civ. P. 59(a)(1). "A new trial is appropriate when the first trial, through a verdict against the weight of the evidence . . . or legal errors at trial, resulted in a miscarriage of justice." *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996). "The authority to grant a new trial is within the discretion of the district court." *Id.* Only if the jury's verdict is so against the great weight of the evidence that it constitutes a miscarriage of justice should a motion for a new trial be granted.

*Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1010 (8th Cir. 2000). If a party contests the Court's evidentiary rulings, a new trial is warranted only if erroneous rulings "had a substantial influence on the jury's verdict." *Littleton v. McNeely*, 562 F.3d 880, 888 (8th Cir. 2009) (quoting *Harris v. Chand*, 506 F.3d 1135, 1139 (8th Cir. 2007)).

### B.    Analysis

CRC argues that a new trial is warranted because the jury's verdict is so contrary to the evidence that it constitutes a miscarriage of justice and because of alleged errors by the Court. The Court will analyze each argument in turn.

### 1.    Contrary to the Weight of the Evidence

CRC first claims that the jury verdict is so unsupported by the weight of the evidence as to imply that the jury failed to consider all the evidence or acted under some mistake. However, as discussed above, the Court finds that the jury's verdict was not against the weight of the evidence, and the Court will not grant a new trial on this ground.

### 2.    Alternative-Design Instruction

CRC repeatedly requested that the jury be instructed that McDougall was required to either provide proof of an alternative feasible design or "prove that the product should be entirely removed from the market instead of redesigned," which the Court rejected. (Trial Tr. 1084:22–1085:23; 1642:7–25.) CRC argues that the Court's alternative-design instruction thus led the jury to believe that the absence of an alternative design was irrelevant and did not inform the jury that only in the rare case could the product's design be unreasonably dangerous.

District courts have "broad discretion" in formulating jury instructions, *Zutz v. Case Corp.*, 422 F.3d 764, 773 (8th Cir. 2005), which must, "taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submit[] the issues in the case to the jury," *Horstmyer v. Black & Decker, (U.S.), Inc.*, 151 F.3d 765, 771 (8th Cir. 1998) (citation omitted). A new trial for instructional errors is only warranted where the errors misled the jury or had a probable impact on the verdict. *Nicholson v. Biomet, Inc.*, 46 F.4th 757, 762 (8th Cir. 2022).

The Court's instruction regarding alternative design adequately informed the jury of the law. The instructions stated that McDougall was not required to provide proof of an alternative feasible design. (Jury Instr. at 20.) This instruction comports with the Court's understanding, explained above, that Minnesota law does not require proof of alternative-design evidence in all products liability cases. *See McDougall*, 2023 WL 5515827, at *8. Furthermore, there was no need to instruct the jury on CRC's proposed alternative requirement that, in the absence of alternative-design evidence, McDougall needed to prove that CRC Duster was so unreasonably dangerous that it should be taken off the market. As explained above, *Kallio* does not explicitly require that, in lieu of alternative-design evidence, a plaintiff must then demonstrate that a product is so unreasonably dangerous that it should be removed from the market rather than be redesigned. The Court's instruction on this matter was therefore appropriate.

### 3.    Misfeasance on Verdict Form and in Jury Instructions

CRC repeatedly requested that the Court submit misfeasance to the jury and instruct the jury on misfeasance, which the Court rejected.  (*See, e.g.*, Trial Tr. 1071:18–1072:13, 1107:23–1108:1, 1631:17–25, 1680:17–1681:9.)  CRC now claims that a new trial is warranted because the Court failed to submit the issue of misfeasance to the jury and to instruct the jury on misfeasance versus nonfeasance.

"The district court has discretion in the style and wording of jury instructions so long as the charge as a whole fairly and adequately states the law."  *Horstmyer*, 151 F.3d at 771 (quoting *Beckman v. Mayo Found.*, 804 F.2d 435, 438 (8th Cir. 1986)).  The Court rejected CRC's requests to instruct the jury on misfeasance because of concerns that misfeasance would confuse the jury.  (*See* Trial Tr. 1681:5–9.)  Furthermore, as explained above, a defendant's own conduct of manufacturing and selling a product that created a foreseeable risk of injury to a plaintiff may constitute misfeasance.  *See Diehl*, 2019 WL 4412976, at *3.  But the jury was instructed that a manufacturer owes a duty of care when its own conduct creates a foreseeable risk of injury to a foreseeable plaintiff, and the jury was asked to determine whether CRC Duster's design created a foreseeable risk of injury to Ms. McDougall.  Thus, the lack of an explicit instruction on misfeasance was appropriate in adequately instructing the jury on the law.

The Court's rejection of CRC's proposed predicate question on misfeasance in the special verdict form was also appropriate.  District courts have "broad discretion in deciding whether to use a special verdict form" under Federal Rule of Civil Procedure 49,

though that discretion "does not extend to submitting instructions that mislead, confuse, or improperly state the law." *Horstmyer*, 151 F.3d at 772. Here, the inclusion of a misfeasance question in the special verdict form would have been unnecessary, duplicative, and confusing because the jury was already instructed that "[A] manufacturer owes a duty when its own conduct creates a foreseeable risk of injury to a foreseeable plaintiff." (Jury Instr. at 18.) This language tracks that used in the *Diehl* opinion, which concluded that the inquiry is whether the defendant's "own conduct of manufacturing and selling the product created a foreseeable risk of injury to [the plaintiff]." *Diehl*, 2019 WL 4412976, at *3. Thus, the jury was not precluded from considering the issue of misfeasance in determining whether CRC owed Ms. McDougall a duty. Accordingly, the omission of misfeasance language from the instructions and special verdict form appropriately avoided confusing the jury and adequately informed the jury on the law on foreseeability.

### 4.    Court's Answer to Jury's Fault Question

Finally, CRC argues that a new trial is warranted because the Court's answer to Juror Question 2 impermissibly road-mapped how the jury could ensure that McDougall would receive all the damages.

"A district court has broad discretion to respond to a jury request for supplemental instructions," so long as the court "insure[s] that any supplemental instructions given are accurate, clear, neutral and non-prejudicial." *United States v. Felici*, 54 F.3d 504, 507 (8th Cir. 1995). In addition to being accurate, clear, neutral, and non-prejudicial, answers to

jury questions must be "within the specific limits of the question presented." *Am. Mod. Home Ins. Co. v. Thomas*, 993 F.3d 1068, 1074 (8th Cir. 2021) (citation and internal quotation marks omitted).

Juror Question 2 asked, "Will the percentages we provide in question 4 affect the damages awarded? (If we decide to award damages)[.]"  (Answer of the Court to Juror Question 2 at 1, Apr. 30, 2024, Docket No. 277.)  The Court held a conference with the parties to determine how to answer the jury's question, which concerned the effect of the jury's apportionment of fault.  (Trial Tr. 1824–1831.)  Over objection from CRC's counsel, the Court determined that the following answer was appropriate: "If you answer 'Yes' to both questions under Count 1 and/or both questions under Count 2, and answer "Yes" to Questions 3A and 3B, then any damages awarded would not be divided and Plaintiff would receive all the damages."  (Answer of the Court to Juror Question 2 at 1.)

CRC contends that the Court's answer improperly permitted the jury to "concern themselves about whether their answers will be favorable to one party or the other or what the final result of the law suit may be." *Chicago, R.I. & P. R. Co. v. Speth*, 404 F.2d 291, 295 (8th Cir. 1968).  However, the Court's answer to Juror Question 2 was appropriate.  The Court's answer was clear and within the limits of the question presented, as it succinctly provided the only scenario where the jury's percentages of fault would affect the damages award.  The Court's answer was also accurate, as it comports with the Court's understanding that Minnesota law does not apportion fault between

negligent and intentional tortfeasors, as explained below. And while the Court acknowledges CRC's concerns regarding neutrality and prejudice, the Court's ordinary practice is to provide an instructional special verdict form that guides the jury through the questions in such a way that the jury knows the impact of their decisions. (*See* Trial Tr. 1827:9–1828:10.) Because the parties requested that such instructions be removed from the special verdict form so that all of the questions on the verdict form were answered, the Court determined that its answer to Juror Question 2 should tell the jury the impact of their decisions, as they normally would have known under ordinary circumstances. (*See id.*; Trial Tr. 1829:4–10.) Furthermore, in state court, juries are instructed on the effect of their answers to comparative fault questions. Minn. R. Civ. P. 49.01(b). And counsel for McDougall and CRC even acknowledged that the Court's ordinary practice of providing instructional special verdict forms was common in state and federal court. (Trial Tr. 1824:16–19; 1829:11–12.) Because under ordinary circumstances the jury would have been able to determine the impact of their percentages of fault, the Court's answer was not so prejudicial to CRC as to warrant a new trial. *Cf. Ramstad v. Lear Siegler Diversified Holdings Corp.*, 836 F. Supp. 1511, 1520–21 (D. Minn. 1993) (finding a conflict between state rule requiring courts to instruct on the effect of comparative fault verdict and Rule 49 requiring courts to provide instructions necessary to make its factual findings).

\*    \*    \*

-26-

In sum, the Court finds no basis for granting a new trial on any of CRC's raised grounds and will thus deny CRC's Rule 59 motion for a new trial.

## III. DEFENDANT'S REQUEST TO AMEND JUDGMENT

Even if the liability judgment stands, CRC requests that the judgment be amended to 22.5% of the damages to be proportionate to the 22.5% fault that the jury apportioned to CRC, pursuant to Federal Rule of Civil Procedure 59(e). In effect, CRC's request would reduce the verdict judgment to $1,743,750.

"Rule 59(e) motions serve a limited function of correcting manifest errors of law or fact or to present newly discovered evidence." *Innovative Home Health Care v. P.T.-O.T. Assoc. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998) (quotations omitted). The Court "has broad discretion to alter or amend a judgment under Rule 59(e)." *SFH, Inc. v. Millard Refrigerated Servs., Inc.*, 339 F.3d 738, 746 (8th Cir. 2003).

At trial, the parties disputed whether and how the jury should be instructed to consider the fault of Neumiller with CRC. The parties' dispute centered on whether the fault of an intentional tortfeasor can be compared with that of a negligent tortfeasor under Minnesota's comparative fault statute. The Court ruled that if the jury found that Neumiller was an intentional tortfeasor, it would not permit CRC to limit its exposure to liability to the extent of its fault. (Mem. Op. & Order on Special Verdict Form and Post-Incident Evidence ("SVF Order") at 1–3, Apr. 17, 2024, Docket No. 229.)

Now, CRC again argues that any fault of CRC must be compared to Neumiller's fault, regardless of whether Neumiller engaged in an intentional tort. However, the Court

-27-

declines to alter its decision to not compare fault between CRC and Neumiller because the jury found Neumiller to be an intentional tortfeasor. The Court previously addressed a similar issue in *ADT Security Services, Inc. v. Swenson, ex rel. Estate of Lee*, 687 F. Supp. 2d 884, 894–96 (D. Minn. 2009), where the Court refused to find as a matter of law that ADT, a negligent tortfeasor, would not be jointly and severally liable for the harm caused by the man convicted of the couple's murders. *Id.* at 896. The Court carefully analyzed Minnesota's comparative fault statute, Minn. Stat. § 604.01, and weighed differing positions on the comparison between negligent and intentional tortfeasors under Minnesota law. *See, e.g.*, Michael K. Steenson, *Joint and Several Liability in Minnesota: The 2003 Model*, 30 Wm. Mitchell L. Rev. 845, 878–81 (2004) (finding support for either position). Notably, the Court acknowledged that Minn. Stat. § 604.01's definition of fault does not mention intentional torts, which the Court found consistent with the view that intentional torts are simply out of the equation for comparative fault purposes. *See ADT*, 687 F. Supp. 2d at 895. Ultimately, the Court concluded that even if there are cases where a negligent tortfeasor can defray some of its liability onto intentional tortfeasors through the comparative fault statute, the negligent tortfeasor remains jointly and severally liable in cases where it was responsible for protecting against the specific type of intentional conduct that ultimately occurred. *Id.* at 896.

That same conclusion applies here, in a case where McDougall argued CRC was responsible for taking necessary steps to avoid the kind of harm that ultimately claimed

Ms. McDougall's life. *See Diehl*, 2019 WL 4412976, at *4 ("[I]t was reasonably foreseeable that R.B. would misuse the dust remover and become acutely intoxicated. If it was also foreseeable that people who inhale the dust remover and become acutely intoxicated were a danger to Diehl, 3M had a duty to protect Diehl from the foreseeable danger.").

CRC's citations to cases that did not address whether an intentional tortfeasor should be included in the fault comparison do not change the Court's conclusion. *See Staab v. Diocese of St. Cloud*, 813 N.W.2d 68, 75 (Minn. 2012) (construing § 604.02, subd. 1 "to provide that the principle of several liability limits the magnitude of a severally liable person's contribution to an amount that is in proportion to his or her percentage of fault, as determined by the jury"); *Staab v. Diocese of St. Cloud*, 853 N.W.2d 713, 719 (Minn. 2014) ("The Legislature's expression of a general rule of several liability subject to four exceptions in subdivision 1 precludes an interpretation of subdivision 2 that would effectively create a fifth exception to the several liability rule."). The Court respectfully rejects the dissent in *Glay v. R.C. of St. Cloud, Inc.*, No. A23-1464, 2024 WL 2266939, at *8 (Minn. Ct. App. May 20, 2024) ("[T]he plain language of section 604.02 specifically permits the comparison of fault between negligent and intentional tortfeasors."). The Court finds no reason to alter its careful conclusion that § 604.02 does not authorize the comparison of fault between negligent and intentional tortfeasors, such that CRC and Neumiller's fault should not be compared.

CRC's remaining arguments are no more convincing. CRC argues that because the jury found Neumiller misused CRC Duster while driving, his fault should be compared to CRC's because "misuse of a product" is "fault" as defined by Minn. Stat. § 604.01. However, the definition of fault in the statute is limited to negligent or reckless conduct based on the qualifying language of the provision, and thus does not include intentional misuse. *See* Minn. Stat. § 604.01, subd. 1a ("'Fault' includes acts or **omissions that are in any measure negligent or reckless** toward the person or property of the actor or others, or that subject a person to strict tort liability." (emphasis added)).

CRC also argues that no reasonable jury could have found that Neumiller was substantially certain that he would kill when he huffed CRC Duster and then drove on July 22, 2019. The Court already rejected this argument during trial. (SVF Order at 3–5.) The test for intentionally tortious conduct is whether the tortfeasor "believes that the consequences are substantially certain to result" from his act. *Victor v. Sell*, 222 N.W.2d 337, 339 (Minn. 1974). Intent can be inferred from the circumstances under Minnesota law, *R.W. v. T.F.*, 528 N.W.2d 869, 872 (Minn. 1995), and the evidence presented to the jury could support either intentional or negligent misconduct. (SVF Order at 4.) The jury ultimately determined that Neumiller acted intentionally, and sufficient evidence supports that conclusion. As a result, the Court sees no reason to alter the judgment on this matter.

Finally, CRC argues that judicial estoppel, which "forbids a party from assuming inconsistent or contradictory positions during the course of a lawsuit," bars the intent finding.  *State v. Profit*, 591 N.W.2d 451, 462 (Minn. 1999).  CRC's argument is that because McDougall petitioned for the approval of a settlement in his separate lawsuit against Neumiller alleging that Ms. McDougall's death was caused by Neumiller's negligent actions, McDougall should not be allowed to argue in this action that Neumiller acted intentionally.

The Minnesota Supreme Court has not expressly adopted the doctrine of judicial estoppel, which "is intended to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories."  *State v. Pendleton*, 706 N.W.2d 500, 507 (Minn. 2005).  Because the Minnesota Supreme Court has not formally adopted this doctrine, the Court declines to apply it to this case.  *Cf. North Cent. Cos., Inc. v. Minerva Dairy, Inc.*, No. 16-3816, 2018 WL 4181605, at *5–6 (D. Minn. Aug. 31, 2018).

But even if it did apply, the doctrine would not bar McDougall's claims because not all three conditions under the doctrine are met.  The three conditions are (1) that the party presenting inconsistent theories must have prevailed in its original position; (2) that there is a clear inconsistency between the original and subsequent position; and (3) that there are not any distinct or different issues of fact in the proceedings.  *Pendleton*, 706 N.W.2d at 507.  Here, however, McDougall did not "prevail" in his original position that

Neumiller acted negligently in the other proceeding; instead, he settled the case and therefore did not succeed "on a factual theory inconsistent to the one in question." *Occidental Fire & Cas. Co. v. Soczynski*, 765 F.3d 931, 935 (8th Cir. 2014).  Further, the prior proceeding served a different purpose and involved different facts from the one at bar, as it served to secure car insurance coverage.  (*See* Trial Tr. 1620:21–24.)  *Profit*, 591 N.W.2d at 462 ("[J]udicial estoppel does not apply . . . where distinct or different issues or facts are involved.").

For the reasons discussed above, the Court does not find that any manifest errors of law justify an amended judgment, and CRC does not present any new evidence. Accordingly, the Court will deny CRC's request to alter or amend the judgment.

## IV.   PLAINTIFF'S MOTION TO AMEND JUDGMENT TO INCLUDE PREJUDGMENT AND POST-JUDGMENT INTEREST

The Court next considers McDougall's motion to amend the judgment to include prejudgment and post-judgment interest pursuant to Rule 59(e).

### A.   Prejudgment Interest

In a diversity action such as this, Minnesota law governs a request for prejudgment interest.  *Matthew v. Unum Life Ins. Co. of Am.*, 639 F.3d 857, 864 (8th Cir. 2011).  Under Minnesota law, prejudgment interest is computed "from the time of the commencement of the action or a demand for arbitration, or the time of a written notice of claim, whichever occurs first" until judgment is entered.  Minn. Stat. § 549.09, subd. 1(a)–(b). Minnesota law clearly dictates that the prevailing party "shall receive interest" on any

award, with few limited exceptions.  Minn. Stat. § 549.09, subd. 1(b).  Where the judgment or award exceeds $50,000, subject to certain exceptions that are inapplicable here, "the interest rate shall be ten percent per year until paid."  *Alby v. BNSF Ry. Co.*, 934 N.W.2d 831, 833 (Minn. 2019) (citing Minn. Stat. 549.09, subd. 1(c)(2) (2018)).

There are two types of prejudgment interest: pre-verdict interest and post-verdict interest.  McDougall claims he is entitled to both.

### 1.    Pre-Verdict Interest

McDougall claims he is entitled to $2,525,523.29 in pre-verdict interest.  By contrast, CRC argues that, if judgment is awarded, McDougall is only entitled to $149,330 in pre-verdict interest.

Pre-verdict interest is "an element of damages awarded to provide full compensation by converting time-of-demand . . . damages into time-of-verdict damages."  *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 918 (8th Cir. 2005) (citing *Lienhard v. State*, 431 N.W.2d 861, 865 (Minn. 1988)).  It is designed to "compensate the plaintiff for the loss occasioned by the defendant's tort."  *Lienhard*, 431 N.W.2d 861, 865.

Where damages are not readily ascertainable, pre-verdict interest is computed from the time that the action was commenced until the time of the verdict.  Minn. Stat. § 549.09, subd. 1(b), (c)(2).  It is undisputed that the damages in this case were not readily ascertainable and that § 549.09 applies.  Thus, the pre-verdict interest will be calculated by multiplying the number of days between the commencement of the action and the

verdict by the daily simple interest earned at the 10% statutory rate on the jury award, less future damages.

First, the Court will determine the appropriate timeframe within which the pre-verdict interest accrued. The pre-verdict interest began to run on the date that McDougall commenced this action by filing his complaint, which was July 1, 2020. The verdict was rendered on April 25, 2024. The parties disagree on the number of days that pre-verdict interest accrued between the commencement of the action and the verdict. McDougall argues that pre-verdict interest accrued from the commencement of the action through the date that the verdict was rendered, or 1,395 days.[4] By contrast, CRC claims that pre-verdict interest accrued from the commencement of the action to the date that the verdict was rendered, or 1,394 days. It is the Court's practice to calculate pre-verdict interest through the date that the verdict was rendered. *See, e.g.*, *Steady State Imaging, LLC v. General Elec. Co.*, No. 17-1048, 2023 WL 4203162, at *8 n.2 (D. Minn. June 27, 2023); *Selective Ins. Co. of Am. v. Heritage Constr. Cos.*, LLC No. 19-3174, 2024 WL 1886124, at *3 (D. Minn. Apr. 30, 2024). Accordingly, the Court finds that pre-verdict interest accrued across the 1,395 days from the commencement of the action on July 1, 2020, through the date that the verdict was rendered on April 25, 2024.

---

[4] Given the timeframe between the commencement of the litigation on July 1, 2020, and the verdict's rendering on April 25, 2024, the year 2020 had 184 days that accrued pre-verdict interest, the years 2021, 2022, and 2023 each had 365 days that accrued pre-verdict interest, and the year 2024 had 116 days that accrued pre-verdict interest. In total, there were 1,395 days.

Second, the Court will determine the principal on which to base the interest—the damages to be factored into the pre-verdict interest calculation. Section 549.09 dictates that pre-verdict interest shall not be awarded on awards for future damages. Minn. Stat. § 549.09, subd. 1(b)(2); *see Baufield v. Safelite Glass Corp.*, 831 F. Supp. 713, 719 (D. Minn. 1993) ("[T]he threshold issue is whether an award of prejudgment interest is proper. Minn. Stat. § 549.09, subd. 1(b)(1)–(5) sets forth specific judgments for which preverdict interest may not be awarded."). At trial, McDougall's damages expert, Dr. Felix Friedt, testified that the present value of McDougall's future losses was $1,142,000. This portion of the jury award is not eligible for pre-verdict interest—and neither party disputes this. Where the parties disagree, however, is on what portion of the remaining damages is eligible.

On the one hand, McDougall argues that the remaining $6,608,000 ($7,750,000 minus $1,142,000) of the damages award is eligible for pre-verdict interest. On the other hand, CRC argues that pre-verdict interest only accrued on the damages that Dr. Friedt explicitly calculated as McDougall's past economic losses—or $391,000. Because the jury did not specify in the verdict what types of damages they awarded, CRC claims that the Court cannot assume that the remaining $6,217,000 that the jury awarded ($7,750,000 minus the $1,142,000 in future losses and the $391,000 in past economic losses) is for anything other than future damages. *See Adams v. Toyota Motor Corp.*, 867 F.3d 903, 921 (8th Cir. 2017) ("[W]e predict that the Minnesota Supreme Court would conclude that

prejudgment interest is not available for judgments that encompass multiple types of damages . . . when it is impossible to differentiate between the types of damages included in the judgment."); *Stinson v. Clark Equip. Co.*, 473 N.W.2d 333, 335–36 (Minn. Ct. App. 1991) (finding amount of prejudgment interest indeterminable because there was no way to differentiate between the types of damages); *Hagen v. State Bank of Cokato*, No. C9-88-1407, 1989 WL 12432, at *3 (Minn. Ct. App. Feb. 21, 1989) ("As the jury verdict did not distinguish between past and future damages and the statute plainly says interest cannot be awarded for future damages, the trial court did not err in denying prejudgment interest.").

However, Minnesota law does not require a jury to spell out how and why it apportioned every penny of its damages for its award to be eligible for pre-verdict interest. It merely requires the Court to exclude pre-verdict interest from awards when future damages are inextricable from other damages. Here, future damages are ascertainable. *Cf. Adams*, 867 F.3d 903, 919–21; *Stinson*, 473 N.W.2d at 335–36. Dr. Friedt testified that McDougall's future losses were $1,142,000, and the parties do not dispute that calculation, so the Court will exclude this amount from the pre-verdict interest principal. The remainder, $6,608,000, is eligible for pre-verdict interest.[5]

---

[5] Pre-verdict interest has regularly been awarded on past general damages even when they were unascertainable. *See, e.g.*, *Myers v. Hearth Techs., Inc.*, 621 N.W.2d 787, 794 (Minn. Ct. App. 2001); *Skifstrom v. City of Coon Rapids*, 524 N.W.2d 294, 296–97 (Minn. Ct. App. 1994); *see also Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 869–70 (8th Cir. 2004) ("The amended [§ 549.09] allows prejudgment interest irrespective of a defendant's ability to ascertain

Having determined that the pre-verdict interest accrued across the 1,395 days between the commencement of the action and the verdict and that $6,608,000 of the jury award is eligible for pre-verdict interest, the Court finds that McDougall is entitled to $2,525,523.29 in pre-verdict prejudgment interest.[6]

### 2.    Post-Verdict Interest

McDougall claims he is entitled to $127,619.09 in post-verdict interest.  CRC contends McDougall is only entitled to $101,717.40 in post-verdict interest.

Minnesota law provides for the accrual of interest "from the time of the verdict . . . until judgment is finally entered."  Minn. Stat. § 549.09, subd. 1(a).  Post-verdict interest is "compensation for the loss of use of money as a result of the nonpayment of a liquidated sum, for which liability has already been determined, not compensation for the injury giving rise to liability."  *Lienhard*, 431 N.W.2d at 865.  Post-verdict interest accrues on the total award, including pre-verdict interest, because "preverdict interest is part of compensatory damages," so "it is part of a prevailing party's judgment or award."  *Hogenson v. Hogenson*, 852 N.W.2d 266, 276 (Minn. Ct. App. 2014).  Post-verdict interest

---

the amount of damages for which he might be held liable." (cleaned up)); *Gen. Mills Operations, LLC v. Five Star Custom Foods, LLC*, 845 F. Supp. 2d 975, 978–79 (D. Minn. 2012) (rejecting argument that damages must have been ascertainable to receive pre-verdict interest); *Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.*, No. 97-2185, 2002 WL 31185884, at *9–10 (D. Minn. Sept. 27, 2002) (same).

[6] This sum is calculated by dividing 10% of the principal, $6,608,000, by 365 days to get a daily pre-verdict interest amount of $1,810.41096.  The daily pre-verdict interest amount is then multiplied by 1,395 days to reach the pre-verdict interest amount of $2,525,523.29.

is calculated by multiplying the number of days between the verdict and the entry of judgment by the daily simple interest earned at the 10% statutory rate on the sum of the compensatory damages and pre-verdict interest.

Because post-verdict interest is calculated by combining the jury award with the pre-verdict interest, the parties' contrasting post-verdict calculations are due, in large part, to their contrasting pre-verdict interest calculations. Because the Court determined that the pre-verdict interest is $2,525,523.29, that amount will be combined with the jury award of $7,750,000 for a total principal of $10,275,523.29 on which to base the post-verdict interest.[7]

The parties' main disagreement relates to the time period over which post-verdict interest accrued. McDougall argues that post-verdict interest accrued until the Court entered amended judgment on June 14, 2024, whereas CRC argues that post-verdict interest accrued until the Court entered original judgment on June 11, 2024.

Post-verdict interest accrued until the Court entered judgment on June 11, 2024. "Logically, the accrual of prejudgment interest ends when the accrual of postjudgment interest begins, and postjudgment interest, which is a procedural matter of federal law, begins to accrue when a 'money judgment' is entered." *U.S. Bank Nat'l Ass'n v. Indian Harbor Ins. Co.*, No. 12-3175, 2015 WL 12778848, at *6 (D. Minn. Mar. 19, 2015) (quoting

---

[7] McDougall appears to have erroneously subtracted the future damages, or $1,142,000, from the jury award in reaching his proposed principal of $9,133,523.29 for the post-verdict interest calculation ($6,608,000 plus $2,525,523.29 equals $9,133,523.29).

28 U.S.C. § 1961(a)).  In the judgment entered on June 11, 2024, the Court accepted the jury's verdict and entered judgment in favor of McDougall against CRC for the full judgment amount.  While the amended judgment entered on June 14, 2024, specified the monetary amount of "$7,750,000" against CRC, the June 11 judgment constituted a "money judgment" because the amount of the judgment was clearly ascertainable. *ResCap Liquidating Tr. v. Primary Residential Mortg., Inc.*, 59 F.4th 905, 923 (8th Cir. 2023) ("Section 1961(a) does not say 'final judgment,' it says 'money judgment.'"); *Perficient, Inc. v. Munley*, 43 F.4th 887, 890–91 (8th Cir. 2022) ("[A] judgment awarding damages but not specifying the amount may still be considered final if only ministerial tasks in determining damages remain. . . . The determination of damages is ministerial where it requires no independent legal judgment." (cleaned up)).  Indeed, it was clear what the Court meant by the full judgment amount in the judgment entered on June 11.  As a result, the post-verdict interest accrued through June 11, 2024.  This means that post-verdict interest accrued over 48 days.[8]

Having determined that the post-verdict interest accrued across the 48 days between the jury's verdict and the original judgment and that $10,275,523.29 is eligible

---

[8] CRC calculates 47 days, presumably by omitting the final day on which the Court entered judgment from its calculation.  However, it is the Court's practice to include the final day in its post-verdict calculations.  *See, e.g.*, *Steady State*, 2023 WL 4203162, at *9.

for post-verdict interest, the Court finds that McDougall is entitled to $135,130.169 in post-verdict prejudgment interest.[9]

Taking pre-verdict and post-verdict interest together then, the total amount of prejudgment interest that McDougall is entitled to under § 549.09 is $2,660,653.46. Pursuant to Rule 59(e) of the Federal Rules, the Court will amend the final judgment to add that amount to the verdict awarded by the jury. The final judgment will thus be amended to be $10,410,653.46.[10]

### B. Post-Judgment Interest

The parties do not dispute applying post-judgment interest to the judgment pursuant to 28 U.S.C. § 1961(a), which provides that [i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." Post-judgment interest is mandatory and governed by federal law. *Travelers Prop. Cas. Inc. Co. of Am. v. Nat'l Union Ins. Co. of Pittsburg*, 735 F.3d 993, 1007–08 (8th Cir. 2013). Post-judgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the

---

[9] This sum is calculated by dividing 10% of the principal, $10,275,523.29, by 365 days to get a daily post-verdict interest amount of $2,815.21186. The daily post-verdict interest amount is then multiplied by 48 days to reach the post-verdict interest amount of $135,130.169.

[10] This sum is computed by adding the $7,750,000 jury award, $2,525,523.29 in pre-verdict interest, and $135,130.169 in post-verdict interest for a total of $10,410,653.46.

judgment." 28 U.S.C. § 1961(a).  Interest is computed daily to the date of payment and compounded annually.  28 U.S.C. § 1961(b).

The parties agree that the post-judgment interest rate on the $7,750,000 jury award is 5.12%, which was the weekly average 1-year constant maturity Treasury yield for the week before the June 11, 2024, judgment.  However, the parties disagree on whether an additional interest rate should apply if prejudgment interest and costs are added to the jury award.  CRC argues that any hypothetical amended judgment awarding prejudgment interest and costs should be subject to a different interest rate, which cannot yet be determined because the post-judgment interest rate depends on the entry of such amended judgment.  *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, No. 3:15-547, 2023 WL 6393157, at *5 (E.D. Tenn. Sept. 29, 2023) (calculating post-judgment interest based on different rates for the verdict judgment and the amended judgment including prejudgment interest).

Despite CRC's well-taken claim, the Court will apply a single post-judgment interest rate.  This conclusion aligns with the Eighth Circuit's logic in *Jenkins v. Missouri*, where the court held that a litigant is entitled to post-judgment interest on its attorney's fees from the date that the litigant becomes entitled to the award, rather than the date when the court quantifies the fees.  931 F.2d 1273, 1275–76 (8th Cir. 1991).  Further, the Court's conclusion aligns with the Supreme Court's holding in *Kaiser Aluminum & Chemical Co. v. Bonjorno*, where the court held that the language of § 1961 "directs that a single

applicable rate of interest be applied to the judgment."  494 U.S. 827, 838 (1990).

Applying *Jenkins* and *Kaiser* to this case, the Court finds that because post-judgment

interest is mandatory, *see Travelers*, 735 F.3d at 1008, McDougall became entitled to

post-judgment interest when the Court entered the June 11, 2024, judgment against CRC

for the full judgment amount, even though prejudgment interest was not yet quantified.

As a result, this Order's amendment to the judgment to quantify the prejudgment interest

does not require its own post-judgment interest rate.  Further, applying a single rate

aligns with previous court practices.  *See, e.g.*, *Selective Ins.*, 2024 WL 1886125, at *3;

*Schwendimann v. Arkwright Advanced Coating, Inc.*, No. 11-820, 2018 WL 3621206, at

*23 (D. Minn. July 30, 2018); *Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.*,

No. 97-2185, 2002 WL 31185884, at *11 (D. Minn. Sept. 27, 2002).  Accordingly, the post-

judgment interest rate of 5.12% will apply to the $7,750,000 jury award as of the June 11,

2024, judgment and will apply to the sum of the total jury award with pre-judgment

interest, $10,410,653.46, and costs as of the date of this Order, computing daily and

compounding annually until the judgment is satisfied.

*    *    *

In sum, the Court will grant McDougall's motion to amend the judgment to include

prejudgment and post-judgment interest in part.  The Court will order CRC to pay

McDougall $2,525,523.29 in pre-verdict prejudgment interest and $135,130.169 in post-

verdict prejudgment interest and will thus amend the judgment to be $10,410,653.46.

Additionally, the Court will order CRC to pay post-judgment interest at a rate of 5.12% starting from the June 11, 2024, judgment for the jury award and from the date of this Order for the jury award plus pre-judgment interest and costs, until the judgment is satisfied.

## CONCLUSION

Because the Court finds no ground warranting JMOL as sufficient evidence supports the jury's verdict in favor of McDougall on the design defect claim, the Court will deny CRC's Rule 50(b) motion. Because the Court finds no basis for granting a new trial on any of CRC's raised grounds, the Court will deny CRC's Rule 59 motion for a new trial. Because the Court finds no manifest errors of law and CRC does not present any new evidence, the Court will deny CRC's request to amend the judgment to be proportionate to the percentage of fault that the jury apportioned to CRC. Finally, the Court will grant McDougall's motion to amend the judgment to include prejudgment and post-judgment interest in part, as consistent with this opinion.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motions for Judgment as a Matter of Law, a New Trial, and Amended Judgment [Docket No. 312] are **DENIED**; and

2. Plaintiff's Motion to Alter/Amend/Correct Judgment [Docket No. 313] is **GRANTED in part**, as follows:

-43-

a. The Amended Judgment [Docket No. 310] is amended to be $10,410,653.46;

b. CRC is ordered to pay pre-verdict prejudgment interest in the amount of $2,525,523.29;

c. CRC is ordered to pay post-verdict prejudgment interest in the amount of $135,130.169; and

d. CRC is ordered to pay post-judgment interest at a rate of 5.12% starting from the June 11, 2024, judgment for the jury award and from the date of this Order for the jury award plus the prejudgment interest and costs, computing daily and compounding annually until the judgment is satisfied.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: November 26, 2024                       s/John R. Tunheim
at Minneapolis, Minnesota.                     JOHN R. TUNHEIM
                                               United States District Judge